UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, and INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually, and on behalf of all others similarly situated, | Civil Action No. 19-cv-1725-AT-BCM <br><br> Class Action <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> Jury Trial Demanded |
| Plaintiffs, | |
| v. | |
| CVS HEALTH CORPORATION, LARRY J. MERLO, DAVID M. DENTON, JONATHAN C. ROBERTS, ROBERT O. "ROCKY" KRAFT, AND EVA C. BORATTO | |

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ............................................................ 1

I.    JURISDICTION AND VENUE ....................................................................... 11

II.   PARTIES ......................................................................................................... 12

    A.    Lead Plaintiffs ...................................................................................... 12

    B.    Defendants ............................................................................................ 13

III.  CONFIDENTIAL WITNESSES ..................................................................... 15

IV.   SUBSTANTIVE ALLEGATIONS ................................................................. 23

    A.    Background of CVS Health .................................................................. 23

    B.    The Acquisition .................................................................................... 25

    C.    CVS Health Touts the Acquisition ...................................................... 28

    D.    Defendants Structured the Integration of the Omnicare LTC Business
        to Allow Them to Conceal Any Decline that Business ........................... 34

    E.    The Omnicare LTC Business Hemorrhages Customers During the
        Class Period .......................................................................................... 39

        i.    Customers Losses at the Omnicare LTC Business Exploded
            After the Acquisition ................................................................ 40

        ii.   CVS Health's Poor Customer Service Drove Customers Away ....... 46

        iii.  CVS Health's "Synergies" Drove Customers Away ......................... 48

        iv.   Former Omnicare and CVS Health Employees Were Poaching
            Customers from the Omnicare LTC Business .................................. 54

        v.    Omnicare LTC Business Customers were Intentionally Defaulting
            on Contracts to Get Away from CVS Health .................................... 56

    F.    The Individual Defendants Had Actual Knowledge of the Actual
        Condition of the Omnicare LTC Business Throughout the Class
        Period .................................................................................................... 56

    G.    Defendants Concealed the Problems in the Omnicare LTC Business to
        Ensure that Those Problems Would Not Interfere with the Company's
        Acquisition of Aetna ............................................................................. 60

    H.    The Individual Defendants Reaped Windfall Profits By Trading in
        Inflated CVS Health Shares During the Class Period ............................. 71

    I.    CVS Health's Share Price Plummets After It Announces the
        Goodwill Writedown ............................................................................. 76

V.    DEFENDANTS' MATERIALLY FALSE  AND MISLEADING
    STATEMENTS DURING THE CLASS PERIOD ............................................. 78

|     | A. | Defendants' Statements Concerning the Financial Performance of the Omnicare LTC Business During the Class Period Were False and Misleading ................................................. 79 |
|     | B. | Defendants Falsely Represented That CVS Health Understood Omnicare LTC Customers' Needs and Were Meeting Those Customers' Service Requirements ............................................. 92 |
|     | C. | CVS Health Failed to Disclose the Material Fact That Its Pursuit of "Synergies" Were Driving Customers Away From the Omnicare LTC Business .......................................................... 95 |
|     | D. | Defendants' Representations Concerning the Condition of the Omnicare LTC Business Were False and Misleading ........................... 101 |
|     | E. | CVS Health's Disclosures Concerning the Value of the Goodwill of the Omnicare LTC Business Were False and Misleading ................. 108 |
|     | F. | The Company's Quarterly and Annual Reports Statements Concerning the Potential for Future LTC Customer Retention, Acquisition Integration, and Goodwill Impairment Problems Were False and Misleading ................................................................... 115 |
|     | G. | Defendants Merlo and Denton's Certifications Attached as Exhibits to the Company's Quarterly and Annual Reports Were False and Misleading ................................................................... 119 |
| VI. | | THE TRUTH BEGINS TO EMERGE .................................................. 122 |
| VII. | | ADDITIONAL SCIENTER ALLEGATIONS ....................................... 124 |
| VIII. | | NO SAFE HARBOR ........................................................................... 126 |
| IX. | | CLASS ACTION ALLEGATIONS ...................................................... 127 |
| X. | | APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS ...................... 129 |
| XI. | | LOSS CAUSATION ........................................................................... 130 |
| | | CAUSES OF ACTION ....................................................................... 131 |
| | | COUNT II .......................................................................................... 134 |
| | | DEMAND FOR JURY TRIAL ............................................................ 136 |

Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust and the International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware  ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to each Plaintiff and each Plaintiff's own acts, and information and belief as to all other matters, based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CVS Health Corporation ("CVS Health" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Counsel for Plaintiffs has conducted extensive due diligence in preparation of this Amended Class Action Complaint ("Complaint"). Plaintiffs, among other things, retained the services of an independent investigation firm with extensive investigative experience, which made significant efforts to identify, locate, contact and interview former employees of Defendants and Omnicare, Inc. ("Omnicare") with potentially relevant information to the Company's acquisition of Omnicare.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant CVS Health Corporation ("CVS Health" or the "Company") securities between February 9, 2016 and February 20, 2019, both dates inclusive (the "Class Period").  This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      CVS Health was founded in 1963 and is headquartered in Woonsocket, Rhode Island.  The Company was formerly known as CVS Caremark Corporation and changed its name to CVS Health Corporation in September 2014.  CVS Health, together with its subsidiaries, provides integrated pharmacy health care services, operating through its Pharmacy Services and Retail/LTC segments.

3.      As of March 31, 2019, CVS Health had 25 retail specialty pharmacy stores, 20 specialty mail order pharmacies and 90 branches for infusion and enteral services.  Its "Retail/LTC segment" sells prescription drugs, over-the-counter drugs, beauty products and cosmetics, personal care products, convenience foods, seasonal merchandise, and greeting cards, as well as offers photo finishing services.  The Company has approximately 9,900 retail stores in forty-nine states, the District of Columbia, Puerto Rico, and Brazil.  The Company also has 156 long-term care ("LTC") pharmacies in 46 states and one LTC repackaging facility.

4.      On May 20, 2015, CVS Pharmacy, Inc. ("CVS Pharmacy"), a wholly owned subsidiary of CVS Health, entered into an Agreement and Plan of Merger (the "Merger Agreement") to acquire Omnicare, a provider of pharmaceuticals and related pharmacy services to LTC facilities and provider of specialty pharmacy and commercialization services for the bio-pharmaceutical industry (the "Acquisition").  According to CVS Health's SEC filings, upon the effective date of the Acquisition, each share of common stock, par value $1.00 per share, of Omnicare would be converted into the right to receive $98.00 in cash, or approximately $10.6 billion in the aggregate.  In addition, CVS Pharmacy would assume approximately $2.3 billion in debt of Omnicare.

5.     When the Acquisition was announced, CVS Health touted that it would "significantly expand [the Company's] ability to dispense prescriptions in assisted living and long term care facilities, serving the senior patient population."  CVS Health's Chief Executive Officer, Defendant Larry Merlo, boasted that "[t]he acquisition of Omnicare significantly expands our business, providing CVS Health access into a new pharmacy dispensing channel . . . . It also creates new opportunities for us to extend our high-quality, innovative pharmacy programs to a broader population of seniors and chronic care patients."

6.     On August 18, 2015, the Acquisition closed.  CVS Health acquired 100% of the outstanding common shares and voting interests of Omnicare for $98 per share for a total of $9.6 billion and assumed long-term debt with a fair value of approximately $3.1 billion, for a total of $12.7 billion.  Additionally, holders of Omnicare restricted stock units and performance based restricted stock units received 738,765 CVS Health restricted stock awards with a fair value of approximately $80 million as replacement awards.  According to CVS Health's SEC filings, the Company acquired Omnicare to expand its operations in dispensing prescription drugs to assisted-living and LTC facilities, and to broaden its presence in the specialty pharmacy business as it sought to serve a greater percentage of the growing senior patient population in the United States.  After the Acquisition closed, Omnicare's operations were folded into CVS Health's Retail Pharmacy reporting segment, which was renamed the "Retail/LTC" reporting segment. The Company's LTC business within the Retail/LTC segment is referred to in this Complaint as the "Omnicare LTC business."

7.     In the first quarterly financial report that the Company filed with the SEC after the Acquisition, which was for the third quarter of 2015, CVS Health highlighted how its newly acquired LTC business was thriving and benefitting CVS Health's bottom line.  The Company

claimed that revenues for its Retail/LTC segment had increased "6.9%, or $1.2 billion, to $17.9 billion" and that "[a]pproximately *half of the increase was driven by the addition of LTC operations* acquired as part of the Omnicare acquisition in August 2015."  The company also boasted that its reporting segments "*benefited from the Omnicare acquisition*."

8.      Although the Company continued touting the Acquisition for months after it closed, investors could not look behind those claims to understand how the business was operating. This was because, rather than establish a new reporting segment for its Omnicare LTC business, Defendants folded that business into the Company's much larger Retail segment. Defendants combined the Omnicare LTC business, which had reported approximately $4.8 billion in revenues in the year before the Acquisition, with the Company's Retail segment, which had reported approximately *$68 billion* in revenues the year before the Acquisition.  As a result, investors could not tell from the Company's financial filings whether the Omnicare LTC business was performing well or declining, because the Company could mask any declines in the performance of its much larger retail business.

9.      Defendants further concealed the performance of the Omnicare LTC business by causing the Company to file quarterly and annual reports that did not comply with Rule 5-02.3 of Regulation S-X.  Rule 5-02.3 requires reporting companies to break down "accounts receivable" on balance sheets into the sub-types of those receivables.  Indeed, prior to the Acquisition, Omnicare had broken down its accounts receivable as required by the rule.  Defendants, however, caused the Company to report its accounts receivable as a single number and ignored how Omnicare had previously disclosed accounts receivable.  The Company's financial reports were not filed in compliance with Rule 5-02.3 until the SEC sent the Company a comment letter demanding to know why it was not complying with the rule.

10.     When the Company disclosed its earnings for the full 2016 year, it again touted that it was a force within the LTC industry.  In its annual report to investors, Defendant Merlo wrote, "[f]rom our nationwide retail footprint to our leading pharmacy benefits management (PBM) and specialty businesses, ***and now our leading presence in long-term pharmacy care***, we have forged a competitive advantage that is helping us benefit from a broad range of market trends."  The Company continued to tout the performance of the Omnicare LTC business for nearly the next two years, telling investors that the business was performing well, that the Company had identified and capitalized on various "synergies" to improve the business, and that it understood its LTC customers' needs and was providing excellent customer service.

11.     But none of this was true.  What Defendants knew, but concealed, was that the Company's Omnicare LTC business was hemorrhaging customers as a result of "synergies" implemented by CVS Health that drove customers away, poor customer service and poaching by former Omnicare and/or CVS Health employees.  For example, CW13 stated that the Omnicare LTC business lost an enormous number of accounts covering approximately 90% of the beds serviced in New York because the Omnicare LTC business was run as a retail operation that ignored customer service and relationships.  As a result, former employees, who now worked for competing LTC pharmacy service providers, easily took enormous numbers of accounts from the Omnicare LTC business.  CW described how former Omnicare employee Michael Rosenblum "singlehandedly closed Omnicare out of upstate New York" by poaching virtually all of Omnicare's LTC clients for Rosenblum's new employer, PharmScript.

12.     In fact, LTC customers were so eager to leave the Omnicare LTC business that they were *intentionally defaulting on contracts* in the hopes that CVS Health would cancel those agreements, which would allow the customers to move to competing LTC pharmacy service

providers.  According to CW14, "this was how nursing home owners would get out of their contracts with Omnicare because they no longer wanted to do business with Omnicare.  They just stopped paying their bills."

13.    Even though they knew that the business was declining, Defendants nevertheless continued to tout the Omnicare LTC business.  In December 2016, for example, Defendant Denton, then CVS Health's chief financial officer, claimed that the Omnicare LTC business would be a profit center for the Company for years to come, saying that CVS Health had a "leadership position in long-term care with Omnicare," and "as the number of frail adults rises with an aging population, the need for long-term care services and support will grow as well."

14.    By the fall of 2017, however, the Company desperately needed to defend itself against a powerful new entrant into the retail pharmacy space:  Amazon Inc. ("Amazon").  Amazon had recently been granted permission to operate pharmacies in certain jurisdictions, which presented a grave threat to CVS Health.  To counter Amazon's pending entry into the pharmacy business, CVS Health was preparing to announce the acquisition of insurance provider Aetna, Inc. ("Aetna").   With the announcement looming, Defendants had to make some disclosure regarding the problems in the Omnicare LTC business.  Defendants knew, however, that disclosing the full extent of the decline of the business, particularly the customer losses caused by poor customer service, a failure to implement "synergies," poaching by former employees and intentional defaults, could jeopardize the acquisition of Aetna (the "Aetna Acquisition").

15.    Full disclosure of the problems in the Omnicare LTC business would, for example, suggest that Defendants could not integrate Aetna into CVS Health.  Analysts and investors knew that integrating Aetna would present significant challenges for Defendants,

6

because Aetna operated in an entirely different market from CVS Health. Aetna was also a huge business, with over *$60 billion* in revenues the previous year. Defendants knew that if they fully disclosed the problems in the Omnicare LTC business, investors would question how they could hope to successfully integrate the $60 billion Aetna business when Defendants had failed to integrate the $4.8 billion Omnicare business.

16.     Defendants also knew that fully disclosing the state of the Omnicare LTC business could have an effect on CVS Health's investment grade credit rating. Defendants knew that CVS Health would need to issue $40 billion in bonds — the third largest corporate bond issuance ever — to fund the Aetna Acquisition (the "Aetna Notes"). A downgrade of the Company's credit prior to issuing those bonds could make it much more expensive to issue the bonds, or preclude the Company from issuing them at all.

17.     Defendants knew that the Aetna Acquisition was essential to the Company's survival, because if it failed the Company would be vulnerable to competition from Amazon. Defendants thus embarked on a plan to dribble out incomplete disclosures of the problems in the Omnicare LTC unit so that the acquisition of Aetna could proceed.

18.     Defendants made sure, however, that they reaped windfall profits before initiating their "dribble out" strategy. On September 13, 2017, for example, Merlo exercised stock options and sold 241,150 shares of the Company, reaping proceeds of over $20 million. Similarly, on September 11, 2017, Denton exercised stock options and sold 237,078 shares of the Company, reaping proceeds of $18.9 million. Finally, on September 18, 2017, Roberts exercised stock options and sold 85,743 shares of the Company, reaping proceeds of over $7 million alone. The proceeds of this sale nearly equaled the proceeds of Merlo's eight prior stock sales in the Class Period combined. The sudden spike in stock sales by Defendants Merlo, Denton and Roberts

was so pronounced that it attracted the attention of the financial press.  On September 22, 2017, Barron's Online published an article questioning why CVS Health insiders appeared to be dumping their stock when the Company was concurrently telling investors, "[w]e see significant opportunity for long-term growth."  *See* Lin, Ed, *CVS Insiders Sell $100 Million in Stock*, Barron's Online, Sep. 22, 2017, https://www.barrons.com/articles/cvs-insiders-sell-100-million-in-stock-1506081167.

19.     After selling large blocks of shares, the Defendants then commenced "dribbling out" disclosures.  First, on November 6, 2017, in its quarterly report for the third quarter of 2017, Defendants caused the Company to disclose that the value of the "goodwill" of the Omnicare LTC business, which had previously exceeded the carrying costs of that business by 7%, now only exceeded those carrying costs by 1%.  Defendants attributed the decrease to weaknesses in the LTC industry, including "customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities" and, euphemistically, client retention rates." Defendants did not disclose, however, that the Omnicare LTC business was hemorrhaging customers, that the "synergies" Defendants had promised to realize were driving customers *away*, that the business was plagued by poor customer service, that customers were intentionally defaulting on contracts, and that former employees were poaching enormous amounts of LTC business.  After the disclosure, CVS Health's stock price fell from $69.25 per share to $66.80 per share, a decline of 3.5%.

20.     Defendants' strategy worked.  On December 3, 2017, the Company announced that it had entered into an agreement to purchase Aetna.  Four months later, in March 2018, the Company successfully funded the Aetna Acquisition by issuing $40 billion in bonds.  Later, Aetna's shareholders approved the Aetna Acquisition.

21.     With the Aetna Acquisition awaiting approval from the United States Department of Justice ("DOJ"), Defendants entered Phase II of their "dribble out" plan.  On August 8, 2018, as it announced its financial and operating results for the second quarter of 2018, Defendants had the Company disclose that its annual test for impairment of "goodwill" of the Omnicare LTC business showed that "the fair value of the [Omnicare LTC business] was lower than the carrying value, resulting in a ***$3.9 billion pre-tax goodwill impairment charge***," and the remaining goodwill balance for its Omnicare LTC business was approximately $2.7 billion.  Defendants attributed the impairment to softening in the LTC industry and "client retention issues." Defendants misleadingly tempered this disclosure by insisting that the "challenges" in the Omnicare LTC business were manageable and outlining a plan to address those problems, which included replacing the entire Omnicare LTC business management team and improving customer service.

22.     The "dribble-out" strategy worked again.   The DOJ approved the Aetna Acquisition in October 2018, and on November 28, 2018, CVS Health announced that the Aetna Acquisition had closed.  In addition, Defendants' dribble-out strategy kept the Company's stock price artificially inflated, and enabled Defendants to reap windfall profits by selling their shares at those inflated prices during the Class Period.

23.     Defendants then wrapped up their "dribble-out" plan on February 20, 2019, when the Company announced its fourth quarter and full year financial and operating results and provided 2019 full year guidance.  CVS Health advised investors that adjusted earnings in 2019 would be $6.68 to $6.88 per share, compared with the $7.36 average of market estimates, citing rising costs and poor results related to the Company's Omnicare LTC business.  Specifically, the Company disclosed that its LTC business "has continued to experience challenges that have

impacted management's ability to grow the business at the rate that was originally estimated when we made the acquisition of Omnicare." The Company further disclosed that it had conducted an impairment test on the value of the "goodwill" of its LTC business, and that the test showed that the Company needed to write down the value of the goodwill of the LTC business by *$2.2 billion*.

24.     When combined with the Company's prior goodwill writedown of the Omnicare LTC business of $3.9 billion, the Company's $2.2 billion writedown meant that, in the space of only six months, it had written down the value of that business by *$6.1 billion*, or nearly half the $12.7 billion purchase price it had paid for Omnicare. After this writedown, the total amount of goodwill for the Omnicare LTC business was only *$432 million*.

25.     The market was thunderstruck by the disclosure of the additional $2.2 billion writedown. In an analysis of the disclosure, a Wells Fargo analyst wrote, "*[w]e were surprised that the . . . charge taken in Q2 2018 wasn't the bottom for this business*." On the Company's earnings call the day the writedown was announced, a Cowen Equity Research analyst noted incredulously, "*[y]ou've kind of written off maybe upwards of half of the value of what you kind of put into [the Omnicare LTC business]* initially when you consider the debt you took on as well." On the same call, a JPMorgan analyst asked pointedly, "*[i]s Omnicare strategic to the company going forward*?"

26.     Following this news, CVS Health's stock price fell by $5.66 per share, or slightly over 8%, to close at $64.22 per share on February 20, 2019. Then, as the market digested the goodwill impairment and recognized the true value of the Omnicare LTC business, CVS Health's share price plummeted even further over the next several days before hitting bottom at $52.36 on March 7, 2019, a decline of over 25%. These declines were attributable to the

disclosure to investors of the goodwill impairment and thus the true financial condition, historical performance and value of the Omnicare LTC business.

27.     As set forth in this Complaint, Defendants concealed the true performance of the Omnicare LTC business by combining it with the Retail/LTC segment, dribbling out incomplete and misleading disclosures about write-downs in goodwill, and making false and/or misleading statements and/or omissions about the financial condition, historical performance and value of the Omnicare LTC business.

28.     Specifically, Defendants made false and/or misleading statements and/or failed to disclose substantial problems in the Omnicare LTC business, including that: (i) "synergies" implemented by CVS Health after the Acquisition were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health, and (v) as a result, CVS Health's public statements were materially false and misleading at all relevant times.

29.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## I.     JURISDICTION AND VENUE

30.     The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, codified at 15 U.S.C. § 78aa.

32.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who continuously and systematically transacts business within this Judicial District or has sufficient minimum contacts with this Judicial District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.  The Company has operated and continues to operate dozens of retail stores in this Judicial District, and the Individual Defendants do, or did during the relevant time period, exercise authority over those retail stores.

33.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  CVS Health securities trade on the NYSE, located within this Judicial District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

34.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of a national securities exchange.

## II.     <u>PARTIES</u>

### A.  Lead Plaintiffs

35.     Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust, as set forth in its previously filed Certification (ECF No. 26),[1] acquired CVS Health securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

---

[1] Although the Class Period is narrower than the class period alleged in the original complaint, all of Plaintiffs' purchases of CVS Health shares in their previously filed certifications were made during the Class Period alleged in this amended complaint.

36.     Plaintiff International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, as set forth in its previously filed Certification (ECF No. 11), acquired CVS Health securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**B.  Defendants**

37.     Defendant CVS Health is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island.  CVS Health's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CVS."

38.     Defendant Larry J. Merlo ("Merlo") served as CVS Health's President and Chief Executive Officer ("CEO") at all relevant times.  Merlo has been CVS Health's President and CEO from March 2011 to the present.  Previously, Merlo was President and Chief Operating Officer ("COO") of CVS Health from May 2010 through March 2011; President of CVS Pharmacy, Inc. ("CVS Pharmacy") from January 2007 through August 2011; Executive Vice President ("EVP") of CVS Health from January 2007 through May 2010; and a director of CVS Health from May 2010 to present.

39.     Defendant David M. Denton ("Denton") was CVS Health's EVP and Chief Financial Officer ("CFO") at all relevant times.  Denton was the Company's EVP and CFO since January 2010 to November 2018.   Prior to that he was Senior Vice President and Controller/Chief Accounting Officer of CVS Health from March 2008 until December 2009.  He is currently the Executive Vice President and CFO of Lowe's Companies, Inc.

40.     Defendant Jonathan C. Roberts ("Roberts") was the President of CVS Caremark from 2012 to March 2017, when he was appointed as CVS Health's EVP and Chief Operating Officer.  Roberts joined the Company in 1991. Prior to his appointment as president of CVS Caremark in 2012, he served as chief operating officer of the Company's PBM business; EVP of

13

pharmacy purchasing, pricing and network relations; senior vice president and chief information officer; among many other leadership roles at the Company.

41.     Defendant Robert O. "Rocky" Kraft ("Kraft") was EVP of CVS Health and President – Omnicare from August 2015 to October 2017.  Kraft was previously Senior Vice President and Chief Financial Officer of Omnicare, Inc. from September 2012 through August 2015 and Senior Vice President – Finance of Omnicare from November 2010 through September 2012.  Kraft is currently the CFO and Treasurer of The Hillman Companies, Inc. and The Hillman Group, Inc.

42.     Defendant Eva C. Boratto ("Boratto") has been CVS Health's EVP and CFO from November 2018 to present.  Boratto joined CVS Caremark in 2010 as Senior Vice President for pharmacy benefit management ("PBM") finance.  Boratto served also as Senior Vice President and Chief Accounting Officer for CVS Caremark, which became CVS Health in 2014, from 2013 to 2017.

43.     Collectively, Defendants Merlo, Denton, Roberts, Kraft and Boratto are referred to throughout this Complaint as the "Individual Defendants."

44.     The Individual Defendants, because of their positions as Executive Officers of CVS Health, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market.  The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.

45.     Because of their positions with the Company and access to material non-public information available to them but not to the public, all the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.   The Individual Defendants are liable for the false statements pleaded herein.

### III.   CONFIDENTIAL WITNESSES

46.     In connection with its investigation of this matter, Plaintiffs interviewed a number of former CVS Health or Omnicare employees identified herein as confidential witnesses ("CWs").  All confidential witnesses are referred to in the masculine to protect their identities.

47.     CW1 worked for Omnicare as a consultant pharmacist and continued working for CVS Health after the Acquisition before leaving in late 2015 or early 2016.  As a consultant pharmacist for the Omnicare LTC business, CW1 was responsible for collaborating with LTC facility leaders and staff to coordinate pharmaceutical services.  Among other things, CW1 assisted LTC facility leaders and staff in identifying, evaluating and addressing pharmacy-related concerns, including compliance with federal regulations, clinical reviews, adoption of programs and service offerings.  CW1 covered seven Catholic Health Services ("CHS") facilities for the Omnicare LTC business in South Florida.

48.     CW2 was a consultant pharmacist with Omnicare from 1990 to 2014.  As a consultant pharmacist in the Omnicare LTC business, CW2 was responsible for collaborating with LTC facility leaders and staff to coordinate pharmaceutical services within LTC facilities. Among other things, CW2 assisted LTC facility leaders and staff in identifying, evaluating and addressing pharmacy-related concerns, including compliance with federal regulations, clinical reviews, adoption of programs and service offerings.  He also served for a time as the primary point of contact for LTC facilities.  Although CW2 left Omnicare prior to it being acquired by

15

CVS Health, CW2 has kept in contact with individuals who remained with CVS Health after the acquisition.  CW2 also has a close relationship with a former high-ranking executive of Omnicare, who is now the CEO of Remedi SeniorCare ("Remedi"), an LTC pharmacy provider that competes with the Omnicare LTC business.

49.    CW2 serviced over 100 LTC facilities for Omnicare in Ohio.  CW2 said that when an LTC client would notify an Omnicare pharmacy that it intended to discontinue its relationship with Omnicare, the pharmacy would notify Omnicare's corporate headquarters. High-ranking executives at Omnicare's corporate headquarters would then demand an explanation from the Omnicare employees responsible for the account.  CW2 also regularly attended meetings of all Omnicare pharmacy managers in the area where loss of accounts and contract status were discussed.  Losses of accounts were reported up to the highest levels of Omnicare.  CW2 believes the notification process and meetings continued after the Acquisition.

50.    CW3 was a staff pharmacist with Omnicare, and later the Omnicare LTC business, in Sarasota Springs, New York, from 2004 until September 2015, where he was responsible for filling prescriptions.  CW3's location serviced approximately 180 skilled nursing and assisted living facilities.  CW3 stated that every Omnicare LTC pharmacy submitted quarterly reports to its regional manager, who discussed those reports with executives on conference calls.

51.    CW4 worked for nine years as consultant pharmacist for Omnicare before leaving in 2007.  As a consultant pharmacist in the Omnicare LTC business, CW4 was responsible for collaborating with LTC facility leaders and staff to coordinate pharmaceutical services within LTC facilities.  Among other things, CW4 assisted LTC facility leaders and staff in identifying, evaluating and addressing pharmacy-related concerns, including compliance with federal

regulations, clinical reviews, adoption of programs and service offerings.  CW4 is currently a senior level clinical pharmacist in the LTC industry.  He maintains relationships with many current and former employees of Omnicare or the Omnicare LTC business.

52.    CW5 was the director of public relations for Omnicare and later the Omnicare LTC business from 2014 until 2016, when he declined an offer to work for CVS Health in Rhode Island.

53.    CW6 was a consultant pharmacist with Omnicare and later the Omnicare LTC business from August 2008 to June 2016.  CW6 currently works for Polaris Pharmacy Services ("Polaris"), a Fort Lauderdale, Florida, LTC pharmacy services provider formed by executives from Omnicare who were terminated after the Acquisition.  As a consultant pharmacist, CW6 coordinated pharmaceutical services and handled customer service at LTC facilities serviced by Omnicare and later the Omnicare LTC business.  He also assisted LTC facilities in complying with state regulations.

54.    CW7 began working as a clinical consulting pharmacist for Omnicare and later the Omnicare LTC business from 2000 until April 2016, when he left because he was disturbed by CVS Health's poor clinical practices.  As a clinical consulting pharmacist, CW7 was responsible for collaborating with LTC facility leaders and staff on coordinating pharmaceutical services within LTC facilities as well as developing and maintain relationships with facilities. He was also the primary contact for facility staff to discuss treatments.  During his time at Omnicare and the Omnicare LTC business, CW7 reported to a state manager at Omnicare responsible for accounts in New York and/or a regional manager of Omnicare's eastern region. CW7 handled eight accounts totaling 800 to 1,000 beds.

55.     CW8 worked as director of human resources for the west region of Omnicare. CW8 joined Omnicare in approximately March 2015 and left approximately one year later, in spring 2016.  CW8 initially reported to the vice president of human resources, who left during the Acquisition, then supported the Omnicare LTC west region general manager, who reported to Defendant Kraft.

56.     CW9 was a district manager for the Omnicare LTC business in Southern California in 2015 and then became a district manager in St. Louis, Missouri, from 2016 to 2018. While in Southern California, CW9 was responsible for approximately five Omnicare LTC pharmacies.  In St. Louis, he supervised approximately seven Omnicare LTC pharmacies spread over Kansas, Iowa, Southern Illinois and Missouri.  CW9 was responsible for operations and customer service at those pharmacies.

57.     CW9 described the reporting structure in the Omnicare LTC business.  In that business, "pharmacy managers" or "general managers" reported to "district managers" or "district directors."  The district managers/directors reported to "regional managers" or "regional vice presidents," who reported to Defendant Kraft.  Defendant Kraft reported to Defendants Merlo, Denton and Roberts.  CW9 said that the Omnicare LTC business used a tool called "SalesForce" to track customers, including customer performance and losses of accounts.  All Omnicare LTC employees, as well as the Individual Defendants, had access to SalesForce.  CW9 also participated in weekly calls with the business development group in the Omnicare LTC business to discuss customers who were unsatisfied with CVS Health or were in danger of moving their accounts to a competing LTC pharmacy services provider.  Omnicare LTC district managers and the vice president of business development participated in these calls.

58.     CW10 worked as an Omnicare regional director for nearly 30 years. Omnicare was organized into regions, each of which was overseen by a regional manager, director or vice president, who reported to Defendant Kraft.   CW10 managed all of Omnicare's pharmacies in Missouri, Kansas, and Southern Illinois.   He left Omnicare in June 2015, shortly after the Acquisition was announced.

59.     CW11 was a consultant pharmacist and software manager for Omnicare for 20 years before he left in 2014.   As a consultant pharmacist, CW11 made in-person visits to LTC facilities and checked documentation concerning prescriptions.   He maintains relationships with many current and former employees of Omnicare and/or the Omnicare LTC business.   CW11 currently works for Skilled Care Pharmacy ("Skilled Care") in Mason, Ohio.

60.     CW12 was an area manager with Omnicare in upstate New York from 2003 until May 2014.   From 2003 to 2011, CW12 managed Omnicare's relationships with LTC facilities in Albany, Utica, Buffalo and Rochester.   From 2011 to 2014, CW12 performed a similar role for the Syracuse area.   CW12 reported to Omnicare regional vice president Paul Jacques, and later to Omnicare regional vice president Steve Rappa.   As an area manager, CW12 participated in weekly conference calls with his managers on Fridays.   Senior management was aware of these calls and would participate in some of the calls, including Omnicare regional CFOs.   After he left Omnicare, CW12 began working for Wayne's Drugs ("WD") in Oswego, New York, which was affiliated with Harbor Pharmacy ("Harbor"), an LTC service provider in Syracuse.   After working with WD for 18 months, CW12 joined Specialty RX ("Specialty"), another LTC service provider.   CW12 is now a vice president with ProCare LTC, an LTC pharmacy in New York and Connecticut.

61. CW13 worked as a Pharmacy Operations Manager at MedWorld, an Omnicare LTC affiliate in New York, from 1995 to 2014. Since leaving MedWorld, CW13 has maintained relationships with his former colleagues at Omnicare, CVS Health and the LTC industry in general.

62. CW14 worked as a General Manager for MedWorld, an Omnicare LTC affiliate in New York, from 1998 to 2017. CW14 started working for MedWorld in 1988 as a pharmacy technician, and began working for Omnicare through MedWorld when Omnicare acquired MedWorld in 1998. CW14 became a supervising pharmacist in 2002 and a general manager in June 2016. As a supervising pharmacist and general manager, CW14 was responsible for operating the MedWorld pharmacy where he worked. CW14 reported to Michael Rosenblum, who was let go from MedWorld in June 2013, then to Tony Russo, a general manager and regional director for Omnicare and later the Omnicare LTC business, and finally to Steve Rappa, a regional vice president of Omnicare and later the Omnicare LTC business. CW14 left MedWorld in January 2017, and the location where he worked was closed two months later. CW14 currently works for a LTC pharmacy called Prescription Center.

63. CW14 would have regular calls with his supervisor (*i.e.*, Russo or Rappa). On these calls, CW14 would provide reports on MedWorld's financial performance, including identifying customer losses. CW14 also participated in weekly calls with the account management team to discuss gains and losses during which "[w]e spent more time talking about losing business than we did trying to save or get new business." On these calls, CW14's supervisors would also pass on directives that the supervisors had received on their calls with Defendant Kraft and other upper management at Omnicare and/or CVS Health.

64.     CW14 said that his supervisors had monthly calls with 15 to 20 other general managers in the Omnicare LTC business to discuss, among other things, pharmacy performance and customer losses.   Omnicare LTC supervisors, including CW14's supervisors, also had regular calls with Defendant Kraft and other upper management at Omnicare and CVS Health. CW14 described how all CVS Health upper management, including the Individual Defendants, had access to sales data, including data on customer losses, via CVS Health's internal computer network, and from monthly spreadsheets describing pharmacy performance that were disseminated across CVS Health as well.   CW14 described the "SalesForce" software that the Omnicare LTC business used to tracked customers, including customer performance and losses.

65.     CW15 was the CFO of the Omnicare LTC distribution center in Toledo, Ohio, and manufacturing operation in Glasgow, Kentucky, from 2008 to December 2015.   CW15 reported to Jim Cialdini, the vice president of operations for Omnicare, and later to Defendant Kraft.   CW15 said that every Omnicare LTC pharmacy was responsible for tracking its customers' contract status and billings.   This data was rolled into reports for regional managers, who passed the information up to senior management at CVS Health.   When an Omnicare LTC customer was threatening to leave or had put the Omnicare LTC business on a "corrective action plan," this information was reported in emails and during conference calls to the general managers of the pharmacies involved as well as the Omnicare LTC regional vice presidents, who reported to Defendant Kraft.

66.     CW16 was a regional vice president with Omnicare and later the Omnicare LTC business from March 2011 to late 2016.   CW16 started as a regional vice president in the Cincinnati region, where he covered 30 pharmacies in over 12 states.   He then moved to the West Coast region, where he oversaw all of Omnicare's and the Omnicare LTC business's

21

pharmacies "from Colorado to the Pacific Ocean" from 2014 until 2016.  After the Acquisition, CW16 reported to Defendant Kraft.  CW16 said he participated in weekly conference calls with Omnicare and CVS Health executives including Defendant Kraft, where losses, client retention rates, client account status, and client contracts were discussed.

67.     CW17 was Chief Tax Counsel for Omnicare from March 2011 until August 2016. According to CW17, Defendant Kraft had access to weekly operations reports that reported Omnicare LTC sales levels region by region.  CW17 also said that, at month end, Defendant Kraft received reports that were "roll-ups" of the month's weekly reports.  After the Acquisition, Defendant Kraft reported to Defendants Merlo and Denton.  Defendant Kraft met frequently with Merlo and Denton to discuss, among other things, the content of those reports.

68.     CW18 was the vice president of operations for Omnicare's Southeast Region.  In that role he oversaw 23 Omnicare LTC pharmacies.  CW18 left Omnicare in 2014 to join a competing LTC pharmacy services provider called Polaris in November 2015 as its chief operating officer.  CW18 said that Omnicare's internal controls mandated that any customer termination letter had to be reported to senior management the same day, up to and including the including the CEO.  CW18 believes that these reports continued after the Acquisition.

69.     CW19 was a consultant pharmacist for Omnicare and the Omnicare LTC business for 20 years before leaving CVS Health in October 2017.  As a consultant pharmacist, CW19 worked directly with LTC facilities and checked documentation concerning patients' prescriptions.  CW19 also described the Omnicare LTC business's "SalesForce" tool, which tracked customers, including customer performance and losses, and to which all Omnicare LTC employees had access.

## IV.    <u>SUBSTANTIVE ALLEGATIONS</u>

### A.  Background of CVS Health

70.    During all times relevant to the allegations in this Complaint, CVS Health had three reportable segments: Pharmacy Services, Corporate, and Retail/LTC.   Prior to the Acquisition closing on August 18, 2015, CVS Health also had three reportable segments: Pharmacy Services, Corporate, and Retail.

71.    The Company's Pharmacy Services segment generates revenue from PBM services, including "plan design offerings and administration, formulary management, retail pharmacy network management services, mail order pharmacy, specialty pharmacy and infusion services, Medicare Part D services, clinical services, disease management services and medical spend management."

72.    The Company's Corporate segment reflects the financial results for CVS Health excluding PBM and Retail/LTC, which consist of "[m]anagement and administrative expenses to support the overall operations of the Company" and "[p]roducts for which the Company no longer solicits or accepts new customers."

73.    The Company's Retail/LTC segment reflects sales of "prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs, beauty products, cosmetics and personal care products."   CVS Health's Retail/LTC segment derives most of its revenues through the sale of prescription drugs, which are dispensed by over 30,000 pharmacists. The Company claims to have an "integrated pharmacy services model" that enables it to "enhance access to care while helping to lower overall health care costs and improve health outcomes" and for which the role of front-line retail pharmacists is essential and has expanded "from primarily dispensing prescriptions to also providing services, including flu vaccinations as

well as face-to-face patient counseling with respect to adherence to drug therapies, closing gaps in care, and more cost-effective drug therapies."

74.     The Company's most recent annual report filed with the SEC on Form 10-K[2] stated that as of December 31, 2018, the Retail/LTC segment operated more than 9,900 retail locations, "filled approximately 1.3 billion prescriptions on a 30-day equivalent basis," and held "approximately 26% of the United States retail pharmacy market."

75.     The Company's Retail/LTC segment contains the Omnicare LTC business. The Company acquired the Omnicare LTC business in the Acquisition.  The Omnicare LTC business consists of providing "pharmacy consulting, including monthly patient drug therapy evaluations, to assist in compliance with state and federal regulations and provide proprietary clinical and health management programs," as well as "pharmaceutical case management services for retirees, employees and dependents who have drug benefits under corporate-sponsored health care programs."

76.     The Company's Omnicare LTC customers "consist of skilled nursing facilities, assisted living facilities, independent living communities, hospitals, correctional facilities, and other health care service providers."  The overwhelming majority of the Omnicare LTC business was with skilled nursing facilities.  In a presentation to financial analysts during the Company's annual "Analyst Day," on December 15, 2016 (the "December 2016 Analyst Day"), for example, the Company stated that, per "CVS Health internal data analysis," *76%* of Omnicare LTC prescriptions were for skilled nursing facilities, while only *24%* were for all other LTC facilities.

---

[2] The Company files quarterly financial reports on form 10-Q ("10-Qs") and annual reports on form 10-K ("10-Ks") with the SEC that report, among other things, the financial performance of the Company's three operating segments.

Accordingly, losses of skilled nursing facility customers would have a material impact on the performance of the Omnicare LTC business.

77.     At all times relevant to the allegations in this Complaint, the Omnicare LTC business consisted of approximately 140–150 spoke pharmacies that primarily handled new prescription orders, of which approximately 30–35 were also hub pharmacies that used what the Company called "proprietary automation" to support spoke pharmacies with refill prescriptions.

**B.  The Acquisition**

78.     On May 20, 2015, CVS Health announced that it had entered into an Agreement and Plan of Merger to acquire Omnicare.  According to CVS Health's SEC filings, upon the effective date of the Acquisition, each share of common stock, par value $1.00 per share, of Omnicare would be converted into the right to receive $98.00 in cash, or approximately $10.6 billion in the aggregate.  In addition, CVS Health would assume approximately $2.3 billion in debt of Omnicare.

79.     The Company told investors that it had acquired Omnicare "to expand [CVS Health's] operations in dispensing prescription drugs to assisted-living and LTC facilities, and to broaden its presence in the specialty pharmacy business as the Company seeks to serve a greater percentage of the growing senior patient population in the United States."

80.     On August 18, 2015, CVS Health acquired 100% of the outstanding common shares and voting interests of Omnicare for $98 per share for a total of $9.6 billion and assumed long-term debt with a fair value of approximately $3.1 billion, for a total of $12.7 billion. Additionally, holders of Omnicare restricted stock units and performance-based restricted stock units received 738,765 CVS Health Corporation restricted stock awards with a fair value of approximately $80 million as replacement awards.

81.    After the Acquisition closed, the Company announced that going forward it would fold the LTC operations it had acquired into its Retail segment for the purposes of reporting financial performance and providing guidance to investors on future performance.   The Company renamed this new segment as the "Retail/LTC segment."

82.    On October 30, 2015, the Company filed its quarterly financial report for the third quarter of the 2015 fiscal year on Form 10-Q with the SEC.[3]   In that 10-Q, the Company informed investors that it had valued the "goodwill" of the Omnicare LTC business at $8.6 billion.[4]   The Company then allocated that goodwill to its Retail/LTC segment.  Specifically, the 10-Q stated that "[t]he goodwill represents future economic benefits expected to arise from the Company's expanded presence in the pharmaceutical care market, the assembled workforce acquired, expected purchasing and revenue synergies, as well as operating efficiencies and cost

---

[3] During the Class Period, the Company filed a 10-Q for the first quarter of fiscal year 2016 on May 3, 2016 (the "Q1 2016 10-Q"), a 10-Q for the second quarter of fiscal year 2016 on August 2, 2016 (the "Q2 2016 10-Q"), a 10-Q for the third quarter of fiscal year 2016 on November 8, 2016 (the "Q3 2016 10-Q"), a 10-Q for the first quarter of fiscal year 2017 on May 2, 2017 (the "Q1 2017 10-Q"), a 10-Q for the second quarter of fiscal year 2017 on August 8, 2017 (the "Q2 2017 10-Q"), a 10-Q for the third quarter of fiscal year 2017 on November 6, 2017 (the "Q3 2017 10-Q"), a 10-Q for the first quarter of fiscal year 2018 on May 2, 2018 (the "Q1 2018 10-Q"), a 10-Q for the second quarter of fiscal year 2018 on August 8, 2018 (the "Q2 2018 10-Q"), a 10-Q for the third quarter of fiscal year 2018 on November 6, 2018 (the "Q3 2018 10-Q," and together with the Q1 2016 10-Q, Q2 2016 10-Q, Q3 2016 10-Q, Q1 2017 10-Q, Q2 2017 10-Q, Q3 2017 10-Q, Q1 2018 10-Q, Q2 2018 10-Q, the "Class Period 10-Qs").  Each of the Class Period 10-Qs was signed by Defendant Denton.

[4] "Goodwill" is a common accounting term used when one company is purchased by another and refers to the value of the anticipated future financial results of an asset.  *See* Hargrave, M., "Goodwill," *Investopedia* (June 24, 2019), https://www.investopedia.com/terms/g/goodwill.asp.  An acquiring company assigns a goodwill value to an asset on the acquiring company's balance sheet when the price the acquiring company paid is higher than the sum of the fair value of the assets purchased.  *See id.*  If the acquiring company later determines that there is evidence that the asset associated with goodwill can no longer demonstrate financial results that were expected at the time of purchase, the goodwill is "impaired" and the goodwill value must be reduced.  Hayes, A., "Goodwill Impairment," *Investopedia*, (July 6, 2019), https://www.investopedia.com/terms/g/goodwill-impairment.asp.   United States accounting principles require companies to review their goodwill for impairment at least annually at a reporting unit level.  *See id.*

savings."   The Company also advised investors that "[g]oodwill and indefinitely-lived trade names are not amortized, but are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate there may be impairment."   The Company then assured investors that:

> During the three months ended September 30, 2015, we performed our required annual impairment tests of goodwill. The results of the impairment tests indicated that there was no impairment of goodwill. The goodwill impairment tests resulted in the fair values of our reporting units exceeding their carrying values by a significant margin.

83.     On February 9, 2016, the Company filed its annual financial report for the 2015 fiscal year on Form 10-K with the SEC.[5]  In that report, the Company repeated that it had valued the goodwill of the Omnicare LTC business at $8.6 billion and allocated that goodwill to the Company's Retail/LTC segment.

84.     The Company make include any disclosures regarding the goodwill of the Omnicare LTC business in its quarterly reports for the first and second quarters of fiscal year 2016.  In the third quarter of fiscal year 2016, however, the Company disclosed in its quarterly report on Form 10-Q that

> During the three months ended September 30, 2016, we performed our required annual impairment tests of goodwill. The results of the impairment tests indicated that there was no impairment of goodwill. The goodwill impairment tests resulted in the fair values of our Pharmacy Services and Retail Pharmacy reporting units exceeding their carrying values by significant margins. The fair values of our LTC and RxCrossroads reporting units exceeded their carrying values by 7% and 12%, respectively. ***The balance of goodwill for our LTC and RxCrossroads***

---

[5] During the Class Period, the Company filed a 10-K for fiscal year 2015 on February 9, 2016 (the "2015 10-K"), a 10-K for fiscal year 2016 on February 9, 2017 (the "2016 10-K"), a 10-K for fiscal year 2017 on February 14, 2018 (the "2018 10-K"), and a 10-K for fiscal year 2018 on February 20, 2019 (the "2018 10-K," and, together with the 2015 10-K, 2016 10-K and 2017 10-K, "the Class Period 10-Ks").  Defendant Denton and Defendant Merlo signed each of the 2015 10-K, 2016 10-K and 2017 10-K.  Defendant Boratto and Defendant Merlo signed the 2018 10-K.

*reporting units at September 30, 2016 was approximately $6.3 billion and $0.6 billion, respectively.*

The Company did not explain of why the balance of goodwill for the Omnicare LTC business was now $6.3 billion after it had allocated $8.6 billion in goodwill to the Retail/LTC segment for that business in its quarterly financial report for the third quarter of fiscal year 2015 and annual financial report for fiscal year 2015.

### C. CVS Health Touts the Acquisition

85.      On May 21, 2015, CVS Health issued a press release announcing CVS Health's acquisition of Omnicare (the "May 2015 Release").  The May 2015 Release was attached as an exhibit to CVS Health's Form 8-K, signed by Defendant Denton, and filed with the SEC on the same date.  The May 2015 Release touted the Omnicare Acquisition expanding the Company's business throughout multiple markets related to LTC, stating, in relevant part:

> With the acquisition of Omnicare, CVS Health will significantly expand its ability to dispense prescriptions in assisted living and long term care facilities, serving the senior patient population. CVS Health will also expand its presence in the rapidly growing specialty pharmacy business. Omnicare's complementary specialty pharmacy platform and clinical expertise will augment CVS Health's capabilities and enable CVS Health to continue to provide innovative and cost-effective solutions to patients and payors.
>
> * * *
>
> CVS Health expects to achieve significant purchasing and revenue synergies as well as operating efficiencies from this combination. The company expects the transaction to be approximately 20 cents accretive to Adjusted EPS in 2016, its first full year, excluding integration and any one-time transaction costs. It is expected to become increasingly accretive to Adjusted EPS in subsequent years. The company has secured $13 billion in fully committed unsecured bridge financing from Barclays and expects to put in place permanent financing in the form of senior notes and/or term loans prior to the closing of the transaction. CVS Health expects that it will continue to have a solid balance sheet and, with its strong free cash flow, is committed to returning to its targeted leverage ratio of 2.7 times adjusted debt-to-EBITDA.
>
> * * *

> Given the aging U.S. population, long term care is a growth segment of the health care system. More people are expected to use assisted living facilities and independent living communities in the coming decades, creating a substantial growth opportunity for those companies serving the health care needs of seniors.

86.    In the same press release, CVS Health's CEO, Defendant Merlo, parroted the May 2015 Release's assertions that the Omnicare Acquisition would "significantly expand[]" the Company's business, stating, in relevant part:

> The acquisition of Omnicare significantly expands our business, providing CVS Health access into a new pharmacy dispensing channel . . . . It also creates new opportunities for us to extend our high-quality, innovative pharmacy programs to a broader population of seniors and chronic care patients as they transition across the care continuum. We have been impressed by the Omnicare team and what they have created for the patients they serve.

> In entering this new customer distribution channel, CVS Health will deliver meaningful benefits to consumers, patients, caregivers, and payors by providing highly coordinated clinical pharmacy care across multiple treatment settings from retail to long term care. CVS Health will help improve patient outcomes and provide enhanced continuity of care to patients and caregivers as they transition through the health care system.

87.    CVS Health continued touting the Acquisition after it closed.  For example, in its first quarterly report on Form 10-Q after the Acquisition, for the third quarter of 2015, the Company told investors that revenues in the Retail/LTC segment had increased "6.9%, or $1.2 billion, to $17.9 billion" because of the Acquisition.   The Company claimed that "[a]pproximately *half of the increase was driven by the addition of LTC operations* acquired as part of the Omnicare acquisition in August 2015."  The Q3 2015 10-Q also boasted that CVS Health's "*segments benefited from the Omnicare acquisition*, increased generic drugs dispensed and favorable purchasing economics," "[p]harmacy revenues as a percentage of total revenues increased . . . due to pharmacy revenues growing faster than front store revenues, *as well as the acquisition of Omnicare*" and that "[p]harmacy revenue growth continued to benefit from the increased utilization by Medicare Part D beneficiaries, *our ability to attract and retain managed*

***care customers*** and favorable industry trends." These statements were repeated in a press release announcing the Company's Q3 earnings (the "Q3 2015 Release"), by Defendants Merlo and Denton on a October 30, 2015 earnings call (the "Q3 2015 Call"), and in a presentation distributed to investors in connection with the Q3 2015 Call.

88. Defendants assured investors that they understood LTC customers' needs and were implementing synergies to ensure that the Company profited when it fulfilled those needs. For example, in the Q3 2015 Call, Defendant Merlo told investors, "we're in the process of doing the evaluation and the understanding of exactly what is the optimal value proposition that adds value for the long-term care operators and their residents . . . . [W]e will see the benefits of purchasing and cost synergy as we go through our integration activities throughout 2016."

89. Approximately a month after the Q3 2015 10-Q and the Q3 2015 Call, the Company held its annual series of presentations to investment analysts, called "Analyst Day," on December 16, 2015 (the "December 2015 Analyst Day"). Defendant Kraft had been the Senior Vice President and Chief Financial Officer of Omnicare for three years leading up to the Acquisition and stayed on at CVS Health as the EVP of CVS Health Corporation and President – Omnicare. Defendant Kraft addressed attendees at the December 2015 Analyst Day, and, although he knew first-hand from internal reports and by virtue of his position at the head of the Omnicare LTC business that material customer losses were already occurring and "synergies" were driving customers away, he boasted to investors at the December 2015 Analyst Day that CVS Health had acquired in Omnicare the "[l]eading pharmacy provider to elderly in chronic care settings" with "$4.8 billion in revenue," and "[a]pproximately 100 million scripts dispensed." Kraft thus strongly suggested to investors that, when the Acquisition closed, CVS Health was now the leader in the LTC industry and had added an additional $4.8 billion in

revenues and 100 million additional prescriptions.  In addition, Kraft's representations signaled to investors that the Omnicare LTC business had a broad and deep customer base that would allow the Company to reap substantial profits going forward.

90.    Also at the December 2015 Analyst Day, Defendant Merlo hyped how the Acquisition would give CVS Health access to the rapidly expanding aging population by telling investors, ***"[w]e've been talking about this silver tsunami now for several years***. It's important to remember that we are still in the very early stages of this trend, as the baby boomers begin entering into retirement age."  Merlo went on to say:

> [T]his population is projected to nearly double over the next 20 years, and this is the group more than any other that will require long-term care services. ***This was one of the driving forces of why we decided to enter this space with the Omnicare acquisition***. And you think about Omnicare, ***they've got a nationwide footprint with significant presence in both assisted living and skilled nursing***. This gives us a broader reach along with an ability to leverage clinical insights that improve care."

With these representations, Merlo portrayed the Omnicare LTC business as a veritable cash cow for CVS Health.

91.    Defendant Kraft reinforced Defendant Merlo's words by telling attendees at the December 2015 Analyst Day that the Omnicare LTC business was a point of focus for the Company that would drive profits:

> ***[W]e believe CVS/Omnicare must play an important role in serving this patient population.*** Although people of all ages may need long-term care services, the risk of needing these services increases with age. By 2050, it's forecasted 27 million people will need long-term care services and support. And it is estimated that at least 70% of people over 65, will require some form of these long-term care services and support during their life time. With this expanding older population, the number of frail adults is expected to also rise rapidly. Between 2000 and 2040, the number of older adults with disabilities is expected to more than double, increasing from about 10 million to 21 million. ***So clearly, demographics favor providers who can serve the needs of frail elderly***.

92.     Defendants also emphasized that CVS Health would benefit from the Acquisition in all segments of the LTC market, which included skilled nursing, assisted living and independent living.  For example, at the December 2015 Analyst Day, Defendant Kraft told investors:

> *[L]et me talk about Skilled Nursing*. While Omnicare has a robust offering with senior nursing facilities giving us a significant share with large national providers, we didn't have a full solution to address care coordination issues occurring during a patient's admittance or discharge. We have a few solutions in development that will help us address this need.

93.     On the February 9, 2016 earnings call disclosing the CVS Health's financial performance in FY 2015 (the "FY 2015 Call"), Defendant Merlo boasted to investors that "we are developing an *enhanced offering for skilled nursing*," "we are also developing segmented assisted-living offerings," and "to better target the rapidly growing independent living market, we have a consumer driven effort underway that utilizes existing CVS Pharmacy capabilities." Later on the FY 2015 Call, Defendant Merlo enthused, "*we see opportunities across the spectrum in skilled nursing, assisted living and the independent living spaces*."  As a result, Defendants left no doubt that the Omnicare LTC business would drive the Company's profitability, and that the business's large stock of skilled nursing facility customers would play a central role in driving that profitability.

94.     This touting of the Acquisition continued throughout 2016, with Defendants assuring investors that they had successfully integrated the Omnicare LTC business.  On a Q2 earnings call on August 2, 2016, for example, Larry Merlo continued touting how the Company's LTC offerings were a part of the Company's success, telling call participants that "We've got 80% of the U.S. population that lives within a couple miles of one of our stores, along with MinuteClinic assets and specialty and mail and infusion *and now, long-term care. And we have created a true level of integration across these different assets*."

32

95.     At the December 2016 Analyst Day, Defendant Merlo boasted to investors that "We have capabilities that generate results that other retail competitors simply cannot match. And we began to offer a menu of bundled services, including our clinical capabilities, along with our MinuteClinic, infusion *and long-term care capabilities* as a component of the CVS Pharmacy value proposition."  Later during the event, he gushed, "we also *have a leadership position in long-term care with Omnicare*.  And as the number of frail adults rises with an aging population, the need for long-term care services and support will grow as well."  Investors thus understood that the LTC market was a can't-miss prospect.  On an earnings call on May 2, 2017 reporting the Company's first quarter 2017 earnings (the "Q1 2017 Call"), Merlo echoed these representations, stating, "our integrated model enables us to effectively address costs across the health care system, and not just through our PBM but also through our retail, specialty, MinuteClinic *and long-term care capabilities*."

96.     Defendants' repeated touting of the Omnicare LTC business — including its skilled nursing, assisted living and independent living sub-segments — demonstrated the materiality of that business to investor and created an obligation by Defendants to inform investors of developments in that business, including that (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health, and (v) as a result, CVS Health's public statements were materially false and misleading at all relevant times.

**D. Defendants Structured the Integration of the Omnicare LTC Business to Allow Them to Conceal Any Decline that Business**

97.     As Defendants were touting the Acquisition, Defendants were also ensuring that investors would have no way to independently gauge the success of the Omnicare LTC business. Defendants structured the Omnicare LTC business so that they could conceal the poor performance of that business, including, but not limited to, customer losses, from investors. Rather than establish a reporting segment for its new Omnicare LTC business, Defendants folded that business into the Company's much larger Retail segment.

98.     In addition, Defendants further covered their tracks by causing the Company to file the balance sheets included in its quarterly and annual reports on forms 10-K and 10-Q in a manner that was not consistent with Rule 5-02.3 of Regulation S-X ("Rule 5-02.3").  As a result, although Defendants repeatedly touted the importance of the Omnicare LTC business to the Company's strategy, boasted that the business was successfully integrated into CVS Health and assured investors that the business was capitalizing on various synergies and performing within expectations, investors had no choice but to take Defendants' word for it as the performance of the Omnicare LTC business was largely hidden from view.

99.     Defendants blocked investors' ability to track the performance of the Omnicare LTC business by dropping that business into the Company's substantially larger Retail segment and renaming the segment the "Retail/LTC segment."  A comparison of the size of CVS Health's retail pharmacy business with the Omnicare LTC business before the Acquisition highlights how effective this organizational sleight of hand was at concealing the performance of the Omnicare LTC business.

100.     For example, in its last full fiscal year before the Acquisition closed, 2014, Omnicare reported net sales of approximately $4.8 billion from its LTC business and 111 million

prescriptions dispensed.  Similarly, in its last full fiscal quarter before the Acquisition closed, the second quarter of 2015, Omnicare's LTC business reported net sales of approximately $1.2 billion and over 26 million prescriptions dispensed.  By comparison, CVS Health's Retail segment was many times larger.  It reported revenues of *$68 billion* and nearly 936 million prescriptions dispensed for fiscal year 2014, and $17 billion in revenues and over 244 million prescriptions dispensed for the second quarter of 2015.

101.    Combining the Omnicare LTC business with the Retail segment made little sense, because Defendants' constantly touting of the performance of that business to investors, and thus Defendants would want to enable investors to see for themselves how profitable the business was.  But Defendants, without explanation, combined the businesses.  Defendant Merlo simply told investors on the Q3 2015 Call that, "as [Defendant Denton] mentioned, we're excited to now include Omnicare's long-term care business in the [Retail] segment" and then added, "[t]he business is performing as we expected. Our integration work is well underway, and we're focused on executing."

102.    CW16 was the Region Director for Omnicare's west region, covering all of Omnicare's pharmacies from Colorado to the Pacific Ocean at the time of the Acquisition.  He said that he was stunned when CVS Health announced that it was combining the financials of its LTC business with its Retail business because keeping the financials for LTC and Retail separate would allow for comparisons of the business before and after the Acquisition.

103.    Defendants, however, did not want the analysts and investors to see these books, so they combined them.  Had Defendants really wanted the market to understand the performance of that business, they would have maintained the Omnicare LTC business as an independent reporting segment so that analysts and investors could track its progress.

104.   Defendants' true intentions in structuring the Retail/LTC segment are also reflected in their evasive answers to questions from investment analysts.  For example, on the Q3 2015 Call, the Company's first earnings call after the Acquisition, an analyst asked Defendant Denton "[i]s there any possibility we get like a one last bed count or script count number for the business before it's consolidated?"  Prior to the Acquisition, CVS Health and Omnicare each regularly reported script counts (*i.e.*, the number of prescriptions filled by a company's employees during a certain period).  Disclosing a script count for the new Omnicare LTC business would allow analysts to compare the current script count for the Omnicare LTC business with the last script count released by Omnicare, Inc. and gain insight into the condition of the business in the wake of the Acquisition.  Defendant Denton demurred sarcastically, telling the analyst, "Probably not.  Good question though."

105.   After the Acquisition, CVS Health did not break out the script counts for the Omnicare LTC business.  By concealing the number of scripts filled in connection with the Omnicare LTC business, Defendants were able to conceal that the business was hemorrhaging customers.

106.   Similarly, when the Company reported its earnings for the second quarter of 2016, Defendants touted the benefits the Omnicare LTC business was having on the Retail/LTC segment, boasting to investors that "[r]evenues in the Retail/LTC Segment increased 16.0%, or $2.8 billion, to approximately $20.0 billion . . . ***primarily driven by the addition of the long-term care ("LTC") pharmacy operations acquired as part of the acquisition of Omnicare, Inc.***"

107.   An analyst on the Q2 2016 call tried to dig into these representations, asking "you highlight in the press release and the prepared comments that there's contribution from Omnicare and Target. Can you quantify for us what percent of the operating income growth per segment

was from acquisitions versus organic?"  Defendant Denton dodged the question, however, and responded "We haven't broken than [sic] out. Quite honestly, the integration of those businesses are pretty complete now, ***so actually having them broken out is a little bit more difficult than you might imagine***. But they're part of our forecast for this year and our forecast is very much in line from a quarter perspective."

108.    Defendants thus were going out of their way to assure investors that the newly added Omnicare LTC business was integrated and performing well, but at the same time claiming that it would be "too difficult" to provide any insight into the basis of those representations.  Defendants plainly wanted analysts and investors to believe that its Omnicare LTC business was operating successfully, but to conceal that the business was materially shrinking within a year of the closing of the Acquisition as a result of lost customers.

109.    Defendants also hid the performance of the Omnicare LTC business by failing to file the Company's financial reports in compliance with Rule 5-02.3.  That rule requires companies who file financial reports with the SEC to "[s]tate separately amounts receivable from (1) customers (trade); (2) related parties; (3) underwriters, promoters, and employees (other than related parties) which arose in other than the ordinary course of business; and (4) others."

110.    The Class Period 10-Ks and Class Period 10-Qs, however, simply reported a single "Accounts Receivable" value that did not separately break out the various types of accounts receivable, which could have provided a window into the performance of the Omnicare LTC business.

111.    On July 16, 2018, after the Company had entered into the Aetna Agreement, funded the Aetna Acquisition with the Aetna Notes, and received shareholder approval to consummate the Aetna Acquisition, the SEC sent a comment letter (the "Comment Letter") to

Defendant Denton asking him to explain why CVS Health was not "separately disclos[ing] your accounts receivable due from vendors and manufacturers pursuant to Rule 5-02.3."

112.    On July 19, 2018, Defendant Denton responded on behalf of CVS Health, copying Defendant Boratto, acknowledging that the Company's filings did not conform with Rule 5-02.3 and "respectfully advis[ing] the Staff that in future filings we will provide footnote disclosure quantifying separately receivables from customers (trade receivables), receivables from vendors and manufacturers, and receivables from others."  The Company's subsequent reports on its Q3 2018 10-Q and 2018 10-K separately identified "Trade Receivables" (which included receivables from LTC customers), "Vendor and Manufacturer Receivables" and "Other Receivables."

113.    Had Defendants caused the Company to file balance sheets in the Class Period 10-Ks and Class Period 10-Qs in compliance with Rule 5-02.3, investors would have been alerted to a decline in certain receivables as a result of customers abandoning the Omnicare LTC business.  Defendants, however, caused the balance sheets to be filed with Company's quarterly and annual reports inconsistent with Rule 5-02.3, which concealed the true condition of the Omnicare LTC business.

114.    In sum, Defendants capitalized on their clever stashing of the Omnicare LTC business within the Company's Retail/LTC segment and failure to comply with Rule 5-02.3 by failing to disclose substantial Omnicare LTC customer losses in the second half of 2015, the full year 2016, and the first three quarters of 2017, and then taking over a year to disclose a writedown of over $6 billion in goodwill associated with the Omnicare LTC business.  As set forth in this Complaint, this scheme enabled Defendants to trade in the Company stock at artificially inflated levels as well as announce, issue $40 billion in bonds to fund and close the

Aetna Acquisition without substantial resistance from the financial markets, investment analysts or its own shareholders.

### E. The Omnicare LTC Business Hemorrhages Customers During the Class Period

115.    The Class Period begins on February 9, 2016, when the Company released its Annual Report to investors (the "2015 Annual Report"), filed the 2015 10-K, held the 2015 Call and issued a press release (the "FY 2015 Release"), which uniformly presented Acquisition as a success and portrayed the Omnicare LTC business as thriving.

116.    In an address attributed to him in the 2015 Annual Report, Defendant Merlo stated that "From our nationwide retail footprint to our leading pharmacy benefits management (PBM) and specialty businesses, *and now our leading presence in long-term pharmacy care*, we have forged a competitive advantage that is helping us benefit from a broad range of market trends."  Merlo went on to say in the 2015 Annual Report that "Through our combined enterprise assets, *we will also bridge some of the historic gaps in Omnicare's offerings* to better address the unmet needs of these high-risk populations . . . . [w]ith roughly 9,600 retail locations, we can ensure the timeliness of medication adherence."  What Merlo knew, or was reckless in not knowing, and did not disclose, however, was that CVS Health was not a "leading presence in long-term pharmacy care" and would never be able to address the Omnicare LTC customers' needs because the Omnicare LTC business was hemorrhaging customers in response to "synergies" that drove customers away, extraordinarily poor customer service and poaching by former Omnicare and/or CVS Health employees.

117.    The 2015 10-K and Release also concealed the true condition of the Omnicare LTC business.  For example, in its Management's Discussion and Analysis of Financial Condition and Results of Operations, which was attached as Exhibit 13 to the 2015 10-K, which in turn was signed by Defendants Merlo and Denton, the Company informed investors that its

39

"*segments benefited from the Omnicare acquisition that occurred in August 2015*," and an increase in net revenues in the Company's Retail/LTC segment "*was primarily driven by the acquisition of Omnicare*."   The misrepresentations were repeated in the FY 2015 Release. These statements in the 2015 10-K were misleading, however, because they suggested to investors that the Omnicare LTC business was healthy and beneficial for CVS Health, when, in fact, the truth was that customers were leaving in droves because they hated the "synergies" implemented by CVS Health as well as the Company's poor customer service.

118.    Defendant Merlo also misleadingly portrayed the Omnicare LTC business on the FY 2015 Call.   For example, Merlo represented to analysts and investors that "Omnicare performed well and in line with our expectations as *we began to realize some of the anticipated synergies*."   A presentation made available to attendees on the call also stated that the Omnicare LTC business was "*performing well* and in line with expectations," and that the business's "*[e]nhanced offering for skilled nursing* driven by improved coordination during care transitions."   What Merlo knew, or was reckless in not knowing, and did not disclose, however, was that CVS Health was not realizing any "synergies," but rather those synergies *were driving Omnicare LTC customers to competitors*.

119.    As set forth below, extensive interviews with CWs reveal the extent to which the Omnicare LTC business was hemorrhaging customers as a result of (i) "synergies" implemented by CVS Health after the Acquisition that were driving customers away, (ii) customer service that was so poor that customers were fleeing to competitors, (iii) former employees poaching Omnicare LTC customers, and (iv) Omnicare LTC customers intentionally defaulting on contracts to end their relationships with CVS Health.

   i.   *Customers Losses at the Omnicare LTC Business Exploded After the Acquisition*

120.    Over a dozen CWs described how the Omnicare LTC business hemorrhaged customers in the wake of the Acquisition, including, but not limited to, post-acute LTC customers.  In fact, when CW1 left CVS Health, he went to work for CHS, an Omnicare LTC customer with four campuses and approximately 850 to 900 beds.  He personally fired CVS Health as CHS's LTC provider in 2016 and hired Polaris, a competing LTC pharmacy services provider.  CW6 confirmed that CVS Health lost the CHS account when CW1 joined CHS and promptly terminated CVS Health and hired Polaris.

121.    CW2 learned from Remedi's CEO, a very close friend, that Remedi had been taking Omnicare customers who were leaving or had left CVS Health since 2015.  CW2 also said that he learned from his contacts that since the Acquisition the Omnicare LTC business has lost a large contingent of Catholic nursing homes, including, for example, St. Leonard Health & Rehabilitation in Ohio.

122.    CW3 stated that he personally saw seven independent skilled nursing homes in upstate New York, including Maplewood Nursing and Rehabilitation, decline to renew their contracts with Omnicare in the aftermath of the Acquisition.  These accounts moved to a competing LTC pharmacy called Cutie Pharmacy, which later became Cutie Pharma-Care, Inc.

123.    CW4 both saw personally and learned from contacts in the LTC industry that Omnicare LTC divisions in Illinois and Missouri, and particularly the St. Louis region, lost at least 50% of their business from 2015 to 2019.  CW4 said that the customers who left CVS Health were largely poached by former Omnicare and CVS Health employees.  For example, CW4 learned from his colleagues in the LTC industry that Health Systems, Inc. ("HSI"), which operated a large number of nursing homes in Missouri, "pulled all of their nursing homes" from CVS Health in 2016.  CW9 corroborated CW4's account of HSI pulling its business from

Omnicare.  CW9 stated that HSI operated approximately 200 LTC facilities in and around Missouri and accounted for approximately 25% of Omnicare's business in the St. Louis region.

124.    CW6 stated that Polaris took 30% of the Omnicare LTC business in South Florida in 2016,[6] because of CVS Health's poor customer service.  CW6 also described how Polaris took CHS, which had four different campuses and roughly 850 to 900 beds, from CVS Health.

125.    CW7 also personally saw many LTC customers leave CVS Health after the Acquisition.  For example, St. Camillus Health and Rehabilitation in Syracuse ("St. Camillus"), New York, a 284-bed hospital, left CVS Health for Harbor.  Similarly, CVS Health during the Class Period lost James Square, a 500-bed account in Syracuse, and Loretto Health and Rehabilitation ("Loretto"), which operates facilities totaling over 500 beds in Central New York State, to a competing LTC pharmacy services provider called PharmScript.  CW7 also said that CVS Health lost accounts with nursing homes and assisted living facilities throughout Upstate New York, including Lady of Lourdes in Albany and Franciscan Racker near Ithaca.

126.    CW19 corroborated CW7's description of the loss of Loretto.  CW19 said that the loss of the account was "devastating" to the Omnicare LTC business and that CVS Health had even sent a regional vice president to Syracuse for the express purpose of trying to retain the account, but to no avail.  CW19 said that while CVS Health had accounts totaling at least 5,000 beds in Syracuse alone, the Company had lost virtually all of those accounts, and beds.

127.    CW9 also saw first-hand the Omnicare LTC business lose accounts after the Acquisition.  In 2015, for example, a LTC pharmacy called Modern Health Pharmacy ("MHP")

---

[6] The market for LTC services in Florida is gigantic.  According to the Florida Health Care Association ("FHCA"), there are 691 licensed nursing homes in Florida, representing approximately 84,448 beds.    FHCA, Facts About Long Term Care in Florida, https://www.fhca.org/media_center/long_term_health_care_facts (last visited July 22, 2019). There are also 3,080 assisted living facilities in Florida, representing approximately 106,103 beds.  *Id.*  These LTC facilities support an estimated $26.68 billion of Florida's economy.  *Id.*

took 10% to 15% of Omnicare's business in California.  In addition, CW9 said that Brookdale Senior Living ("Brookdale"), which he believed was CVS Health's largest LTC account with over 1,000 facilities, refused to renew an exclusive contract with Omnicare and after the agreement expired, so it could shift large amounts of business away from CVS Health.  CW9 personally attended the meeting where Brookdale informed CVS Health that it was pulling business from the Company because of poor service at a large number of facilities.  CW9 said that a regional vice president, division vice president and Defendant Kraft were at that meeting as well.

128.     CW9 said that prior to the Acquisition, he met with customers regularly to maintain relationships and ensure that customer needs were met.  After the Acquisition, CVS Health implemented a system (*i.e.*, a "synergy") that limited CW9 to focusing on "getting the drugs out the door" and prohibited district managers like CW9 from meeting with clients unless an "account manager" specifically requested that he attend.  CW9 said that the customers did not like the account managers, whose poor performance "put us at risk [with customers] a lot of times."

129.     CW9 also commented on the contracting bottleneck created by another CVS Health "synergy."  On the occasions when the Omnicare LTC business actually attracted new customers, the district managers would not be notified until the last minute.  CW9 said that this resulted in a significant loss of business in Wichita, Kansas, because "Having that short a timeframe to go live caused major problems."  CW9 said that the Wichita pharmacy had been servicing 20,000 beds, and lost approximately 12,000 of those beds.  CW9 said the regional vice president who oversaw him was Defendant Kraft's CFO assistant and a close friend of Defendant Kraft.  CW9 said that the regional vice president oversaw a substantial portion of the nationwide

Omnicare business and told Kraft directly about the extensive customer losses, customer service problems and ineffective synergies.

130.    CW10 said that he formed Infinium Pharmacy in St. Louis after he left Omnicare. According to CW10, Infinium took facilities containing several thousand beds that Omnicare used to service for HSI.   CW10 also said that two very large accounts, Brookdale, an LTC provider with over 1,000 facilities, and Life Care Centers of America, which operates over 200 facilities in 28 states, did not renew their exclusive agreements with Omnicare and have moved business to other pharmacy service providers.   CW10 also said that he learned from colleagues that CVS Health had purchased Pharmore Drugs ("Pharmore"), a pharmacy in Chicago with a large LTC business that serviced approximately 20,000 beds, but that the Omnicare LTC business promptly lost most of those customers to other LTC pharmacy services providers.

131.    CW11 stated that his current employer, Skilled Care, had taken multiple LTC accounts from CVS Health.   For example, Skilled Care took the Ohio Masonic Home, a Springfield, Ohio, assisted living facility with approximately 300 beds.

132.    CW12 stated that while he was with WD, he saw WD's affiliate, Harbor, take the St. Camillus account from CVS Health, which was worth approximately 300 beds.   He also saw Harbor take another 100-bed account from Auburn Nursing Home, another LTC facility in Upstate New York.   In addition, CW12 stated that after he joined Specialty, Specialty took Absolut Care, a chain of 12 nursing homes in Western New York with approximately 1,200 beds from CVS Health as well.   Specialty also took another Upstate New York LTC facility from CVS Health, the Elcor Nursing and Rehab Center, a facility with approximately 300 beds. CW12 also corroborated CW7's account of Loretto, an LTC provider in Central New York that services close to 10,000 residents and their families, leaving CVS Health.   CW12 further

described how the Syracuse Home Association (now known as McHarrie Life), a facility with approximately 200 beds stopped using the Omnicare LTC business.  Masonic Care Community of New York, a facility with over 500 beds, left the Omnicare LTC business as well, for LTC services competitor Kinney Drugs and Eli Drugs ("Kinney").

133.    CW13 described in detail how customer losses at MedWorld, the Omnicare LTC affiliate at which he worked, exploded after the Acquisition closed.  According to CW13, former Omnicare employee Michael Rosenblum "singlehandedly closed Omnicare out of upstate New York" by poaching virtually all of Omnicare's LTC clients for Rosenblum's new employer, PharmScript.  In fact, CW13 said that Rosenblum hired approximately half of MedWorld's staff to PharmScript, in addition to taking MedWorld's customers.  CW13 said that MedWorld had provided LTC pharmacy services for 22,000 beds among various clients when CW13 worked there, but that 75% of these beds were lost almost immediately after the Acquisition and another 15% of the beds were lost thereafter.  The losses were so great that, only 18 months after the Acquisition, the MedWorld location where CW13 worked closed.  CW13 said that multiple accounts totaling thousands of beds were taken by PharmScript and ProCare LTC, where another former Omnicare general manager worked.

134.    CW14 recalled that Richmond Center for Rehabilitation on Staten Island, New York, left the Omnicare LTC business for another provider, as did Beth Abraham Center, a nursing home with approximately 440 beds in the Bronx, New York.

135.    CW16 said that shortly after the Acquisition, the Omnicare LTC business lost millions in revenue when Sun Mar Healthcare, a California-based LTC advisory and services organization with 24 skilled nursing facilities and 1 assisted living facility, left CVS Health for a competing LTC pharmacy services provider.  In addition, CW16, like other CWs, also described

45

how Brookdale, an LTC provider with over 1,000 facilities, pulled many of its accounts.  CW16 also stated that the Omnicare LTC business lost a substantial number of accounts to competing LTC pharmacy ModernHealth LTC Pharmacy ("ModernHealth").

136.    Like CW1 and CW6, CW18 stated that Polaris expressly targeted Omnicare LTC clients.  CW18 also said that Polaris currently services approximately 25,000 beds, and that 20,000 of those beds are former Omnicare LTC customers.  CW18 said that Polaris has two pharmacies in Florida, and one each in Michigan, Minnesota, and North Carolina.  The pharmacy in Michigan services about 2,500 beds, all of which came from former Omnicare client Villa Health Care.  In Minnesota, Polaris has 4,000 beds, half of them from Omnicare.  North Carolina has 3,500 beds, almost all of which used to be Omnicare.  Finally, in Florida, Polaris has about 14,000 beds and 10,000 of which came from Omnicare.

*ii.   CVS Health's Poor Customer Service Drove Customers Away*

137.    The CWs nearly universally attributed the Omnicare business's customer losses to poor customer service and synergies that drove customers to other LTC service providers.  For example, CW7 said that CVS Health lost accounts with, among others, St. Camillus, James Square, Loretto, Lady of Lourdes and Franciscan Racker because CVS Health's complete lack of attention to customer service meant that its Omnicare LTC business did not build relationships with customers or provide those customers with the attention that they needed.  For example, CW7 recalled that when CVS Health sent contracts out for renewal, Omnicare LTC customers would request changes or try to negotiate terms.  CVS Health, however, would ignore those requests and simply resend the old contract without any changes.  In addition, CW7 said that St. Camillus left Omnicare specifically because the individual responsible for contracts at Omnicare, Steve Rappa, "just wouldn't get back to people [and] that's what pissed off St. Camillus.  They asked for something in the contract and Rappa did not reply."  This failure to engage with

46

customers, CW7 said, reflected how CVS Health's approach to LTC was "all about the money and not about the relationships," and caused the business to hemorrhage customers.

138.    CW4 also pointed to CVS Health's poor customer service as the reason why the Omnicare LTC business was in sharp decline.  CW4 said, "Their business is being taken away all across the country . . . . CVS Omnicare is losing all of their business because they provide terrible service."   CW6 agreed with CW4 that CVS Health's poor customer service drove customers to competitors, saying that CVS Health "tried to run [the Omnicare LTC business] like a community pharmacy.   They didn't know how to cater to clients.   They were not accommodating on pricing or on special requests from the facilities . . . . CVS was not ready for long term care."

139.    Likewise, CW13 stated that the Omnicare LTC business lost accounts covering approximately 90% of the beds serviced because the Omnicare LTC business was run as a retail operation that ignored customer service and relationships: "It's all a relationship business . . . . When you take out the people who have all the relationships — it doesn't matter what's the name on the door.  They are all selling the same thing, it's about the person you're dealing with." As a result of CVS Health's approach to the market, the customers quickly left for competing LTC pharmacy service providers that provided the necessary level of client service.

140.    CW18 said that Polaris was able to acquire so many Omnicare customers because of the Omnicare LTC business's poor service, which included delays in getting medication to customers.    Normally, CW18 said, a LTC client receives two or three deliveries of pharmaceuticals daily.   After the Acquisition, however, CW18 said that CVS Health scrapped Omnicare's delivery system and folded deliveries into CVS Health's retail program.  As a result,

47

the Omnicare LTC business simply could not get medications out on time and customers went to competitors who could meet their needs.

141.    Without disclosing that the customer service it offered as part of the Omnicare LTC business had driven customers away, Defendants effectively acknowledged the CWs' descriptions of the Company's customer service problems on an August 8, 2018 earnings call (the "Q2 2018 Call").   On that call, Defendant Denton told investors the Company was "*undertaking a broad initiative to enhance service* levels with the objective of improving client retention," *i.e.*, making wholesale changes to their customer service processes, undoubtedly because the processes implemented by had driven customers away from virtually the moment the acquisition closed.

   iii.    *CVS Health's "Synergies" Drove Customers Away*

142.    Along with CVS Health's utter failure to provide anything resembling adequate customer service, the CWs also said that changes implemented by CVS Health in an effort to capitalize on "synergies" drove customers to competitors.   For example, CW1 stated that CVS Health changed how the Omnicare LTC business operated because it "wants to operate like a big box pharmacy."   However, "You do not run long term care post acute like a retail pharmacy. People in the post acute business are [thus] bailing out from CVS."   In addition, CW1 stated that CVS Health "even eliminated their clinical division.   The consolidation [*i.e.*, implementation of synergies] that they've done is ridiculous . . . you cannot compromise clinical care."

143.    Several other CWs pointed to CVS Health's implementation of synergies as a core reason why Omnicare LTC customers fled.   For example, CW5 stated that, while Omnicare ran a much more patient-centric line of business with dedicated staff that developed relationships with individual accounts, those individuals were let go in the Acquisition and their replacement account managers did not understand the LTC business and were hated by customers.

144.   CW13 saw the same sequence of events that CW5 described at MedWorld. According to CW13, 90% of the beds serviced were lost at MedWorld, where he worked, because "[w]hen you take out the people who have all the relationships — it doesn't matter what's the name on the door.  They are all selling the same thing, it's about the person you're dealing with."  CW10 also pointed to CVS Health's changes to Omnicare's business, including a focus on profit versus patient care, and the lack of staff and tools to properly service clients, as reasons customers were leaving the Omnicare LTC business.

145.   CW3 also attributed CVS Health's loss of customers to the synergies it implemented when integrating Omnicare's business.  CW3 said that, after the acquisition, Omnicare's Customer Service Patient Billing Department was moved into a centralized billing department within CVS Health.  According to CW3, this delayed the resolution of insurance issues and infuriated customers, who detested CVS Health's new centralized billing department and quickly started leaving.  CW3 stated that "clients would find out that something wasn't covered a day or two later instead of the same day," which caused delays in treatment and led to customers leaving the Omnicare LTC business.  CW3 also stated that "the bottom line is that CVS purchased something, a long-term care company, and they are trying to run it like a retail pharmacy.  They don't know what they are doing."

146.   CW8 stated that he personally saw CVS Health focus heavily on changing the culture at Omnicare to a "retail model" in the name of synergies.  He stated that while Omnicare distributed medications from warehouses to nursing homes and assisted living facilities, CVS Health insisted on distributing medication from retail stores.  CW8 said his peers and his supervisor, the vice president and general manager of the West Region, consistently discussed

how CVS Health's insistence on applying a retail model to Omnicare's LTC business was driving customers away.

147. CW9 described how, at Omnicare, district managers frequently met with LTC clients face-to-face every week. After the Acquisition, however, CVS Health — in the name of synergies — limited district managers to monitoring prescription fulfillment and stopped face-to-face visits with Omnicare LTC customers. CW9 said that CVS Health instead used "business development" employees or account managers to make in-person visits. In practice CW9 said that CVS Health hired people off the street, gave them 30 to 90 days of training and sent them out to be the face of CVS Health. CW9 said that Omnicare LTC customers *hated* the account managers, who did not understand the industry and did not know how to properly service the LTC clients. Accordingly, accounts were not properly serviced and clients left CVS Health in droves.

148. CW9 also described how CVS Health pushed its Omnicare LTC clients to use Omniview, an online customer management tool, rather than interact with individuals. CW9 said that customers could not stand Omniview, ignored it and just called Omnicare LTC district managers directly.

149. CW11 stated that competitors were able to take accounts from CVS Health because CVS Health laid off a large number of veteran employees during the acquisition to reduce payroll. These employees had had long-term relationships with the LTC customers, and when they were laid off, Omnicare LTC customers moved on to CVS Health's competitors.

150. As with several other CWs, CW12 stated that CVS Health's approach to running the Omnicare LTC business as a retail "big box" pharmacy caused CVS Health to lose customers. LTC pharmacies are built on relationships, CW12 said, while big box pharmacies

rely on circulars, advertising and easy access to retail locations.  CW12 said that Loretto moved to PharmScript because of poor customer service and the synergies implemented by CVS Health, particularly centralized billing.

151.   CW14 also stated that CVS Health's approach to pursuing new business also prevented the Omnicare LTC business from bringing on new customers.  CVS Health had only staffed a very small number of attorneys to handle contracts with LTC customers.  New potential LTC customers would simply go elsewhere rather than wait for CVS Health's processes.  According to CW14, "the process was just broken."  CW14 also said that CVS Health's integration of LTC into retail drove customers away.  He said, "There is a reason why LTC is separate from retail.  LTC cannot operate in a retail environment because there are too many specialties and things that nursing homes need that a retail pharmacy could never provide."  He went on, "CVS felt that they could roll the assisted living and independent living people into the retail stores.  You really can't do that.  These people need 24/7 availability, deliveries, printed medical records, and all kinds of things that a retail CVS store . . . that a pharmacist would blow his brains out if they tried to do that.  They are understaffed as it is."

152.   CW14 also stated that he noticed customers became especially frustrated when CVS Health implemented a centralized billing center in Pennsylvania.  CVS Health felt that centralizing certain operations would lead to increased efficiency, but, according to CW14, "part of your customer relationship was dealing with them and their bills.  [While at Omnicare] we gave them personal attention and did bill reviews for incorrect charges.  All of that disappeared.  There was turnover in the billing department, so nobody ever knew who their biller was."  This attempt by CVS Health to implement efficiencies ultimately drove still more customers away from Omnicare.

153.    CW15 also stated that CVS Health's strategy of running the Omnicare LTC business as a retail pharmacy was a disaster.  He stated that "CVS was inept and unprepared to run the business that they acquired.  They did not understand what a long-term care pharmacy did.  They thought that they could just meld it into a retail pharmacy model."  CVS Health's attempts to create synergies thus seriously damaged the business and drove customers away.  CW15 stated that CVS Health immediately started planning to close down the Omnicare distribution center in Toledo and instead use CVS Health's regional distribution centers to distribute pharmaceuticals to LTC clients.  While CVS Health believed that this would have the effect of placing products closer to CVS Health's own pharmacies, and thus cut freight costs, CVS Health's regional distribution centers were not set up to handle Omnicare's LTC clients' ordering patterns.  CW15 said that CVS Health's regional distribution centers were not equipped or staffed to handle the proposed change.

154.    CW15 also said that CVS Health had laid off the Omnicare employees who understood the LTC business as part of its pursuit of "synergies."  This meant that CVS Health did not know how to service their LTC clients and utterly failed to maintain client satisfaction and service levels. CW15 said that "If the Director of Nursing at a facility doesn't like the consultant pharmacist, or doesn't feel that they are getting an adequate service level, or adequate attention from the pharmacy, they are the ones that have the ear of their corporate office and can easily get a contract terminated, or make life challenging for the pharmacy."  CW15 said that when he raised his concerns to CVS Health personnel they told him that "they had a directive from their corporate office that this is what they were supposed to do, regardless of input from the operation."

155.    CW16 said that the Omnicare LTC business diminished significantly in the first year after the Acquisition as customers left CVS Health for other LTC pharmacy services providers.  CW16 said that based on the LTC clients he interacted with, the clients believed that the synergies CVS Health was pursuing would mean that clients would be "just a number" when interacting with CVS Health.  CW16 said that LTC is "business to business and service driven. Service is even more important than price."  CVS Health's "synergies," which centralized billing and contract negotiation, pushed customers to use the Omniview tool, changed LTC clients' points of contact and reduced the use of Omnicare distribution centers thus drove customers to competitors.

156.    CW16 also said that CVS Health's synergies involved trying to service customers further and further away from an LTC pharmacy, while also reducing the staff at LTC pharmacies.  CW16 said he saw that these synergies "led to a diminished service experience for the customer.  This is when people vote and decide to leave the island," *i.e.*, take their business to competing LTC pharmacy service providers.  CW16 said that in speaking with his colleagues, this was happening throughout the Omnicare LTC business.

157.    CW18 pointed to how, after the Acquisition, CVS Health replaced the Omnicare LTC customers' relationship contacts with CVS Health account managers.  CW18 said, "[t]his market is all about relationships" and "[a]nybody that knew anything about long term care was no longer there."  CW18 also said that Omnicare had constant problems with its new centralization of the billing process.

158.    Although they did not disclose the extent of the customer losses caused by the Company's ill-conceived and wholly inappropriate "synergies," Defendants effectively corroborated the CWs' descriptions of how replacing Omnicare management with CVS Health

employees who lacked LTC experience drove customers away.  Belatedly, on an August 8, 2018 earnings call, Defendant Denton told investors that CVS Health was replacing the entire Omnicare LTC business management team, saying that "we have recently installed a new leadership team to manage Omnicare's day-to-day operation. The team is made up of ***individuals with expertise in the long-term care market***, supplemented with operational talent from CVS Pharmacy."  In other words, CVS Health needed to hire an entire new management team for the Omnicare LTC business, because the individuals running that business previously lacked the requisite experience.

   *iv.  Former Omnicare and CVS Health Employees Were Poaching Customers from the Omnicare LTC Business*

   159.   Multiple confidential witnesses also described how losses of customers in the Omnicare LTC business were accelerated because former Omnicare and/or CVS Health employees were poaching customers.  Remedi's CEO told CW2 that Remedi had captured a large portion of the Omnicare LTC business, including most of the business in Ohio.  CW15 also described how former Omnicare employees started Remedi, and then used Remedi to take a significant portion of the Omnicare LTC business.  According to CW2, Remedi's CEO told him that acquiring former Omnicare customers who were leaving CVS Health, among other things, enabled Remedi to expand its operations from five states to 30 states.

   160.   CW4 also both personally saw and learned from his contacts in the LTC industry that Omnicare LTC businesses in Illinois and Missouri, particularly the St. Louis region, which had lost at least 50% of their businesses from 2015 to 2019, lost those customers largely as a result of poaching by former Omnicare and CVS Health employees.  Similarly, CW7 saw first-hand how St. Camillus left CVS Health for Harbor after being wooed by a former Omnicare employee who had been laid off during the acquisition and subsequently joined Harbor.

161.    CW9 described how a former Omnicare district manager began working for Infinium Pharmacy ("Infinium") a competitor of Omnicare after the district manager's non-competition agreement had expired.  The district manager, among other things, moved HSI's business from CVS Health to Infinium.

162.    In addition, CW12 learned from former Omnicare and CVS Health colleagues that Michael Rosenblum, a former Omnicare employee now with PharmScript, an LTC service provider that competes with CVS Health, had taken "thousands of beds from Omnicare."  CW14 had also heard of poaching by Rosenblum.

163.    CW14 also said that in addition to PharmScript, many local LTC pharmacies took clients from Omnicare in the wake of the Acquisition, including LI Script, Specialty Rx, Community Care Rx and Grassy Sprain Pharmacy.  In fact, CW14 stated that he had personally taken accounts with facilities totaling approximately 1,000 beds from Omnicare after taking his current job with Prescription Center.  CW14 said the poaching of Omnicare LTC customers by former employees had gotten so bad that he began to see a pattern whereby CVS Health would acquire local pharmacies and lock the pharmacy owners into non-competition agreements.  Once the non-competition agreements expired, the pharmacy owners would open new local pharmacies, poach customers and then sell those pharmacies to CVS Health *again*.

164.    CW16 said that the vice president of pharmacy services at Modern Health had been an area manager at Omnicare prior to the Acquisition.  The area manager had overseen four pharmacies in Southern California that serviced over 30,000 nursing home and assisted living beds with annual revenue of over $150M.  After the Acquisition, the area manager took a substantial number of accounts that had been serviced by the Omnicare LTC business.  Akin to CW14's observations about former employees poaching Omnicare LTC customers, CW16

55

described how Modern Health took so many accounts from CVS Health that CVS Health eventually acquired Modern Health, after which the area manager left CVS Health *again* and joined Med-Plus Pharmacy LTC, where he resumed poaching customers.

      *v.  Omnicare LTC Business Customers were Intentionally Defaulting on Contracts to Get Away from CVS Health*

165. Confidential witnesses described how Omnicare LTC customers were so desperate to leave CVS Health that they began intentionally breaching agreements so that CVS Health would terminate those agreements, leaving the LTC customer free to move to a competitor.  In describing how LTC clients had begun trying to induce CVS Health to terminate their contracts, CW14 said, "this was how nursing home owners would get out of their contracts with Omnicare because they no longer wanted to do business with Omnicare.  They just stopped paying their bills."  CW15 also stated that, after the Acquisition, CVS Health made the conscious decision to just terminate accounts in Ohio because of non-payment, which allowed the customers to move to other providers, exactly the behavior described by CW14 concerning customers in New York.

**F.  The Individual Defendants Had Actual Knowledge of the Actual Condition of the Omnicare LTC Business Throughout the Class Period**

166. The Individual Defendants, by virtue of their roles in senior management and involvement in Company's core operations, would have had knowledge of the Omnicare LTC business model, including its relationships with its key customers. The Individual Defendants had access to reports and communications describing these operations, and discussed those reports, including reports describing the performance of the Omnicare LTC business and losses of customers, failures of synergies, poor customer service, poaching of customers by former employees of the Omnicare/CVS Health and intentional defaulting on contracts by LTC customers.

167.    CW2, CW15 and CW18 described how when any LTC customer indicated an intention to leave the Omnicare LTC business, the loss (or potential loss) of that customer was required to be reported up to the highest levels of CVS Health.  In addition, CW9 described how Defendant Kraft was present at the meeting where Brookdale, one of the Omnicare LTC business's largest clients said that it would not be renewing an exclusive contract so that it could move business to other LTC pharmacy service providers.

168.    According to CW17 Defendant Kraft had access to weekly operations reports that reported region by region LTC sales levels.  CW17 also said that, at month end, Defendant Kraft received "roll-ups" of the month's weekly reports to review.  Defendant Kraft reported to Defendants Merlo and Denton and met frequently with Merlo and Denton to discuss, among other things, those reports.

169.    CW9 and CW12 described weekly calls with district managers and/or vice presidents to discuss customers who were unhappy with CVS Health or in danger of leaving. Senior management was aware of these calls. According to CW14, on these calls, "[w]e spent more time talking about losing business than we did trying to save or get new business."

170.    CW9 and CW14 described how the Omnicare LTC business's "SalesForce" software tracked the status and performance of all Omnicare LTC customers, and how the Individual Defendants had access to that software at all times.  CW14 also described how all CVS Health upper management, including the Individual Defendants, had access to sales data, including data on customer losses, from monthly spreadsheets describing pharmacy performance that were disseminated across CVS Health.

171.    CW16 described weekly conference calls with Omnicare and CVS Health executives, including Defendant Kraft, where losses, client retention rates, client account status, and client contracts were discussed.

172.    CW15 said that every Omnicare LTC pharmacy was responsible for tracking its customers' contract status and billings.  This data was then rolled into reports for regional managers, who passed the information up to senior management at CVS Health.

173.    The Individual Defendants also publicly represented that they had actual knowledge of the performance of the Omnicare LTC business because they were focused on that business.  For example, on the August 4, 2015 Call, the first earnings call after the Acquisition, Defendant Denton told analysts and investors that "I would just say that *our focus, first and foremost, is to execute against the pending acquisitions*, rollout our products and services in a way that puts our clinical programs into the hands of more members as they shop this new and exciting channel."  Similarly, on the Q3 2015 Call, Defendant Merlo assured investors that the Omnicare LTC business "is performing as well expected.  Our integration work is well underway, and we're focused on executing to ensure a seamless transition for clients and patients."  Since Merlo and Denton insisted that they — and the entire enterprise — were *focused* on implementing the Acquisition of the Omnicare LTC business, Defendants must have had actual knowledge that the Omnicare LTC business was hemorrhaging customers.

174.    On an earnings call on November 8, 2016, which disclosed the Company's financial performance for the third quarter of 2016 (the "Q3 2016 Call"), Defendant Denton said to investors that "although both the Omnicare and Target pharmacy acquisitions are performing well, *the ramp-up in the level of accretion is slightly slower than anticipated*."  This was accompanied by a disclosure on a slide in the Q3 2016 Presentation, which stated that "[y]ear-

over-year accretion from Omnicare and Target *slightly slower than anticipated*." Denton thus was well aware that there were problems in the Omnicare LTC business, and undoubtedly saw that customers were fleeing the business *en masse*.

175. Similarly, Defendant Merlo represented to attendees at the December 2016 Analyst Day that "[w]'ve also *completed the majority of our integration work for the Omnicare acquisition*. *We're now focused introducing pilot programs* that capitalize on our integrated assets to improve patient care while enhancing our technology to support a broader rollout of new LTC service offerings." Defendants thus must have had actual knowledge of the poor performance of the Omnicare LTC business, including the customer losses, from 2015–2016 by virtue of their focus on integrating the Omnicare LTC business. In addition, Defendants thus must have had actual knowledge of customer losses in the years after December 2016 Analyst Day because they were focused on introducing pilot programs to serve Omnicare LTC customers.

176. On an earnings call on August 8, 2017 announcing the Company's financial performance in the second quarter of 2017 (the "Q2 2017 Call"), when an analyst asked about a potential slowdown in prescriptions, Defendants Merlo and Denton highlighted how they were closely monitoring prescription rates in Omnicare LTC business. Denton said that although "script delivery for the first half of the year within the Retail/Long-Term Care segment has been pretty consistent with expectation" the Company nevertheless saw "a little softness from a market perspective, so our go-forward guidance reflects that." Denton continued, "I would also say that just from a Long-Term Care perspective, we're seeing bed census lower, so that obviously had some effect on script delivery in that portion of our business." Merlo chimed in, "[a]nd mostly, Mike, within the skilled nursing space." When another analyst followed up with

additional questions regarding prescriptions rates in the Omnicare LTC business, Denton responded,

> I think the softness from a volume perspective is a little bit of both, both Long-Term Care and we're just seeing some softness in retail more broadly . . . . I do think what you see in the skilled nursing facility space, you're seeing length of stay and just that census come down a little bit in the marketplace. And as that has occurred, that affects Omnicare disproportionally greater because it has a fairly sizable share in that space.

These representations informed the market that Defendants were closely monitoring prescription levels in the Omnicare LTC business, and thus Defendants would have had actual knowledge of customer losses.

177.    Defendants' incomplete and misleading disclosures also indicate that they had actual knowledge of the extent and nature of the problems in the Omnicare LTC business.  On the August 8, 2018 earnings call announcing the Company's second quarter 2018 financial results,  for example, Defendant Denton told investors that, "In 2017, we disclosed that our annual goodwill impairment test of our long-term care reporting unit resulted in its fair value exceeding its carrying value only by a narrow margin.  ***As a result, we've been closely monitoring the performance of the business for potential indicators of impairment***."

178.    Defendants thus had actual knowledge of the customers losses, and the reasons underlying those losses, by virtue of their access to internal reporting systems, the circulation of reports on customer performance, calls directly involving Defendant Kraft and the Individual Defendants own statements assuring investors that they were closely monitoring the Omnicare LTC business.

### G.  Defendants Concealed the Problems in the Omnicare LTC Business to Ensure that Those Problems Would Not Interfere with the Company's Acquisition of Aetna

179.    Although Defendants knew, or at an absolute minimum were reckless in not knowing, about the customer losses in the Omnicare LTC business, and the reasons underlying

those losses, Defendants nevertheless repeatedly made materially false and/or misleading statements and/or omissions about the condition of the Omnicare LTC business throughout the class period.

180.    Defendants engaged in this misconduct because they needed to prevent the truth about the Omnicare LTC business from interfering with future acquisitions by the Company, especially the Aetna Acquisition.  The Aetna Acquisition was essential to the Company's future competitiveness, and to complete that acquisition, the company would need to issue tens of billions of dollars in corporate bonds, as well as overcome significant integration challenges.

181.    Acquisitions were a central feature of how Defendants operated the Company. Approximately a year after the Acquisition closed, Defendants began signaling to the market that CVS Health was exploring additional acquisitions.  For example, on an August 2, 2016 earnings call disclosing CVS Health's financial performance for the second quarter of 2016 (the "Q2 2016 Call"), Defendant Denton disclosed that the Company would "continue to invest in our business *and do bolt-on acquisitions*."

182.    Three months later, on a November 3, 2016 call to report the Company's third quarter 2016 financial performance (the "Q3 2016 Call"), Defendant Merlo disclosed that the Company was actively exploring potential acquisitions and "*expect[s] to continue to evaluate opportunities for acquisitions that meet our strategic and financial criteria*."  Merlo repeated this representation on a February 9, 2017 call disclosing the Company's financial performance for the full 2016 fiscal year (the "FY 2016 Call").

183.    Another three months later, on a May 2, 2017 call to report the Company's financial performance for the first quarter of 2017, Defendant Denton again emphasized to the

market, "don't underestimate *the importance of bolt-on acquisitions*. Those are part of our

targets."

184.    As Defendants reiterated that future acquisitions were essential to the Company's

future, Defendants also emphasized the importance of the Company's credit rating.  In CVS

Health's 2015 Annual Report, which it published on February 9, 2016, for example, Defendant

Merlo emphasized that "[w]e maintain a high triple-B credit rating that allows CVS Health to

continue to effectively finance the working capital needs of the company."

185.    As described by the CWs, immediately after the Acquisition the Omnicare LTC

began hemorrhaging customers.  Defendants did not, however, disclose these losses or that the

losses were caused by the failure to properly integrate Omnicare, poor customer service, loss of

accounts to former employees and intentional defaulting on contracts by customers.

186.    Defendants knew that disclosing the problems within the Omnicare LTC business

could negatively affect the Company's credit rating.  Defendants knew that the large number of

bonds the Company would need to issue to fund the Aetna Acquisition would likely result in a

downgrade of the Company's credit rating in and of themselves.  A downgrade in advance of the

issuance of those bonds, however, as a result of the problems in the Omnicare LTC business,

could result in the Company issuing bonds in connection with the Aetna Acquisition at a rating

below "investment grade," which would dramatically increase the cost of issuing the bonds.

187.    Defendants were also concerned that if the extent of the losses in the Omnicare

LTC business, and the reasons for those losses, became public, analysts, investors, and the

market in general would question Defendants' ability to integrate a business as large and

different from CVS Health's current business as Aetna.  The markets would naturally question

how, if Defendants could not successfully integrate and operate the Omnicare LTC business's

$4.8 billion in revenue without driving a substantial number of customers to competitors, how could Defendants successfully integrate and operate Aetna, which *reported over $60.5 billion in total revenue in FY 2017*?

188.    On October 26, 2017, the Wall Street Journal and several other news outlets reported that CVS Health had made a bid to acquire Aetna.  In an article entitled, *CVS Makes Blockbuster Aetna Bid*, the Wall Street Journal revealed that CVS Health had proposed to buy Aetna for $66 billion.

189.    The Wall Street Journal article highlighted the various ways in which the potential acquisition was pivotal for CVS Health.  It emphasized that the merger could be pivotal for the Company's future prospects, as it was "scrambl[ing] to fortify itself against looming competition from Amazon.com Inc.," which had just received approval for wholesale pharmacy licenses in several states."  The article also emphasized that the potential transaction came with multiple challenges, including that it would be the largest in CVS Health's history, draw the scrutiny of antitrust regulators, and, if successful, allow CVS Health to "lock in a huge number of members for its pharmacy benefits management, or PBM, arm" and "bolster its leverage in negotiations with drugmakers."

190.    Defendants recognized that the acquisition of Aetna was necessary to grow CVS Health and protect the Company from competition from Amazon.  Defendants also knew that the problems in the Omnicare LTC business were so severe that some disclosure was necessary.

191.    Defendants, however, knew they could not disclose the extent of the problems in the Omnicare LTC business because the acquisition would require the Company to issue $40 billion in corporate bonds, and the disclosure could affect the Company's credit rating, which was at the lower end of "investment grade."  Defendants knew that issuing $40 billion in bonds

would likely result in a downgrade of the Company's credit rating on its own. Accordingly, a credit downgrade in advance of the announcement of the bond offering could result in the offering itself causing the Company's credit rating to fall below investment grade, which would dramatically increase the interest rate on the bonds.

192.    Defendants were clearly aware of the need to preserve the Company's credit rating in the lead-up to the announcement of the Aetna acquisition. For example, in the Annual Report on an earnings call a month before the agreement to purchase Aetna was announced, Defendant Denton was asked, "If you were to think just more strategically around the flexibility you have within the BBB spectrum, would there be a willingness to trade off, say, Tier 2 commercial paper access for a short time if they gave you sort of greater access in the long-term debt markets?" Denton responded sharply, "We're not focused on that . . . ***We're focused on maintaining our high BBB rating***, and that's consistent with our leverage targets that we've established at 2.7 times. So that's not what we're focusing on as of this point." Defendants thus knew that any downgrade to the Company's credit rating in advance of the issuance of the bonds could be catastrophic.

193.    However, Defendants' fears about investors questioning their ability to manage the integration of Aetna were well-founded. Coverage of the acquisition of Aetna focused on the difficulty the Company would have in integrating the target. "There are serious challenges to CVS's proposal. Revamping the stores could cost several billion dollars. The company will have to change how millions of customers see a doctor or nurse. And it will have to fight decades of health-care economics and patterns." Tracer, Z., *et al.*, *CVS's Megadeal to Change U.S. Health Care Faces Stiff Challenges*, Bloomberg News (Dec. 22, 2017),

https://www.bloomberg.com/news/articles/2017-12-22/cvs-s-megadeal-to-change-u-s-health-care-faces-stiff-challenges ("Megadeal Article").

194.    A Moody's analyst expressed similar concerns, opining that, "It's a strategic, sound transaction for the longer-term, but CVS has to integrate another company that has not necessarily been done before between a retailer and an insurance company," he said. "There are elevated   risks   in   terms   of   that   execution." *CVS   Borrows*,   Bloomberg   News, www.bloomberg.com/news/articles/2018-03-06/cvs-starts-blockbuster-debt-sale-to-fund-68-billion-aetna-deal.

195.    Similarly, Jeff Goldsmith, who runs the healthcare consulting firm Health Futures Inc. is skeptical of the strategy behind the deal, calling it 'flat out baffling', and says that the minute clinics 'lack the clinical acumen or trusting relationships with patients to effectively manage care' and does not 'see it generating new customers for the acquirer or the acquiree, or leverage to lower health costs.'" *See* Megadeal Article.

196.    Analysts covering the Company also questioned management's ability to integrate Aetna.   On an earnings call on May 2, 2018 reporting the Company's earnings for the first quarter of 2018 (the "Q1 2018 Call"), for example, an analyst asked, "I think investors very much understand and appreciate the long-term bull [sic] case of the combination. ***But we hear a lot of concerns about the potential for integration issues***."   Defendant Merlo downplayed these concerns by saying that, "the integration work is going very well."   Had Defendants disclosed their failures to integrate the Omnicare LTC business, the market would have been unlikely to accept Merlo's assurances.

197.    Accordingly,   either   a   credit   downgrade   or   the   market's   loss   of   faith   in Defendants' ability to integrate Aetna could cause the Aetna Acquisition to fail, which would

65

make it more difficult for the Company to grow and/or compete with Amazon. Defendants thus embarked on a plan to dribble out a disclosure of the problems in the Omnicare LTC unit that would allow the acquisition of Aetna to proceed.

198.    On November 6, 2017, Defendants caused the Company to disclose in its 10-Q that the amount by which the goodwill of the Omnicare LTC business exceeded its carrying costs had fallen from 7% to 1%. Defendants attributed the decrease to weaknesses in the LTC industry, but did not disclose the customer losses, failure of CVS Health's synergies, poor customer service, loss of accounts to former employees and intentional defaulting on contracts by customers. In the third quarter of 2016, the Company had disclosed that the goodwill of the Omnicare LTC business exceeded its carrying costs by 7% and that the value of the goodwill was approximately $6.5 billion. Incredibly, when the Company disclosed that the value that its goodwill exceeded its carrying value had fallen to only 1%, the Company nevertheless insisted that the value of the goodwill *was unchanged* at approximately $6.5 billion.

199.    In addition to disclosing that the amount by which the fair value of the Omnicare LTC business exceeded its carrying costs had shrunk to 1%, the Company disclosed that its:

> multi-year cash flow projections for our LTC reporting unit have declined from the prior year *due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates* . . . . If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term *and the LTC reporting unit could be deemed to be impaired by a material amount*.

This disclosure merely alluded to nebulous "client retention rates," which wholly failed to apprise investors of the extent of the problems affecting the Omnicare LTC business. It also had the effect of priming the market for the future disclosures of problems in the LTC business in a way that would allow the Company to issue the bonds needed to fund the Aetna Acquisition

without affecting the Company's credit rating or raising additional questions about Defendants' ability to integrate the Aetna business.  After the disclosure, CVS Health's stock price fell from $69.25 per share to $66.80 per share, a decline of 3.5%.

200.    On December 3, 2017, CVS Health announced that it had reached an agreement to buy Aetna for $69 billion, which would be the largest acquisition in the Company's history.  It would also involve integrating an entirely different line of business under the CVS Health umbrella.

201.    On February 14, 2018, Defendants caused the Company to release its annual report on Form 10-K for the full year 2017.  The report repeated the disclosure in the Q3 2017 10-Q, but failed to disclose that the goodwill of the Omnicare LTC business was impaired or the customer losses, failure of CVS Health's synergies, poor customer service, loss of accounts to former employees and customers' intentional defaulting on contracts.  Like the prior disclosure, the 2018 10-K disclosure primed the market for the future writedown of the goodwill of the Omnicare LTC business, even though that goodwill was already severely impaired.  The second incomplete disclosure worked as Defendants intended, as the Company's credit rating did not change and a groundswell of opposition to the Aetna Acquisition relating to integration difficulties did not arise.

202.    Less than a month later, in early March, the Company issued a whopping $40 billion in corporate bonds to fund the acquisition.  At the time of the issuance, it was the third largest bond sale ever, behind Verizon Communications Inc.'s $49 billion offering in 2013 and Anheuser-Busch InBev SA's $46 billion offering in 2016.

203.    Not only was the issuance by CVS Health mammoth, but the bonds were being issued into a poor market.  At the time of the issuance, Bloomberg highlighted how risky the

issuance was, writing that CVS Health was "testing the appetite of a market that's off to is worst annual start in decades" because, among other things, "[w]ith the Federal Reserve hiking interest rates and withdrawing its unprecedented stimulus measures . . . yields on investment-grade debt have climbed to the highest levels in six years.  Smith, M., *CVS Borrows $40 Billion for Aetna in Third-Largest Bond Sale*, Bloomberg News (Mar. 6, 2018) ("CVS Borrows"), www.bloomberg.com/news/articles/2018-03-06/cvs-starts-blockbuster-debt-sale-to-fund-68-billion-aetna-deal.  Had Defendants not concealed the extent of the problems in the Omnicare LTC unit by making only partial disclosures, the Company's credit rating may have fallen below investment grade and the Company would have had to pay a much higher interest rate to issue the bonds, if it was able to issue the bonds at all.

204.     On March 9, 2018, the Company issued an aggregate of $40.0 billion of floating rate notes and unsecured senior notes, collectively the "Notes", for total proceeds of approximately $39.4 billion, net of discounts and underwriting fees.  As Defendants expected, two ratings agencies lowered the Company's credit rating in the wake of the offering.  Genovese, M., *S&P Cuts CVS to 'BBB' on Risk Profile Post Merger*, Bloomberg News (Mar. 6, 2018); Rating *Action: Moody's downgrades CVS to Baa2; outlook negative*, Moody's Investors Service (Nov. 28, 2018), https://www.moodys.com/research/Moodys-downgrades-CVS-to-Baa2-outlook-negative--PR_392258.  Since Defendants had not disclosed the extent of the problems in the Omnicare LTC business, however, the bonds themselves were still investment grade when they were issued, saving the Company billions.

205.     In August 2018, Defendants continued their strategy of dribbling out their disclosure of problems in the Omnicare LTC business.  Defendants claimed that they had conducted a goodwill impairment test in the second quarter of 2018, instead of the first quarter,

because of a forecast and budget that suggested "a deterioration in the financial results" for the Omnicare LTC business.  Defendants then disclosed that the results of the impairment test showed that "the fair value of the LTC reporting unit was lower than the carrying value, resulting in a *$3.9 billion pre-tax goodwill impairment charge*."  The Company reminded investors that the remaining goodwill balance for its Omnicare LTC business was approximately $2.7 billion.

206.    Defendants euphemistically attributed the write-down in goodwill to certain "challenges" facing the Omnicare LTC business, including

> client retention rates, occupancy rates in skilled nursing facilities, the financial health of skilled nursing facility customers, facility reimbursement pressures, our ability to execute our senior living initiative, our ability to make acquisitions and integrate those businesses into our LTC operations in an orderly manner, as well as our ability to extract cost savings from labor productivity and other initiatives.

Defendants, however, were careful to assure investors that these new "challenges" were manageable and that a four-point plan had been implemented to respond to them, including making "a number of additions and changes to our LTC management team."  These reassurances grossly misled investors as to the severity of the issues facing the Omnicare LTC business and concealed from investors the fact that an enormous numbers LTC customers had fled CVS Health as a result of systemic issues created by the Company's synergies, atrocious customer service, and poaching of customers by former employees.

207.    The Aetna Acquisition successfully closed on November 28, 2018.   The Defendants' strategy had worked.  Their incomplete and misleading disclosures of problems in the Omnicare LTC business, including waiting to write down any impairment of the goodwill for that business until *after* the Company had issued the bonds used to fund the Aetna Acquisition, had allowed the Company to acquire Aetna.

208.    With the Aetna Acquisition complete, the Company finally told investors that all of the goodwill for the Omnicare LTC business was more or less gone.  In its annual report on

Form 10-K for 2018, the Company disclosed that it had run yet another impairment test on the goodwill for its Omnicare LTC business and determined that it needed to write down the value of the remaining goodwill by an additional $2.2 billion.  The disclosure was made with a straight face, even though it was highly implausible that the business could decline by *an additional $2.2 billion* in only six months.  After taking this second impairment, the value of the goodwill remaining in the Omnicare business three-and-a-half years after the Acquisition *was only $432 million*.  The 2018 10-K attributed this writedown to:

> *operational issues* and customer liquidity issues, including one significant customer bankruptcy. Additionally, LTC management submitted an updated final budget for 2019 which *showed significant additional deterioration in the projected financial results for 2019 compared to the analyses performed in the second and third quarters of 2018 primarily due to continued industry and operational challenges*.

209.    The 2018 10-K was the first time Defendants disclosed that the Omnicare LTC business was being affected by "operational issues," in addition to "customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates."  Defendants had never suggested there were any "operational issues" contributing to the problems in the Omnicare LTC business, because that could have led to the market questioning whether Defendants could operate the Aetna business effectively after the Aetna Acquisition.

210.    Defendants' dribbled-out, partial disclosures of problems in the Omnicare LTC business were false and misleading because, having disclosed an impairment of the business, Defendants had a duty to be truthful about the extent of the impairment and the problems in that business.  Instead, Defendants made materially false and/or misleading statements and/or omissions regarding the financial and operational condition of the Omnicare LTC business

intentionally or at a minimum with a reckless disregard for the truth because Defendants did not want the problems in the Omnicare LTC business to interfere with the Aetna Acquisition.

### H. The Individual Defendants Reaped Windfall Profits By Trading in Inflated CVS Health Shares During the Class Period

211.    The Individual Defendants also concealed the problems in the Omnicare LTC business because they knew that they could reap windfall profits from selling their shares of CVS Health stock during the Class Period while in possession of material, non-public information regarding the true condition of the Omnicare LTC business.

212.    As described below, not only did the Defendants Merlo, Denton, and Roberts sell shares of CVS Health stock at a profit during the Class Period, but their stock sales *increased sharply* during the Class Period, as illustrated by the chart in paragraph 214 below.

213.    The sudden spike in stock sales by Defendants Merlo, Denton and Roberts during the Class Period attracted the attention of the financial press.  On September 22, 2017, Barron's Online published an article questioning why CVS Health insiders appeared to be dumping their stock when the Company was contemporaneously telling investors, "[w]e see significant opportunity for long-term growth."  *See* Lin, Ed, *CVS Insiders Sell $100 Million in Stock*, Barron's Online, Sep. 22, 2017, https://www.barrons.com/articles/cvs-insiders-sell-100-million-in-stock-1506081167 (the "Insider Sales Article").  The Insider Sales Article described the increase starkly, stating that "So far this year, insiders at the drugstore and pharmacy benefit manager, including the chief executive [Merlo], chief financial [Denton] and chief operating officers [Roberts], *have sold nearly $100 million in shares — more than five times the dollar amount they sold last year*."  The article then observed, "*[w]hat's odd is the timing* . . . . Why are they selling shares now — some for the first time in years and some for the first time — in a rebuilding period before the shares can truly rebound?"

214.    The following chart shows the spikes in individual sales and total sales for Defendants Merlo and Denton during the three years leading up to the Class Period when compared with the thee-year period prior to the Class Period.  The chart also shows how Merlo, Denton and Roberts each sold more shares in 2017 than any other year, and made all of those sales *prior to* the first "dribble-out" disclosure in November 2017 of the decline in the percent that the Omnicare LTC business's goodwill exceeded the business's carrying costs.

**COMPARISON OF CVS HEALTH INSIDER STOCK SALES
DURING THREE FULL YEARS PRIOR TO CLASS PERIOD VS. CLASS PERIOD**



215.    During the Class Period the Company had two share repurchase programs in effect, which the Company identified as the 2014 Repurchase Program and the 2016 Repurchase Program, respectively (together, the "Repurchase Programs").  The 2014 Repurchase Program was authorized on December 15, 2014 and was completed during the second quarter of 2017. The 2016 Repurchase Program was authorized on November 2, 2016 and remains active.  The Repurchase Programs permitted the Company at its discretion to repurchase up to a total of $25

billion shares of CVS Health on the open market, in privately negotiated transactions, in accelerated share repurchase transactions and/or in other derivative transactions.

216.   CVS Health repeatedly made large purchases of its own shares during the Class Period pursuant to the Repurchase Programs, which allowed the Company to further artificially inflate its share price beyond what the share price would have been had the Company disclosed that the Omnicare LTC business was failing in the wake of the Acquisition.

217.   Defendant Merlo capitalized on the inflated stock price by selling shares in the Company twelve times during the Class Period to reap gross proceeds of nearly $65 million and net proceeds of $33.3 million.   Merlo's largest sales occurred shortly before the Company announced that it was reducing or taking impairments on the value of the goodwill for the Omnicare LTC business.

218.   For example, on September 13, 2017, Merlo exercised stock options and sold 241,150 shares of the Company, reaping proceeds of over $20 million alone.   The proceeds of this sale nearly amounted to the proceeds of Merlo's eight prior stock sales in the Class Period combined.   Defendant Merlo's sale seemed especially fishy to industry observers.   The Insider Sales Article questioned why, if the sale was pursuant to a 10b5-1 plan, "did Merlo set up his plan to sell shares at a price that represents *a mere 7% gain* from the Dec. 30 price, excluding dividends?"

219.   The answer was that the sales took place in the run-up to the release of the Company's Q3 10-Q, on November 8, 2017, where the Company suggested for the first time that there could problems in the Omnicare LTC business.   In that 10-Q, the Company stated that the excess of the fair value of its goodwill for Omnicare LTC business over its carrying value had declined from 7% to 1% and could potentially be impaired in the future.

220.    Similarly, on January 8, 2019, Merlo exercised stock options and sold 166,368 shares of CVS Health, his second-largest sale of shares during the Class Period.  As a result of this sale he reaped $11.5 million in proceeds.  On February 1, 2019, he again sold 166,368 shares, this time reaping $10.7 million in proceeds.  On February 20, 2019, less than three weeks later, the Company announced the $2.1 million write-down of goodwill for its LTC business, and the Company's share price fell 8% on that day alone and a total of 25% when it bottomed out two weeks later.

221.    Defendant Denton also profited handsomely by selling shares in the Company eleven times during the Class Period to reap gross proceeds of over $45 million and net proceeds of nearly $26 million.  Like Merlo, Denton's largest sales occurred shortly before the Company announced that it was reducing the value of the goodwill for its LTC business.

222.    On June 12, 2017, Denton exercised stock options and sold 230,510 shares of the Company, reaping proceeds of $18.4 million.  The proceeds of this sale were nearly double the proceeds of Denton's prior stock sales in the Class Period combined.  Three months later, on September 11, 2017, Denton again exercised stock options and sold 237,078 shares of the Company, reaping proceeds of $18.9 million.  These sales were made as the Company was preparing to conduct and conducting its annual goodwill impairment tests in the third quarter of 2017.  On November 8, 2017, two months after the sale and as part of the Company's next quarterly report, it's Q3 10-Q, the Company disclosed for the first time that there might be something wrong with the Omnicare LTC business, namely that the excess of the fair value of its goodwill for its LTC reporting unit over its carrying value had declined from 7% to 1% and could potentially be impaired in the future.

223.    Defendant Roberts also capitalized on the inflated stock price by selling shares in the Company eight times during the Class Period to reap gross proceeds of over $17 million and net proceeds of $10.5 million.  Roberts' largest sales occurred shortly before the Company announced that it was reducing or taking impairments on the value of the goodwill for the Omnicare LTC business.

224.    For example, on September 18, 2017, Roberts exercised stock options and sold 85,743 shares of the Company, reaping proceeds of over $7 million alone.  This sale took place while the Company was conducting its annual goodwill impairment tests in the third quarter of 2017.  On November 8, 2017, two months after the sale and as part of the Company's very next quarterly report, the Q3 2017 10-Q, the Company disclosed for the first time that there were problems in its LTC business, namely that the excess of the fair value of its goodwill for its LTC reporting unit over its carrying value had declined from 7% to 1% and could potentially be impaired in the future.

225.    Similarly, on February 1, 2019, Roberts exercised stock options and sold 77,639 shares of CVS Health, his second-largest sale of shares during the Class Period.  As a result of this sale he reaped over $5 million in proceeds.  On February 20, 2019, less than three weeks later, the Company announced the $2.1 million write-down of goodwill for its LTC business, and the Company's share price fell 8% on that day alone and a total of 25% when it bottomed out two weeks later.

226.    Defendant Boratto also capitalized on the inflated stock price by selling shares in the Company 18 times during the Class Period to reap gross proceeds of over $4 million and net proceeds of over $2.5 million.

227.    In short, Defendants Merlo, Denton, Roberts, and Boratto reaped tens of millions of dollars at the expense of investors by selling shares during the Class Period knowing that the Company's LTC business was in tatters.

228.    The Individual Defendants' scienter is thus established because several of the Individual Defendants profited from the sale of CVS Health stock during the Class Period while in possession of material, non-public information regarding the true condition of the Omnicare LTC business.

229.    CVS Health itself had scienter as to the false and misleading nature of the statements described above based on the knowledge of the Individual Defendants, all of whom were among the Company's most senior executives and part of the Company's management team. In addition, because the false and misleading statements at issue here relate to the Company's basic business model, the Company's scienter can be inferred because these statements would have been approved by corporate officials that knew they were false or misleading.

230.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

I.  **CVS Health's Share Price Plummets After It Announces the Goodwill Writedown**

231.    The news of the second writedown of the goodwill of the Omnicare LTC business on February 20, 2019 indicated that there were extensive financial and operational problems in

the Omnicare LTC business.  That day, CVS Health's stock price fell by $5.66 per share, or slightly over 8%, to close at $64.22 per share.  Then, as the market digested the goodwill impairment and recognized the true value of the Omnicare business, Dur Health's share price plummeted over the next several days before hitting bottom at $52.36 on March 7, 2019, a decline of over 25%.  These declines were attributable to the disclosure to investors of the goodwill impairment, and that there were significant financial and operational problems affecting the value of the Omnicare business.

232.    On the same day, *Fortune* published an article titled "CVS Stock Plummets as 2019 Looks Like It Will Be a 'Major Disappointment' for Investors," which stated, in relevant part:

> The company announced a $2.2 billion writedown on its 2015 takeover of Omnicare, a $12.9 billion deal that was meant to build the company's business serving patients in nursing homes and long-term medical-care facilities.
>
> But that business hasn't grown as expected. There are fewer patients in long-term care facilities, which caused a number of CVS's customers to go bankrupt last year.
>
> The $2.2 billion Omnicare charge follows an earlier, $3.9 billion writedown CVS took on the business in the second quarter. Together, they add up to half of what the company paid for Omnicare three years ago. The unit is predicting more challenges in the future, CVS said.

233.    The *Fortune* article also quoted Evercore ISI analyst Ross Muken, who noted that not only was the 2019 guidance a "major disappointment," but it would also "stoke fears" that the Company's $68 billion purchase of insurer Aetna the year before "was defensive in nature."

234.    An article published by *The Motley Fool* the same day, titled "What's Behind CVS Health's Fourth-Quarter Loss?" also noted Omnicare's "spotlight" in the February 2019 Release "and not for a good reason."  According to the article, despite "relatively good news" that came out of the press release, "CVS Health still posted a net loss of $421 million in the

fourth quarter" because "[t]he company recorded a goodwill impairment charge of $2.2 billion in the fourth quarter (and $6.1 billion for the full year) related to its struggling LTC pharmacy unit."

235.    The goodwill impairment charge took investors and analysts by surprise.  A Wells Fargo analyst wrote in his coverage of the writedown that "*[w]e were surprised* that the . . . charge taken in Q2 2018 wasn't the bottom for this business."  On the Company's earnings call on February 20, 2019, the day the writedown was announced, a Cowen analyst remarked incredulously, "[y]ou've kind of written off *maybe upwards of half of the value* of what you kind of put into [the Omnicare LTC business] initially when you consider the debt you took on as well."  On the same call, a JPMorgan analyst asked pointedly, "[i]s Omnicare *strategic to the company* going forward?"

236.    Following the February 20, 2019 disclosure of the $2.2 billion goodwill impairment charge to the Omnicare LTC business, CVS Health's stock price fell by $5.66 per share, or slightly over 8%, to close at $64.22 per share on February 20, 2019.  Then, as the market digested the goodwill impairment and recognized the true value of the Omnicare business, CVS Health's share price plummeted over the next several days before hitting bottom at $52.36 on March 7, 2019, a decline of over 25%.  These declines were attributable to the disclosure to investors of the goodwill impairment, and thus the true value of the Omnicare business.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

237.    Throughout the Class Period, CVS Health and the Individual Defendants made false and misleading statements concerning the financial health of the Omnicare LTC business and failed to disclose material facts necessary to make their statements not misleading, namely

that the Omnicare LTC business was in material decline because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health, and (v) as a result, CVS Health's public statements were materially false and misleading at all relevant times.

A. **Defendants' Statements Concerning the Financial Performance of the Omnicare LTC Business During the Class Period Were False and Misleading**

238.    As described in detail below, each Class Period 10-K and Class Period 10-Q, as well as the press releases, earnings calls and presentations associated with each Class Period 10-K and Class Period 10-Q, misrepresented the performance, financial health and goodwill value of the Omnicare LTC business by failing to disclose that the Omnicare LTC business was declining materially because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health, and (v) as a result, CVS Health's public statements were materially false and misleading at all relevant times.

239.    When the Company reported its financial performance for fiscal year 2015 on February 9, 2016 in the 2015 10-K, which was signed by Defendants Merlo and Denton, the Company attached Management's Discussion and Analysis of Financial Condition and Results of Operations as Exhibit 13 to that 10-K.  In Exhibit 13, the Company informed investors that its "*segments benefited from the Omnicare acquisition*," an increase in net revenues in the Company's Retail/LTC segment "*was primarily driven by the acquisition of Omnicare*,"

"[p]harmacy revenue growth continued to benefit from increased utilization by Medicare Part D beneficiaries, ***our ability to attract and retain managed care customers*** and favorable industry trends," and "[p]harmacy revenues as a percentage of total net revenues increased . . . . [D]ue to pharmacy revenues growing faster than front store revenues, ***as well as the acquisition of Omnicare***." These statements in the FY 2015 10-K communicated to investors that CVS Health's reporting segments were benefitting from the Acquisition, the Acquisition was driving increases in revenues, and CVS Health was attracting and retaining customers when, in reality, as described by the CWs, Omnicare LTC customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.

240.   In the Q1 2016 10-Q, which was signed by Defendant Denton, the Company informed investors that its "Net revenues [in the Retail/LTC segment] ***were positively affected by the addition of LTC***"; "[g]ross profit dollars . . . was positively affected by an increase in generic dispensing rates, as well as volume from the ***acquisitions of Omnicare*** and the pharmacies and clinics of Target," "[t]he increase in [Retail/LTC segment] gross profit dollars was primarily driven by the addition of LTC and the pharmacies and clinics of Target," and that its pharmacy revenue growth benefitted from "***our ability to attract and retain managed care customers and favorable industry trends***." These statements communicated to investors that CVS Health's reporting segments were benefitting from the Acquisition, the Acquisition was driving increases in revenues, and CVS Health was attracting and retaining customers when, in reality, as described by the CWs, Omnicare LTC customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to

ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.

241.    In the Q2 2016 10-Q, which was signed by Defendant Denton, the Company told investors that its "Net revenues were ***positively affected*** by the addition of LTC"; its pharmacy revenue growth benefitted from "***our ability to attract and retain managed care customers*** and favorable industry trends"; "pharmacy gross profit rates have been adversely affected by . . . ***changes in the mix of our business*** within the pharmacy portion of the Retail/LTC Segment"; increases in revenues were "***driven by the acquisitions of Omnicare*** in August 2015 and the pharmacies and clinics of Target in December 2015, which ***positively affected both segments***"; "Net revenues [for the Retail/LTC segment] were ***positively affected by the addition of LTC***"; and "[t]he increase in gross profit dollars was primarily ***driven by the addition of LTC*** and the pharmacies and clinics of Target, as well as same store sales."  These statements communicated to investors that CVS Health's reporting segments were benefitting from the Acquisition, the Acquisition was driving increases in revenues, and CVS Health was attracting and retaining customers when, in reality, as described by the CWs, Omnicare LTC customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.

242.    In the Q3 2016 10-Q, which was signed by Defendant Denton, the Company told investors that its "increase [in net revenues in the Retail/LTC segment] was ***driven by the acquisition of Omnicare*** in August 2015, which positively affected both segments," "[g]ross profit dollars for the three and nine months ended September 30, 2016, were positively affected by . . . ***volume from the acquisitions of Omnicare***," "[n]et revenues were ***positively affected by***

*the addition of LTC* which was acquired in August 2015," "[p]harmacy revenues as a percentage of total net revenues increased . . . due to pharmacy revenues growing faster than front store revenues, *as well as the acquisition of Omnicare*," "increase in gross profit dollars [in the Retail/LTC segment] was *primarily driven by the addition of the pharmacies and clinics of Target and LTC*," "[p]harmacy revenue continued to benefit from the increased utilization by Medicare Part D beneficiaries, *our ability to attract and retain managed care customers* and favorable industry trends."  These statements communicated to investors that CVS Health's reporting segments were benefitting from the Acquisition, the Acquisition was driving increases in revenues, and CVS Health was attracting and retaining customers when, in reality, as described by the CWs, Omnicare LTC customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.

243.    When the Company reported its financial performance for fiscal year 2016 on February 9, 2017 in the 2016 10-K, which was signed by Defendants Merlo and Denton, the Company attached Management's Discussion and Analysis of Financial Condition and Results of Operations as Exhibit 13 to that 10-K.  In Exhibit 13, the Company told investors that its "*segments benefited from the Omnicare acquisition that occurred in August 2015*," its "increase in gross profit dollars in the year ended December 31, 2015, was *primarily driven by the addition of LTC*, same store sales and new store sales," increase in net revenues in its Retail/LTC segment "*was primarily driven by the acquisition of Omnicare*," and "[p]harmacy revenue growth continued to benefit from increased utilization by Medicare Part D beneficiaries, *our ability to attract and retain managed care customers* and favorable industry trends."  These

statements communicated to investors that CVS Health's reporting segments were benefitting from the Acquisition, the Acquisition was driving increases in revenues, and CVS Health was attracting and retaining customers when, in reality, as described by the CWs, Omnicare LTC customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.

244.    In the Q1 2017 10-Q, which was signed by Defendant Denton, the Company told investors that its "decrease in the Retail/LTC Segment . . .  was primarily due to marketplace changes that restrict CVS Pharmacy from participating in certain networks" and a "decline in same store sales, continued reimbursement pressure and an increase in the generic dispensing rate."  The Company also told investors that "[p]harmacy revenue continued to benefit from our *ability to attract and retain managed care customers*, the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC division were limited to network, same store sales, and reimbursement issues and concealed that the Omnicare LTC business was in material decline because of substantial customer losses.  Defendants were able to use these statements to "launder" the problems in the Omnicare LTC business because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.  The Q1 2017 10-Q also touted CVS Health's ability to *attract and retain* customers when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to

retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

245.    In the Q2 2017 10-Q, which was signed by Defendant Denton, the Company told investors that its "decrease in the Retail/LTC Segment . . . was primarily due to marketplace changes that restrict CVS Pharmacy from participating in certain networks" and a "decline in same store sales, continued reimbursement pressure and an increase in the generic dispensing rate.  The Company also told investors that "[p]harmacy revenue continued to benefit from our *ability to attract and retain managed care customers*, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC division were limited to network, same store sales, and reimbursement issues and concealed that the Omnicare LTC business was in material decline because of substantial customer losses.  Defendants were able to use these statements to "launder" the problems in the Omnicare LTC business because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.  The Q2 2017 10-Q also touted CVS Health's ability to *attract and retain* customers when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14

described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

246.    In the Q3 2017 10-Q, which was signed by Defendant Denton, the Company told investors that its "decrease in the Retail/LTC Segment . . . was primarily due to marketplace changes that restrict CVS Pharmacy from participating in certain networks" and a "decline in same store sales, continued reimbursement pressure and an increase in the generic dispensing rate."  The Company also told investors that "[p]harmacy revenue growth may be impacted by industry changes in the LTC business, such as lower occupancy rates at skilled nursing facilities," and that "[p]harmacy revenue continued to benefit from our ***ability to attract and retain managed care customers***, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  In addition, on an earnings call on November 6, 2017 reporting earnings for the third quarter 2017 (the "Q3 2017 Call"), Defendant Denton told investors that the decline in the Company's overall gross margin in the prior quarter was "due in part to a mix shift in our business."  These statements misled investors into believing that declines in the Retail/LTC division were limited to network, same store sales, and reimbursement issues and/or concealed that the Omnicare LTC business was in material decline because of substantial customer losses.  Defendants were able to use these statements to "launder" the problems in the Omnicare LTC business because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.  The Q3 2017 10-Q also touted CVS Health's ability to ***attract and retain*** customers when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with

85

relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

247.     When the Company reported its financial performance for fiscal year 2017 on February 14, 2018 in the 2017 10-K, which was signed by Defendants Merlo and Denton, the Company attached Management's Discussion and Analysis of Financial Condition and Results of Operations as Exhibit 13 to that 10-K.  In Exhibit 13, which in turn was signed by Defendant Denton, the Company told investors that its  "net revenues in our Retail/LTC Segment decreased . . . primarily due to a decline in same store sales of 2.6% as a result of the previously-announced marketplace changes that restrict CVS Pharmacy from participating in certain networks," "[p]harmacy revenue growth may be impacted by industry changes in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities," "[p]harmacy revenue continued to benefit from our ability to attract and retain managed care customers, the increased use of pharmaceuticals by an aging population and as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC division were limited to network, same store sales, and reimbursement issues and concealed that the Omnicare LTC business was in material decline because of substantial customer losses.  Defendants were able to use these statements to "launder" the problems in the Omnicare LTC business because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.  The 2017 10-K also touted CVS Health's ability to **attract and retain** customers when, as described by the CWs, synergies

implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

248.    In the Q1 2018 10-Q, which was filed on May 2, 2018 and signed by Defendant Denton, the Company told investors that "[t]he increase in the Retail/LTC Segment was primarily due to increased prescription volume and brand inflation, partially offset by continued reimbursement pressure and the impact of recent generic introductions," increases in gross profit dollars were "*partially offset by continued reimbursement pressure* in the Retail/LTC Segment," "[p]harmacy revenue growth has been *impacted by industry changes in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities,*" and "[p]harmacy revenue continued to benefit from our ability to *attract and retain managed care customers*, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC segment were the result of reimbursement issues and lower occupancy rates at skilled nursing facilities, when in fact, as described by the CWs, the Omnicare LTC business was in material decline because of substantial customer losses.  Investors had no way to evaluate the accuracy of these statements because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.  The Q1 2018 10-Q also touted CVS Health's ability to *attract and retain* customers

when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

249.    In the Q2 2018 10-Q, which was signed by Defendant Denton, the Company told investors that "[t]he increase in the Retail/LTC Segment was primarily due to increased prescription volume and brand inflation, ***partially offset by continued reimbursement pressure*** and the impact of recent generic introductions," increases in gross profit dollars were "***partially offset by continued reimbursement pressure*** in the Retail/LTC Segment," "[p]harmacy revenue growth has been impacted by industry changes in the LTC business, such as ***continuing lower occupancy rates at skilled nursing facilities***," and "[p]harmacy revenue continued to benefit from ***our ability to attract and retain managed care customers***, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC segment were the result of reimbursement issues and lower occupancy rates at skilled nursing facilities, when in fact, as described by the CWs, the Omnicare LTC business was in material decline because of substantial customer losses.  Investors had no way to evaluate the accuracy of these statements because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.

250.    The Q2 2018 10-Q also touted CVS Health's ability to **attract and retain** customers when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

251.    In the Q3 2018 10-Q, which was signed by Defendant Denton, the Company told investors that its "[t]he increase [in net revenues] is due to . . . increased prescription volume in the Retail/LTC Segment, as well as brand inflation.  The increases were **partially offset by continued price compression and reimbursement pressure** as well as increased generic dispensing." The Company also told investors that "[p]harmacy revenue growth has been impacted by industry changes in the LTC business, such as **continuing lower occupancy rates at skilled nursing facilities**," and "[p]harmacy revenue continued to benefit from our ability to **attract and retain managed care customers**, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC segment were the result of reimbursement issues and lower occupancy rates at skilled nursing facilities, when in fact, as described by the CWs, the Omnicare LTC business was in material decline because of substantial customer losses. Investors had no way to evaluate the accuracy of these statements because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.  The Q3 2018 10-Q also touted CVS Health's

ability to **attract and retain** customers when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

252.   When the Company reported its financial performance for fiscal year 2018 on February 20, 2019 in the 2018 10-K, which was signed by Defendants Merlo and Denton, the Company attached Management's Discussion and Analysis of Financial Condition and Results of Operations as Exhibit 13 to that 10-K.  In Exhibit 13, the Company told investors that its increase in total revenues "was primarily driven by increased prescription volume and brand name drug price inflation, partially offset by continued reimbursement pressure and the impact of recent generic introduction."  The Company also told investors that "[p]harmacy revenue growth has been adversely affected by industry challenges in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities, as well as the deteriorating financial health of many skilled nursing facilities which resulted in a number of customer bankruptcies in 2018," and that "[p]harmacy revenue in 2018 continued to benefit from the Company's ability **to attract and retain managed care customers** and the increased use of pharmaceuticals by an aging population as the first line of defense for health care."  These statements misled investors into believing that declines in the Retail/LTC segment were the result of reimbursement issues and lower occupancy rates at skilled nursing facilities, when in fact the Omnicare LTC business was in material decline because of substantial customer losses.  Investors had no way to evaluate the

accuracy of these statements because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements did not comply with Rule 5-02.3.

253.    The 2018 10-K also touted CVS Health's ability to ***attract and retain*** customers when, as described by the CWs, synergies implemented by CVS Health in the Omnicare LTC business, like a centralized billing center, replacing employees with relationships with LTC providers, and moving shipments of LTC medications to retail pharmacies were driving customers away, while contracting bottlenecks, as described by CW7, CW9, and CW14, prevented CVS Health from attracting new customers or, as CW14 described, effectively servicing the few new LTC customers who agreed to do business with CVS Health.

254.    In sum, the statements in paragraphs 238 to 253 above misled investors because they misrepresented and concealed the actual reasons for the declines in the Omnicare LTC business that were materially affecting the performance of the Retail/LTC segment, which in turn was affecting the overall performance of the Company.  The statements concealed the declines in the Omnicare LTC business because they failed to disclose that (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.  Defendants were able to use the above statements to "launder" the problems in the Omnicare LTC business because Defendants had structured the Company's reporting segments so that the Omnicare LTC business was enveloped within the larger retail pharmacy business and because the Company's reported balance sheet statements

did not comply with Rule 5-02.3.  Defendants made these statements so that, among other things, they could sell their shares in CVS Health at artificially inflated prices and so that they could successfully negotiate, announce, fund and close the Aetna Acquisition without the Company's credit rating deteriorating to "junk bond" status and without the markets questioning Defendants' ability to integrate the Aetna business.

### B. Defendants Falsely Represented That CVS Health Understood Omnicare LTC Customers' Needs and Were Meeting Those Customers' Service Requirements

255.    At the time of the Acquisition, Defendants emphasized to investors that they understood the importance of customer service to LTC customers in general and would be delivering the appropriate customer service to those customers.   For example, when the Acquisition closed, Defendant Merlo boasted that the Company understood the importance of customer service to its "integrated model," which included the Omnicare LTC business, saying "as we've talked in the past, you've got to be right on price, *you've got to be right on service*." Later in the call, Merlo went on, "*you've got to be right on price and service as the ticket to the game*. And then I think our differentiated model comes into play in a very healthy way after that."

256.    Defendants repeatedly assured investors throughout the Class Period that the Company understood the needs of Omnicare LTC customers and was meeting those customers' needs.   These statements were materially false and misleading, however, because Defendants concealed and failed to disclose that Omnicare LTC customers were fleeing CVS Health, including by intentionally defaulting on contracts, because CVS Health did not understand their needs and was providing sub-standard, ineffective customer service.

257.     Each of the 2015 10-K, Q1 2016 10-Q, Q2 2016 10-Q, Q3 2016 10-Q, 2016 10-K, Q1 2017 10-Q, Q2 2017 10-Q, Q3 2017 10-Q, 2017 10-K, and Q1 2018 10-Q, Q2 2018 10-Q, and Q3 2018 10-Q, assured investors that CVS Health was:

> "the only integrated pharmacy health care company with the ability to impact consumers, payors, and providers with innovative, channel-agnostic solutions to complex challenges managing costs and care. *We have a deep understanding of their diverse needs through our unique integrated model*, and we are bringing them innovative solutions that help increase access to quality care, deliver better health outcomes and lower overall health care costs."

258.     Similarly, on the Q3 2016 Call, Defendant Merlo told investors, "one of the things that we learned this past year through our pilots in the assisted living space is that we found that *we had to target both the needs of the residents in those facilities along with the facility operator needs*. . . . Those investments are underway, and they really need to be completed for us to broadly sell the value proposition that we can bring to the assisted living space."

259.     These statements were materially false and misleading because, as described by CW4, CW6, CW7, CW13, and CW18, Omnicare LTC customers were fleeing CVS Health, including by intentionally defaulting on contracts.  The customers were fleeing, CW4, CW6, CW7, CW13, and CW18 said, because CVS Health did *not* understand their needs, and consistently failed to address those needs.

260.     CVS Health could not understand or address the Omnicare LTC customers' needs because it *ignored* those needs.  As described by CW4, the Omnicare LTC business refused to negotiate prices and ignored customer requests from facilities, even though addressing these needs was essential to retaining the facilities' business.  In addition, CW7 separately described how the Omnicare LTC business ignored requests to negotiate contract terms, going as far as to re-send prior versions of contracts for signature without even acknowledging that the customers had requested changes.  Finally, CW18 described how the Omnicare LTC business delayed

getting medication to customers, even though prompt responses to those customers' requests was essential to serving them properly.

261.    On the Q2 2016 Call, Defendant Merlo assured investors that CVS Health was *"[w]orking with our LTC clients to address currently unmet needs of their residents with goal of improving patient care and driving operational efficiencies*."  This statement also appeared on a presentation distributed to investors on August 2, 2016 in connection with the Q2 2016 Call (the "Q2 2016 Presentation").   Later on the same call, Defendant Merlo claimed "we also continue to pilot our integrative service offerings to the Assisted and Independent Living communities, *offering residents enhanced prescription delivery options based on their preference and acuity level*."

262.    A year later, during the Q2 2017 Call, Defendant Merlo updated analysts and investors that "*We have invested the time and capital over the past two years to get the right technology and processes in place* in order to differentiate our offering to make it more compelling for our clients as well as the residents at these facilities." These representations were repeated in the presentation provided to call attendees as well.

263.    These statements misled investors into believing CVS Health's Omnicare LTC business was interacting successfully with customers and concealed the truth that CVS Health had destroyed existing customer relationships because, as described by several CWs, including CW13, CVS Health had replaced the individuals who understood the LTC customers' business with inexperienced account managers.  Far from working with Omnicare LTC customers, these new account managers, as described by CW5, CW9, CW11, CW13, and CW16 were so poor that LTC customers fled to competitors, particularly competitors staffed by Omnicare/CVS Health employees who had had relationships, understood the LTC customers' service requirements, and

could deliver the necessary level of customer service.  Finally, Defendant Merlo's statement that CVS Health had "the rights technology and processes in place," was materially false and misleading because, as described by CW9 and CW16, Omnicare LTC customers hated CVS Health's technological innovations, and, as described by CW3, CW8, CW12 CW14, CW15, CW16, and CW18, the processes implemented by CVS Health had been and were anathema to customers and resulted in the Omnicare LTC business hemorrhaging customers.

264.    Defendants misrepresented that the Company understood the Omnicare LTC customers' needs so that, among other things, they could sell their shares in CVS Health at artificially inflated prices and so that they could successfully negotiate, announce, fund and close the Aetna Acquisition without the Company's credit rating deteriorating to "junk bond" status and without the markets questioning Defendants' ability to integrate the Aetna business.

### C. CVS Health Failed to Disclose the Material Fact That Its Pursuit of "Synergies" Were Driving Customers Away From the Omnicare LTC Business

265.    At the time of the Acquisition, Defendants assured investors that they had identified "synergies" associated with the Company's purchase of Omnicare that would enable them to integrate the Omnicare LTC business into CVS Health's retail offerings and expand that business to capitalize on the aging population's exploding need for LTC services.

266.    During a call on May 20, 2015 to announce the Acquisition (the "May 2015 Call"), Defendant Denton provided an overview of how the Company would implement "synergies" for analysts and investors:

> We expect to achieve significant purchasing and revenue synergies, as well as operating efficiencies from this transaction

> * * *

> While it is a little too early to lay out our specific plans, we expect to see significant purchasing synergies from this transaction. We also believe that we can improve Omnicare's current workflow and make the delivery service more

efficient.  Additionally, there are opportunities for us to grow revenue by applying many of our best practices to the Omnicare model.

\* \* \*

I do think revenue synergies, while there will be some opportunities in the short term, this is probably more of a medium term opportunity. Those will require us to put in place new processes or new services or new products that can again enhance the continuity of care for these patients as they transition through our healthcare system. And while I think there are real opportunities there, we will have to develop those new expertise.

When pressed about those synergies, Defendant Denton assured investors that, "We do feel strongly that we have pretty good line of sight to the synergies here."

267.    On the same call, Defendant Merlo echoed Defendant Denton's sentiments, telling investors, "we expect to achieve significant purchasing and revenue synergies, as well as additional synergies with this transaction over time."

268.    At the December 2015 Analyst Day, the Company's EVP and President – CVS Pharmacy, Helena Foulkes, boasted of the synergies CVS Health was implementing, telling attendees that:

We've driven down our labor cost to fill excluding wage inflation . . . and we continue to innovate in our processes and workflows. ***This focus has led to a better customer experience and a more efficient pharmacy***. Our Omnicare acquisition significantly expands our ability to serve the growing senior patient population and our presence in the ever important specialty pharmacy business."

269.    At the same Analyst Day, Defendant Kraft touted "synergies" as well, telling investors that "[w]e have a dynamic plan in place that focuses in the near-term on integrating the business and in the longer-term on the operational and revenue synergies, we believe we can drive."  These synergies involved, Kraft said, "leveraging best practices to ensure that our shared services, functions like finance, HR and legal are appropriately staffed."

270.    Two months later, during the FY 2015 Call, Defendant Merlo repeatedly touted the synergies, stating that "we expect to generate revenue synergies focused on the transitions of

96

care, market adjacencies and differentiated offerings. And these should begin to be realized in the second half of this year and grow in future periods." Merlo also told investors:

> If you look at Omnicare, we've got a number of pilots that have just begun to kick off that would focus on the revenue synergy side of the equation, acknowledging that we see opportunities across the spectrum in skilled nursing, assisted living and the independent living spaces. And I think *as we've been talking for quite a while now, those opportunities will really manifest themselves* across our retail business.

271.    Later in the same call, Defendant Merlo assured investors that the Omnicare LTC business could capitalize on the synergies because, "we've spent enough time with the long-term care clients to understand their pain points and their needs, and that's what's driving some of the pilots that we have underway."

272.    On the Q3 2016 Call, Defendant Merlo told investors the Omnicare LTC business needed to "target both the needs of the residents in those facilities along with the facility operator needs.  And in doing that, we need to make some additional and incremental technology investments. . . . we'll be getting that work done in 2017, and *I'm confident that we'll capitalize on the synergies once that work's complete*."

273.    At the December 2016 Analyst Day, CVS Pharmacy President Helena Foulkes detailed the "synergies" CVS Health was implementing in the Omnicare LTC business:

> First, CVS is sharing its extensive operational experience to *help improve efficiency and productivity in the core skilled nursing business*. When we acquired Omnicare, it was essentially a chain of chains. We've made key investments in people, processes and technology to increase standardization, improve service levels and make operational improvements across Omnicare's entire footprint.  For example, *through our national CVS Pharmacy network, we're able to fill emergency or stacked scripts for skilled nursing facilities much more quickly in urgent situations*. 77% of Omnicare's customers are within 3 miles of a CVS Pharmacy.  In addition, using CVS' expertise in standardizing pharmacy operations we're *driving operational improvements and investments at Omnicare*, including new workflow and the intake processes for when residents move into the facility. And *we've made technology upgrades including labor scheduling tools and e-prescribing enhancements to improve staff workflow*.

These investments *are bringing increased standardization to Omnicare and driving much better satisfaction among the communities we serve*.

274.    In reality, as CW3, CW5, CW9, CW11, CW12, CW13, CW14, CW16 and/or CW18 disclosed, the "synergies" that CVS Health implemented consisted of, among other things, (i) centralizing billing into centers for the east and west coasts, respectively, (ii) replacing the Omnicare employees who had had relationships with LTC customers with inexperienced account managers who did not know the customers or understand the industry, (iii) create bottlenecks in the contracting process, (iv) directing consulting pharmacists to focus on pushing prescriptions out instead of working with facilities, and (v) use retail stores to try to fill medication orders from LTC facilities.

275.    As described by these CWs, these "synergies," did not "help improve efficiency and productivity in the core skilled nursing business," "drive operational improvements and investments at Omnicare" or "bring[] increased standardization to Omnicare and driving much better satisfaction among the communities we serve."  Instead, these synergies were anathema to Omnicare LTC customers and drove them *away* from CVS Health.  The synergies also made it possible, even easy, as described by CW2, CW4, CW9, CW12, CW14 and CW16, for former Omnicare/CVS Health employees who were working for competing LTC pharmacy service providers to poach Omnicare LTC customers.  As a result of the customer losses caused by the synergies, the Omnicare LTC business declined precipitously.

276.    Even though the synergies were driving away Omnicare LTC customers, Defendants nevertheless continue to represent to investors that the Company had implemented and was benefitting from these synergies.

277.    For example, at the December 2015 Analyst Day, Defendant Kraft gave a presentation to investors touting "Innovative Technology Solutions [that] Resonate with Our

Customers and Drive Higher Retention Rates," namely an online portal for Omnicare LTC customers called, "Omniview." Kraft told investors that "Omniview is a critical component of our value proposition and one *that resonates very well with its users* . . . . [H]elping them optimize cost effectiveness and better manage medication therapies." This representation was misleading because it suggests that Omniview was liked by customers and benefitted the business, while the truth was, as CW9 and CW16 stated, customers resisted using "Omniview" and "Innovative Technology Solutions."

278.   Similarly, on the FY 2015 Call, Defendant Merlo represented to analysts and investors that "Omnicare performed well and in line with our expectations as *we began to realize some of the anticipated synergies*." This representation was false and misleading because it gave investors the misimpression that synergies were benefitting the Omnicare LTC business when, in fact, "synergies" implemented by CVS Health were driving customers away.

279.   In addition, on an earnings call for the first quarter of 2016 (the "Q1 2016 Call"), Defendant Merlo assured investors that "*the Long-term Care Pharmacy . . . benefited from some of the anticipated costs and sourcing synergies*" and that CVS Health was "working to combine operational infrastructures and further develop programs to improve work-streams and enhance service delivery and had "rolled out the use of CVS pharmacies as an extension of the Omnicare pharmacies to speed the delivery of first fills or emergency order prescriptions in the skilled nursing facilities." These representations also appeared on Slide 9 of a presentation Defendant Merlo used during the earnings call (the "Q1 2016 Presentation") and which was distributed to investors.

280.   Further, on the Q2 2016 Call, Defendant Merlo assured investors that "[i]n Q1, CVS Health introduced the use of CVS pharmacies to speed the delivery of first fills and

emergency needs to the facilities. ***This program continues to grow, and we now fill nearly half of all emergency scripts using a CVS pharmacy***." Defendant Merlo also told investors that "in Q2 [CVS Health] began piloting our transition of care program to enable us to better serve patients as they transition across different care settings. And we also continue to pilot our integrative service offerings to the Assisted and Independent Living communities, ***offering residents enhanced prescription delivery options*** based on their preference and acuity level." These representations also appeared on Slide 11 of the Q2 2016 Presentation and which was distributed to investors.

281.     Each of these statements concerning the effective implementation and realization of synergies by Defendants were false and misleading since, when Defendants made these statements, customers were fleeing CVS Health *because* of these synergies.  As described by CW3, CW12, CW14 and CW18, Omnicare LTC customers hated the new centralized billing system implemented by CVS Health after the Acquisition.  Similarly, CW7, CW9 and CW14 described how CVS Health created a bottleneck in contract processing that prevented contracts from being approved efficiently and that rejected customers' requests without explanation. CW8, CW14, CW15 and CW16 each described how CVS Health's plan to use retail pharmacies to ship prescriptions to LTC facilities resulted in late deliveries, and CW9 and CW16 described how customers disliked CVS Health's online Omniview tool.  The "synergies" touted by Defendants as beneficial to the Omnicare LTC business thus resulted in customers leaving and ultimately caused the business to decline.

282.     During the Q2 2018 Call, Defendant Roberts himself effectively corroborated the CWs' description of the damage done to the Omnicare LTC business by CVS Health's synergies. On the call, an analyst asked, "[a]nd then on Omnicare, you mentioned new leadership and other

initiatives. I guess what needs to be done there, or how quickly can you address some of the challenges there?"  Defendant Roberts responded, "we ha[ve] invested in account management resources to work directly with facility managers and their residence to improve our service and penetration of the facilities. So early results where we have this model fully in place are positive and we're confident that this service model will enable us to achieve our goals in assisted living."

283.    These statements misled investors into believing CVS Health's Omnicare LTC business was interacting successfully with customers and concealed the truth that CVS Health had destroyed existing customer relationships by replacing customers' contacts and that customers were fleeing to competitors and being poached by former Omnicare employees. Defendants had actual knowledge, or at the very least were reckless in not knowing, about the problems caused by the synergies implemented after the Acquisition as a result of the internal reporting systems in place at CVS Health.  In addition, Defendants made these statements so that, among other things, they could sell their shares in CVS Health at artificially inflated prices and so that they could successfully negotiate, announce, fund and close the Aetna Acquisition without the Company's credit rating deteriorating or the market questioning Defendants' ability to integrate the Aetna business.

**D.  Defendants' Representations Concerning the Condition of the Omnicare LTC Business Were False and Misleading**

284.    Defendants repeatedly assured investors throughout the Class Period that the CVS Health enterprise was benefitting from the Acquisition and that the Omnicare LTC business was healthy.  These representations were false and misleading because in reality the Omnicare LTC business was materially declining because of customer losses.

285.    Defendants' made misstatements about the success of the Omnicare LTC business throughout the Class Period.  On the Q3 2016 Call, for example, Defendant Denton assured investors that "*although both the Omnicare and Target pharmacy acquisition are performing well*, the ramp-up in the level of accretion is slightly slower than anticipated."  On the same call, when an analysts probed "what's holding back Target and Omnicare from meeting your near-term accretion expectations," Defendant Merlo assured him that the Omnicare LTC business was *certain* to realize its predicted accretions because, "[w]ith Omnicare, Ricky, *it's certainly not a question of if; it's more a question of when*."  These statements were false and misleading because the Omnicare LTC business was not "performing well" since, as described by the CWs, Omnicare LTC customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.   Defendant Merlo's assurance that "it's certainly not a question of if; it's more a question of when" was false and misleading since not only was the Omnicare LTC business in material decline, but it was impossible for the business to recover since, as described by CW14, the contracting bottleneck implemented by the Company prevented the business from growing.

286.    Similarly, on the FY 2016 Call, Defendant Denton boasted to investors, "[w]e continued to grow scripts and claims across our enterprise with this year's growth enhanced notably by the successful integration of both Omnicare and the Target pharmacies," and "the addition of both Omnicare and the Target pharmacies and clinics *has contributed nicely to our performance and is also providing the platform for future growth*."  In addition, in the 2016 10-K, which was signed by Defendants Merlo and Denton, the Company assured investors that it was "delivering break-through products and services, from advising patients on their medications

at our CVS Pharmacy® locations . . . to *improving pharmacy care for the senior community through Omnicare®.*"  These statements in the 2016 10-K and FY 2016 Call were false and misleading because, while they communicated to investors that the Omnicare LTC business was growing and providing valuable services to customers, the Omnicare LTC business was in material decline because customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts.  In addition, as described by multiple CWs, customers were abandoning the Omnicare business specifically because of their poor customer service, which resulted in delays in confirmation of service coverage and late deliveries of medication.  The statement that the Omnicare LTC business was providing a "platform for future growth" was also false and misleading since not only was the Omnicare LTC business in material decline, but it was impossible for the business to recover since, as described by CW14, the contracting bottleneck implemented by the Company prevented the business from growing.

287.    Also on the FY 2016 Call, Defendant Merlo represented to analysts and investors that "Omnicare *performed well* and in line with our expectations as we began to realize some of the anticipated synergies."  This representation was false and misleading because it gave investors the impression that the Omnicare LTC business was thriving, when in reality, as described by the CWs, Omnicare LTC customers were fleeing CVS Health, including, as described by CW14 and CW15, by deliberately defaulting on contracts, in response to ineffective "synergies," poor customer service, and poaching by former Omnicare/CVS Health employees.

288.    Similarly, at the December 2016 Analyst Day, Defendant Denton told attendees that "[w]e continued to grow scripts and claims across our enterprise with this year's growth enhanced *notably by the successful integration of both Omnicare and the Target pharmacies*."

103

He also told investors that "Furthermore, the addition of both Omnicare and the Target pharmacies and clinics *has contributed nicely to our performance and is also providing the platform for future growth*."    These statements were false and misleading because they gave investors the misimpression that the Omnicare LTC business was thriving, when in reality it was in material decline because customers were leaving CVS Health in droves, including, as described by CW14 and CW15, by deliberately defaulting on contracts.  The statement that the Omnicare LTC business was providing a "platform for future growth" was also false and misleading since not only was the Omnicare LTC business in material decline, but it was impossible for the business to recover since, as described by CW14, the contracting bottleneck implemented by the Company prevented the business from growing.

289.    At the December 2016 Analyst Day, Defendant Denton also misled investors and analysts by suggesting that the Omnicare LTC business would decline in the following year, but failing to disclose the customer losses that would drive the decline.  Denton told investors, "[a]s for the retail Long-Term Care segment, it will be a challenging year. Revenue growth is expected to be flat to down 1.5% due to the loss of prescriptions for the network changes, ongoing reimbursement pressures and the slowdown in traffic in the front store."  This inadequate disclosure was false and misleading because it failed to disclose that, as described by the CWs, (i) "synergies" implemented by Defendants were driving customers away, (ii) former employees were poaching Omnicare LTC customers, (iii) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

290.    During the FY 2017 Call, on February 9, 2017, Defendant Merlo misled investors by saying that "[i]n our Long Term Care pharmacy business, *we continue to target the significant growth opportunities we see in the Assisted and Independent Living markets*. And

*we're focused on creating better solutions* that meet the need of senior living communities and their residents."  These statements were false and misleading because they gave investors the misimpression that CVS Health could "target" or "creat[e] better solutions for LTC customers, when in reality the Omnicare LTC business was in material decline because customers were leaving CVS Health in droves in response CVS Health's efforts to target those customers, including, as described by CW14 and CW15, by deliberately defaulting on contracts.

291.    During the Q1 2017 Call, on May 2, 2017, Defendant Merlo misled investors by stating that CVS Health's "integrated model enables us to effectively address costs across the health care system, and not just through our PBM but also through our retail, specialty, MinuteClinic *and long-term care capabilities*."   These statements were false and misleading because they gave investors the misimpression that the Omnicare LTC business was thriving, when in reality it was in material decline because customers were leaving CVS Health in droves, including, as a result of "synergies" implemented as a part of integrating the business into the Retail/LTC segment.

292.    During the Q2 2017 Call, Defendant Merlo made multiple misrepresentations to call attendees regarding the Omnicare LTC business.   Merlo told attendees that "Omnicare *remains the leader in the market*," "[w]e have invested the time and capital over the past two years *to get the right technology and processes in place* in order to differentiate our offering to make it more compelling for our clients as well as the residents at these facilities," and "[i]t's been a slower process than we expected due to technology enhancements that needed to be built along with *certain dynamics in the skilled nursing space*."   These claims were also repeated in a presentation made available to call attendees as well.   These inadequate disclosures were false and misleading because it failed to disclose that, as described by the CWs, (i) "synergies"

implemented by Defendants were driving customers away, (ii) former employees were poaching Omnicare LTC customers, and (iii) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

293.    Later on the Q2 2017 Call, Defendant Denton misleadingly told attendees that, with regards to the Omnicare LTC business, "I will say as we think about new beds and as we think about marketing and offering new services to new clients and new operators, *I think our products are resonating in the marketplace. I feel like we're nicely positioned here*."  These statements were false and misleading because they gave investors the misimpression that the Omnicare LTC business was in good condition, when in reality it was in material decline because the business was hemorrhaging customers.  The statement that the Omnicare LTC business was "nicely positioned" was also false and misleading since not only was the Omnicare LTC business in material decline, its customer service was driving customers away and, as described by CW14, the contracting bottleneck implemented by the Company prevented the business from growing.

294.    Defendants made similar materially false and misleading statements that down-played the extent of the problems in the Omnicare LTC business throughout 2018.  In the FY 2017 10-K, FY 2017 Release, Q1 2018 10-Q and Q1 2018 Release, for example, the Company told investors that

> Our LTC reporting unit continues to face challenges . . . . These challenges include customer reimbursement pressures, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and client retention rates.

Similarly, in the Q2 2018 10-Q, Q2 2018 Release, and the Q2 2018 Call, for example, the Company told investors that it was writing down the goodwill for the Omnicare LTC business by $3.9 billion because of "*higher levels of bad debt and longer collection times on receivables; a*

*faster decline in facility reimbursement rates than we originally forecasted; and lower client retention rates*."  During the Q2 2018 Call, Defendant Roberts also told investors, "I talked at our last earnings calls, how we had invested in account management resources to work directly with facility managers and their residence to improve our service and penetration of the facilities. So *early results where we have this model fully in place are positive and we're confident that this service model will enable us to achieve our goals in assisted living*."  Finally, on an earnings call for the third quarter of 2018 (the "Q3 2018 Call"), Defendant Boratto told investors, "*We continue to see challenges in the skilled nursing facility space as the market continues to experience bed loss in these facilities*."

295.   These disclosures were false and misleading because in attributing losses to reimbursement pressures and issues at skilled nursing facilities, as well as the euphemistically described "client retention rates," the disclosure downplayed the effect the substantial customer losses was having on the Omnicare LTC business.  The disclosures were also false and misleading because they concealed the gravity of the customer losses by omitting that customers were fleeing the Company in response to poor customer service and synergies implemented by CVS Health, to the point that customers were intentionally defaulting on contracts and switching to competing LTC providers staffed by former Omnicare/CVS Health employees.  Finally, Defendant Denton's statement that the early results for CVS Health's LTC model were "positive" was also false and misleading because not only was the Omnicare LTC business in material decline, but it was impossible for the business to recover since, as described by CW14, the contracting bottleneck implemented by the Company prevented the business from growing.

296.   Defendants made these misrepresentations so that, among other things, they could sell their shares in CVS Health at artificially inflated prices and so that they could successfully

negotiate, announce, fund and close the Aetna Acquisition without the Company's credit rating deteriorating to "junk bond" status and without the markets questioning Defendants' ability to integrate the Aetna business.

### E. CVS Health's Disclosures Concerning the Value of the Goodwill of the Omnicare LTC Business Were False and Misleading

297.    Defendants said nothing about declines in the performance of the Omnicare LTC business in the two years after the Acquisition, even though as the CWs describe, the Omnicare LTC business was in free fall because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

298.    In the 2015 10-K, which was signed by Defendants Merlo and Denton, CVS Health represented to investors that it had "performed our required annual impairment tests of goodwill," that "[t]he results of the impairment tests indicated that there was no impairment of goodwill, and "the goodwill impairment tests resulted in the fair values of our reporting units exceeding their carrying values by a significant margin."   These disclosures were incomplete, false and misleading because they failed to disclose the true nature and extent of the problems in the Omnicare LTC business and that the Omnicare LTC business was *already substantially impaired* because, as described by the CWs, (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

299.     Similarly, the Q3 2016 10-Q, which was signed by Defendant Denton, and 2016 10-K, which was signed by Defendants Merlo and Denton, informed investors that the Company's:

> impairment tests indicated that there was no impairment of goodwill . . . . The fair values of our LTC and RxCrossroads reporting units exceeded their carrying values by 7% and 12%, respectively. The balance of goodwill for our LTC and RxCrossroads reporting units at September 30, 2016 was approximately $6.3 billion and $0.6 billion, respectively.

These disclosures were incomplete, false and misleading because they failed to disclose the true nature and extent of the problems in the Omnicare LTC business and that the Omnicare LTC business *was already substantially impaired* because, as the CWs described, (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

300.     When Defendants did finally disclose the problems in the Omnicare LTC business to investors, as described below, those disclosures were incomplete and materially misleading because they concealed the true extent of the problems in the Omnicare LTC business and omitted material facts concerning the causes of the problems with that business.

301.     In the 2017 Q3 10Q, which was signed by Defendant Denton, and the 2017 10-K, which was signed by Defendant Denton and by Defendant Merlo, CVS Health disclosed that "Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates," and:

> If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC

reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount.

These disclosures were incomplete, false and misleading because they failed to disclose the true nature and extent of the problems in the Omnicare LTC business *and that the Omnicare LTC business was already substantially impaired* because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health. While the Company did make a passing reference to "client retention rates," this attempt to downplay the catastrophic customer losses was not sufficient to disclose the extent and reasons for the customer losses.

302. In the 2018 Q1 10Q, which was signed by Defendant Denton, CVS Health repeated disclosures that downplayed the extent of the poor performance of the Omnicare LTC business, informing investors that:

> Our LTC reporting unit continues to face challenges that may affect our ability to grow the business at the rate that we had originally estimated when we made the acquisition of Omnicare and when we performed our prior year annual goodwill impairment test. ***These challenges include customer reimbursement pressures, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and client retention rates*** . . . . If we do not achieve our forecasts, given the small excess of fair value over the related carrying value in the prior year, as well as current market conditions in the healthcare industry, ***it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the goodwill of the LTC reporting unit could be deemed to be impaired*** by a material amount.

These disclosures were incomplete, false and misleading because they failed to disclose the true nature and extent of the problems in the Omnicare LTC business *and that the Omnicare LTC business was already substantially impaired* because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that

customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.  While the Company did make a passing reference to "client retention rates," this attempt to downplay the catastrophic customer losses was not sufficient to disclose the extent and reasons for the customer losses.

303.    Three years after the acquisition, in the 2018 Q2 10Q, CVS Health finally disclosed material problems in the Omnicare LTC business, but still downplayed the extent of those problems and misleadingly suggested that they were reparable without further impairment:

> During 2018, the LTC reporting unit has continued to experience challenges that have impacted management's ability to grow the business at the rate that was originally estimated when we made the acquisition of Omnicare, Inc. and when the prior year annual goodwill impairment test was performed. ***These challenges include lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures.***
>
> * * *
>
> [W]e performed an interim goodwill impairment test as of June 30, 2018. The results of the impairment test showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in a $3.9 billion pre-tax goodwill impairment charge . . . . Though we believe the financial projections used to determine the fair value of the LTC reporting unit as of June 30, 2018 are reasonable and achievable, our LTC reporting unit may continue to face challenges that may affect our ability to grow the business at the rate we estimated when we performed such goodwill impairment test. These challenges and some of the key assumptions included in our financial projections to determine the estimated fair value of our LTC reporting unit include ***client retention rates, occupancy rates in skilled nursing facilities, the financial health of skilled nursing facility customers, facility reimbursement pressures, our ability to execute our senior living initiative, our ability to make acquisitions and integrate those businesses into our LTC operations in an orderly manner, as well as our ability to extract cost savings from labor productivity and other initiatives.***
>
> * * *
>
> If we do not achieve our forecasts, given that the fair value and the carrying value of the LTC reporting unit were the same as of June 30, 2018, it is reasonably

> possible in the near term that the goodwill of the LTC reporting unit could be
> deemed to be impaired again by a material amount.

These disclosures were incomplete, false and misleading because they failed to disclose the true

nature and extent of the problems in the Omnicare LTC business *and that the Omnicare LTC*

*business was already even further impaired than Defendants were disclosing* because

(i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's

customer service was so poor that customers were fleeing to competitors, (iii) former employees

were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally

defaulting on contracts to end their relationships with CVS Health.  While the Company did

make a passing reference to "client retention rates," this attempt to downplay the catastrophic

customer losses was not sufficient to disclose the extent and reasons for the customer losses.

304.    In the 2018 Q3 10Q, which was signed by Defendant Denton, CVS Health

continued to conceal the extent of the poor performance of the Omnicare LTC business and

misleadingly suggest that the problems at that business were reparable without further

impairment, informing investors that:

> Though we believe the financial projections used to determine the fair value of
> the LTC reporting unit in the third quarter of 2018 are reasonable and achievable,
> our LTC reporting unit may continue to face challenges that may affect our ability
> to grow the business at the rate we estimated when we performed such goodwill
> impairment test. ***These challenges and some of the key assumptions included in
> our financial projections to determine the estimated fair value of our LTC
> reporting unit include client retention rates, occupancy rates in skilled nursing
> facilities, the financial health of skilled nursing facility customers, facility
> reimbursement pressures, our ability to execute our senior living initiative, our
> ability to make acquisitions and integrate those businesses into our LTC
> operations in an orderly manner, as well as our ability to extract cost savings
> from labor productivity and other initiatives.*** We recently made a number of
> additions and changes to our LTC management team to better respond to these
> challenges. The estimated fair value of our LTC reporting unit is also dependent
> on earnings multiples of market participants in the pharmacy industry, as well as
> the risk-free interest rate environment which impacts the discount rate used in the
> discounted cash flow method. ***If we do not achieve our forecasts, given that the
> fair value of the LTC reporting unit only exceeded its carrying value by***

> *approximately 2% in the third quarter of 2018, it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount*.

These disclosures were incomplete, false and misleading because they failed to disclose the true nature and extent of the problems in the Omnicare LTC business *and that the Omnicare LTC business was already even further impaired than Defendants were disclosing* because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.   While the Company did make a passing reference to "client retention rates," this attempt to downplay the catastrophic customer losses was not sufficient to disclose the extent and reason for the customer losses.

305.   Finally, in the 2018 10K, CVS Health disclosed that in fact there was only a fraction of the goodwill for the LTC business remaining and that in the prior six months it had written down the value of its Omnicare LTC business by $6.1 billion, approximately half of the purchase price it paid for Omnicare Inc.   Even if this disclosed the extent of the poor performance of the Omnicare LTC business, Defendants still failed to tell investors the true source of the problems afflicting that business:

> During the fourth quarter of 2018, the LTC reporting unit **missed its forecast primarily due to operational issues** and customer liquidity issues, including one significant customer bankruptcy. Additionally, LTC management submitted an updated final budget for 2019 which **showed significant additional deterioration in the projected financial results for 2019 compared to the analyses performed in the second and third quarters of 2018 primarily due to continued industry and operational challenges**, which also caused management to make further updates to its long-term forecast beyond 2019. The updated projections continue to reflect industry wide challenges including **lower occupancy rates in skilled nursing facilities, the significant deterioration in the financial health of numerous skilled nursing facility customers and continued facility reimbursement pressures.**

Based on these updated projections, management determined that there were indicators that the LTC reporting unit's goodwill may be impaired and, accordingly, an interim goodwill impairment test was performed during the fourth quarter of 2018. The results of that impairment test showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in an additional $2.2 billion goodwill impairment charge in the fourth quarter of 2018. In addition to the lower financial projections, lower market multiples of peer group companies also contributed to the amount of the fourth quarter 2018 goodwill impairment charge.

306.    Notably, in the 2018 10-K Defendants disclosed for the first time that there were unspecified "operational issues" that were materially affecting the performance of the Omnicare LTC business.  The disclosure of operational issues, and the other disclosures accompanying the write-down of goodwill, however, were nevertheless incomplete, false and misleading because they failed to disclose the true nature and extent of the problems in the Omnicare LTC business *and that the Omnicare LTC business was already even further impaired than Defendants were disclosing* because (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health. While the Company did make a passing reference to "client retention rates," this attempt to downplay the catastrophic customer losses was not sufficient to disclose the extent and reasons for the customer losses.

307.    As described above, Defendants' disclosures concerning the performance of the Omnicare LTC business and the potential impairments associated with that business were incomplete and materially misleading because they concealed the true extent of the problems in the Omnicare LTC business and omitted material facts concerning the causes of the problems with that business.  Defendants made these statements so that, among other things, they could sell their shares in CVS Health at artificially inflated prices and so that they could successfully

negotiate, announce, fund and close the Aetna Acquisition without the Company's credit rating deteriorating to "junk bond" status and without the markets questioning Defendants' ability to integrate the Aetna business.

**F.  The Company's Quarterly and Annual Reports Statements Concerning the Potential for Future LTC Customer Retention, Acquisition Integration, and Goodwill Impairment Problems Were False and Misleading**

308.    The Class Period 10-Ks, which were signed by Defendant Merlo (all Class Period 10-Ks), Defendant Denton (the 2015 10-K, 2016 10-K, and 2017 10-K only) and Defendant Boratto (2018 10-K only), as well as the Class Period 10-Qs, which were signed by Defendant Denton, all contained boilerplate statements advising investors of, among other things, the possibility of future losses if CVS Health was not able to realize benefits from its various acquisitions, maintain the goodwill assigned to any of its assets, or retain customers.  As described below, these statements were materially false and misleading because they purported to alert investors of potential future events that Defendants knew or were reckless in not knowing were already occurring.

309.    Each of the Class Period 10-Ks advised investors that "the success of our retail drugstore and long-term care businesses is dependent upon our ability to establish and maintain contractual relationships with PBMs and other payors on acceptable terms."  All of the Class Period 10-Qs cross-referenced this statement in the 10-Ks as well. This statement, however, was materially misleading because it failed to disclose that the Omnicare LTC business was already failing to "establish and maintain contractual relationships" with a substantial number of customers who were fleeing to CVS Health's competitors because (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were driving customers away, (ii) Omnicare LTC's customer service was so poor that

customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

310.   Each of the Class Period 10-Ks also advised investors that:

> With respect to our LTC business, reimbursement from skilled nursing facilities for prescriptions we dispense is determined pursuant to our agreements with those skilled nursing facilities. The termination of these agreements generally causes our ability to provide services to any of the residents of that facility to cease, resulting in the loss of revenue from any source for those residents. There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms.

All of the Class Period 10-Qs cross-referenced this statement in the 10-Ks as well. This statement, however, was materially misleading because it failed to disclose that the Omnicare LTC business was already failing to "establish and maintain contractual relationships" with a substantial number of customers who were fleeing to CVS Health's competitors because (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

311.   Each of the Class Period 10-Ks also advised investors that:

> If an acquisition is consummated, the integration of the acquired business, its products, services and related assets into our company may also be complex and time-consuming and, if the integration is not fully successful, we may not achieve the anticipated benefits, operating and cost synergies or growth opportunities of an acquisition. Potential difficulties that may be encountered in the integration process include . . . . Retaining existing customers and attracting new customers . . . . An inability to realize the full extent of the anticipated benefits, operating and cost synergies, innovations and operations efficiencies or growth opportunities of an acquisition, as well as any delays encountered in the integration process, could

> have a material adverse effect on our business and results of operation. Furthermore, these acquisitions, even if successfully integrated, may fail to further our business strategy as anticipated, expose us to increased competition or challenges with respect to our products, services or geographic markets, and expose us to additional liabilities associated with an acquired business including risks and liabilities associated with litigation involving the acquired business. Any one of these challenges or risks could impair our ability to realize any benefit from our acquisitions after we have expended resources on them.

All of the Class Period 10-Qs cross-referenced this statement in the 10-Ks as well. This statement, however, was materially misleading because it failed to disclose that (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health.

312.    Each of the Class Period 10-Ks and Class Period 10-Qs advised investors of:

> the possibility of PBM and LTC client loss and/or the failure to win new PBM and LTC business, including as a result of failure to win renewal of expiring contracts, contract termination rights that may permit clients to terminate a contract prior to expiration and early or periodic renegotiation of pricing by clients prior to expiration of a contract.

This statement, however, was materially misleading because it failed to disclose that (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were already driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were already fleeing to competitors, (iii) former employees already were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were already intentionally defaulting on contracts to end their relationships with CVS Health.

313.     Each of the Class Period 10-Ks and Class Period 10-Qs also advised investors of "The possibility that the anticipated synergies and other benefits from any acquisition by us will not be realized, or will not be realized within the expected time periods."   This statement, however, was materially misleading because it failed to disclose that (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were already driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were already fleeing to competitors, (iii) former employees already were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were already intentionally defaulting on contracts to end their relationships with CVS Health.

314.     Each of the Class Period 10-Ks and Class Period 10-Qs advised investors of purported "risks and uncertainties related to our ability to integrate the operations, products, services and employees of any entities acquired by us and the effect of the potential disruption of management's attention from ongoing business operations due to any pending acquisitions." This statement, however, was materially misleading because it failed to disclose that (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were already driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were already fleeing to competitors, (iii) former employees already were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were already intentionally defaulting on contracts to end their relationships with CVS Health.

315.     Each of the Q3 2017 10-Q, 2017 10-K, Q1 2018 10-Q, Q2 2018 10-Q, Q3 2018 10-Q, and 2018 10-K also advised investors of "[t]he possibility of lower than expected

valuations at the Company's reporting units could result in goodwill impairment charges at those reporting units." This statement, however, was materially misleading because it failed to disclose that the Omnicare LTC business was already impaired because (i) "synergies" implemented by Defendants, including CVS Health's refusal to negotiate contract provisions, inability to approve contracts in a timely manner and failure to respond to customer inquiries regarding contracts, were already driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were already fleeing to competitors, (iii) former employees already were poaching Omnicare LTC customers, and (iv) Omnicare LTC customers were already intentionally defaulting on contracts to end their relationships with CVS Health.

316. The above statements in the Company's Class Period 10-Ks and Class Period 10-Qs were thus materially false and misleading because they purported to alert investors to the possibility of future events that Defendants knew or were reckless in not knowing were already occurring. Defendants made these statements so that, among other things, they could sell their shares in CVS Health at artificially inflated prices and so that they could successfully negotiate, announce, fund and close the Aetna Acquisition without the Company's credit rating deteriorating and without the markets questioning Defendants' ability to integrate the Aetna business.

### G. Defendants Merlo and Denton's Certifications Attached as Exhibits to the Company's Quarterly and Annual Reports Were False and Misleading

317. Appended as exhibits to the each of the Class Period 10-Ks were signed certifications pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002, in which Defendants Merlo (all Class Period 10-Ks), Denton (2015 10-K, 2016 10-K, and 2017 10-K only), and Boratto (2018 10-K only) certified that they had "reviewed the annual report on Form 10-K of the CVS Health Corporation [and] . . . [b]ased on my knowledge [the] report contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

318.   Also appended to the Class Period 10-Ks were signed certifications pursuant to 18 U.S.C. § 1350 in which Defendants Merlo (all Class Period 10-Ks), Denton (2015 10-K, 2016 10-K, and 2017 10-K only), and Boratto (2018 10-K only) certified that "to the best of [their] knowledge:  (1) [Each of the 2015, 2016 and 2017 10-Ks] fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and (2) The information contained in [each of the 2015, 2016 and 2017 10-Ks] fairly presents, in all material respects, the financial condition and result of operations of the Company."

319.   Appended as exhibits to the Class Period 10-Qs were signed certifications pursuant to the Rules 13a-14a and 15d-14(a) under the Exchange Act, in which Defendants Merlo and Denton certified that they had "reviewed the quarterly report on Form 10-Q of the CVS Health Corporation [and] . . . [b]ased on my knowledge [the] report contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

320.    Also appended to the Class Period 10-Qs were signed certifications pursuant to 18 U.S.C. § 1350 in which Defendants Merlo and Denton certified that "to the best of [their] knowledge:  (1) [Each of the 2015, 2016 and 2017 10-Ks] fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and (2) The information contained in [each of the 2015, 2016 and 2017 10-Ks] fairly presents, in all material respects, the financial condition and result of operations of the Company."

321.    Each of the statements excerpted from the exhibits to the Class Period 10-Ks and Class Period 10-Qs was materially false and misleading because each Class Period 10-K and Class Period 10-Q contained "untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," did not "fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act" and did not "fairly present[], in all material respects, the financial condition and result of operations of the Company" because each Class Period 10-K and Class Period 10-Q misrepresented the performance and goodwill value of the Omnicare LTC business.  As described in detail in paragraphs 238 to 253 *supra*, each Class Period 10-K and Class Period 10-Q misrepresented the performance, financial health and goodwill value of the Omnicare LTC business by failing to disclose that (i) "synergies" implemented by CVS Health were driving customers away, (ii) Omnicare LTC's customer service was so poor that customers were fleeing to competitors, (iii) former employees were poaching Omnicare LTC customers, (iv) Omnicare LTC customers were intentionally defaulting on contracts to end their relationships with CVS Health, and (v) as a result, CVS Health's public statements were materially false and misleading at all relevant times.

## VI.    THE TRUTH BEGINS TO EMERGE

322.    On February 20, 2019, CVS Health issued a press release announcing the Company's fourth quarter and full year financial and operating results and provided 2019 full year guidance (the "February 2019 Release").   CVS Health advised investors that adjusted earnings in 2019 would be $6.68 to $6.88 per share, compared with the $7.36 average of market estimates, citing rising costs and poor performance of the Omnicare LTC business.  Specifically, with regard to Omnicare, the February 2019 Release stated, in relevant part:

> The LTC business has continued to experience industry wide challenges that have impacted our ability to grow the business at the rate that was originally estimated when the Company acquired Omnicare, Inc. in 2015. These challenges include lower occupancy rates in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures. As a result of these challenges, a goodwill impairment charge of $3.9 billion was recorded during the second quarter of 2018. During the fourth quarter of 2018, the LTC reporting unit missed its forecast primarily due to operational issues and customer liquidity issues, including one significant customer bankruptcy. Additionally, LTC management submitted an updated final budget for 2019 which showed significant additional deterioration in the reporting unit's projected financial results for 2019 compared to the analysis performed in the second quarter of 2018, primarily due to continued industry and operational challenges, which also caused management to make further updates to their long term forecast beyond 2019. Based on these updated financial projections, management determined that there were indicators that the goodwill of the LTC business may be further impaired, and accordingly, an interim goodwill impairment test was performed as of December 31, 2018. The results of the impairment test showed that the fair value of the LTC business was lower than the carrying value resulting in a $2.2 billion goodwill impairment charge. In addition to the lower financial projections, lower market multiples of the peer group companies contributed to the amount of the goodwill impairment charge.

323.    On the same day, *Fortune* published an article titled "CVS Stock Plummets as 2019 Looks Like It Will Be a 'Major Disappointment' for Investors," which stated, in relevant part:

The company announced a $2.2 billion writedown on its 2015 takeover of Omnicare, a $12.9 billion deal that was meant to build the company's business serving patients in nursing homes and long-term medical-care facilities.

But that business hasn't grown as expected. There are fewer patients in long-term care facilities, which caused a number of CVS's customers to go bankrupt last year.

The $2.2 billion Omnicare charge follows an earlier, $3.9 billion writedown CVS took on the business in the second quarter. Together, they add up to half of what the company paid for Omnicare three years ago. The unit is predicting more challenges in the future, CVS said.

324.   The *Fortune* article also quoted Evercore ISI analyst Ross Muken, who noted that not only was the February 2019 Release's 2019 guidance a "major disappointment," but it would also "stoke fears" that the Company's $68 billion purchase of insurer Aetna the year before "was defensive in nature."

325.   An article published by *The Motley Fool* the same day, titled "What's Behind CVS Health's Fourth-Quarter Loss?" also noted Omnicare's "spotlight" in the February 2019 Press Release, "and not for a good reason."   According to the article, despite "relatively good news" that came out of the press release, "CVS Health still posted a net loss of $421 million in the fourth quarter" because "[t]he company recorded a goodwill impairment charge of $2.2 billion in the fourth quarter (and $6.1 billion for the full year) related to its struggling LTC pharmacy unit . . . . CVS Health noted that its Omnicare LTC business continues to face multiple challenges.   These issues include lower occupancy rates in skilled nursing facilities (SNF), reimbursement pressures on LTC facilities, and a significant deterioration in the financial health of SNF customers."

326.   An article published by *Bloomberg News* the same day titled, "CVS Sees Dire 2019 as Deal From 2015 Turns Out to Be a Lemon," which stated that CVS Health "said its results this year will be dragged down by rising costs and poor results from a 2015 takeover of

nursing-home pharmacy Omnicare, raising questions about whether an ambitious $68 billion purchase of insurer Aetna last year was the right move for the health-care giant."  The article specifically noted how much of the value of the acquisition CVS Health had written off, states that the Company had "announced a $2.2 billion writedown, following a $3.9 billion charge on the business in the second quarter. ***Together, they add up to almost half of what the company paid for Omnicare three years ago, and the unit is predicting more challenges in the future***."

327.    The following day, a Wells Fargo analyst summed up the mood of the market in response to the disclosure of the goodwill writedown and poor performance of the Omnicare LTC business in an analyst report entitled, "CVS: 2019 Guide Shows Widespread Pressure." The analyst stated, "[w]e believe the disappointing adjusted EPS guidance of $6.68-6.88 for FY19 reflects a combination of pressures on existing businesses and ***the failure of the acquired LTC (Long-term care) business to improve, which instead deteriorated further***."  Notably, the analyst expressed how unprepared the market was for the disclosure of an additional writedown of the Omnicare LTC goodwill, writing that "***[w]e were surprised*** that the . . . charge taken in Q2 2018 wasn't the bottom for this business."

328.    Following this news, CVS Health's stock price fell by $5.66 per share, or slightly over 8%, to close at $64.22 per share on February 20, 2019.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

329.    As set forth above, Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in Sections IV.G and IV.H above for the following reasons.

(a)    *First,* Defendants used the structure of CVS Health's segments after the Acquisition to conceal the problems in the Omnicare LTC business.

(b)     *Second*, Defendants caused or allowed CVS Health to file financial reports that did not comply with Rule 5-02.3, which enabled Defendants to conceal the problems in the Omnicare LTC business.

(c)     *Third*, CVS Health was evaluating potential acquisitions of companies — including an acquisition of the insurance provider Aetna, Inc.  Defendants concealed the truth about the performance and condition of the Omnicare LTC business so that the revelations would not interfere with any acquisition.  Defendants engaged in piecemeal disclosures over the course of a year and did not disclose the truth regarding the Omnicare LTC business until the Acquisition of Aetna closed.

(d)     *Fourth*, Defendants Merlo, Denton, Roberts, and Boratto dramatically increased their trading in CVS Health stock during the Class Period and reaped millions of dollars in profits due to the fact that CVS Health's stock price was artificially inflated at that time.

(e)     *Fifth*, Defendants had actual knowledge of the problems in the Omnicare LTC business because of their review of Omnicare's financial documentation during the Acquisition and because of internal financial reports, calls and meetings circulated and held within CVS Health throughout the Class Period.

330.    In addition to the above allegations, which on their own create a strong inference of scienter, Defendants made the false and/or misleading statements and/or omissions intentionally or with a reckless disregard for the truth because the performance of the Omnicare LTC business was part of the Company's core operations, for which the Individual Defendants were responsible, and because Defendants assured investors during the Class Period that they were closely monitoring the performance of the Omnicare LTC business.

331.    During the Class Period, Defendants Merlo and Denton repeatedly described the Omnicare LTC business as integral to CVS Health's core operations.  For example, during the May 20, 2015 Call, Defendant Merlo told investors that the Omnicare LTC business "*significantly expands our business*," "provides us with *access into a new pharmacy dispensing channel*," and "*creates new opportunities* for us to extend our high-quality,

innovative pharmacy programs to a broader population of seniors and chronic care patients as again they transition across the care continuum."

332.    Similarly, after the Acquisition, Defendant Merlo effused at the December 2015 Analyst Day that:

> We've also continued to execute on our strategy of ***growing the core*** and ***broadening our base***. We entered into a new adjacent dispensing channel with the acquisition of Omnicare, a leading provider in long-term care pharmacy. And this example is our – ***this acquisition is a great example of how we are broadening our base as it expands our customer reach to a broader population of seniors and chronic care patients***. And this allows us to provide enhanced continuity of care as these patients transition throughout the healthcare system."

333.    In addition, after the Acquisition, Defendants made many statements misrepresenting the Omnicare LTC performance and customer losses, which Defendants' portrayed as an essential part of the Company's "unique integrated model" that could bring customers "innovative solutions that help increase access to quality care, deliver better health outcomes and lower overall health care costs," and which was the core way that Defendants described the Company to the investing public.

**VIII.   NO SAFE HARBOR**

334.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## IX.   CLASS ACTION ALLEGATIONS

335.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired CVS Health securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of CVS Health, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

336.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CVS Health securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CVS Health or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

337.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

338. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

339. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of CVS Health;

(c) Whether the Individual Defendants caused CVS Health to issue false and misleading financial statements during the Class Period;

(d) Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) Whether the prices of CVS Health securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f) Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

340. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS

341.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   CVS Health's securities traded in efficient markets;

(d)   CVS Health's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)   CVS Health traded on the NYSE and was covered by multiple analysts;

(f)   The misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the CVS Health's securities; and

(g)   Plaintiffs and members of the class purchased, acquired and/or sold CVS Health's securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

342.   At all relevant times, the markets for the Company's securities were efficient for the following reasons, among others:  (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiffs and the Class relied on the price of the Company's securities, which reflected all information in the market, including the misstatements by Defendants.

343.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

344.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    LOSS CAUSATION

345.    CVS Health's stock price closed trading at $69.88 per share on Tuesday, February 19, 2019.   On Wednesday, February 20, 2019, the day the $2.2 billion impairment to the goodwill of the Company's Omnicare business was announced, CVS Health's stock price closed at $64.22 per share, a decline of roughly 8.01%.   Then, as the market digested the goodwill impairment and recognized the true value of the Omnicare business, CVS Health's share price plummeted over the next several days before hitting bottom at $52.36 on March 7, 2019, a decline of over 25%.   These declines were attributable to the disclosure to investors of the goodwill impairment and thus the true value of the Omnicare business.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

346.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

347.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

348.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CVS Health securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire CVS Health securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

349.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for CVS Health securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the financial health and business prospects of the Omnicare LTC business.

350.     By virtue of their positions at CVS Health, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

351.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of CVS Health, the Individual Defendants had knowledge of the details of CVS Health's internal affairs.

352.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CVS Health. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CVS Health's businesses, operations, future financial condition and future prospects. As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CVS Health securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CVS Health's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired CVS Health securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

353.     During the Class Period, CVS Health securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CVS Health securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of CVS Health securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of CVS Health securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

354.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

355.    Plaintiffs and members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CVS Health's securities. Plaintiffs and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had written off the entire value of the goodwill associated with the Omnicare acquisition.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

356.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

357.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's failure to disclose that Omnicare's LTC business was in significant decline.  The Individual Defendants also knew that the Company's failure to disclose these facts made its statements during the Class Period about its LTC business misleading.

358.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CVS

Health, and to correct promptly any public statements issued by CVS Health which had become materially false or misleading.

359.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CVS Health disseminated in the marketplace during the Class Period concerning the Company's LTC business. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CVS Health to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CVS Health within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CVS Health securities.

360.   Each of the Individual Defendants, therefore, acted as a controlling person of CVS Health. By reason of their senior management positions and/or being directors of CVS Health, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CVS Health to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CVS Health and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

361.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CVS Health.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a

certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory and punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.      Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.      Awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury.

Dated:  July 22, 2019                              Respectfully submitted,

POMERANTZ LLP

<u>/s/ Jeremy A. Lieberman</u>
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
          bcalandra@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*/s/ Laurie Rubinow*

SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
Laurie Rubinow
52 Duane Street,
New York, NY 10007
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: lrubinow@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
James E. Miller
65 Main St.
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
Eric L. Young
Jayne A, Goldstein
35 East State St.
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: eyoung@sfmslaw.com
       jgoldstein@sfmslaw.com