UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JANAK ANARKAT, et al.,

                    Plaintiff,

          v.                                        Case No.: 1:19-cv-00437-MSM-PAS

CVS HEALTH CORPORATION, et al.,

                    Defendants.                     **ORAL ARGUMENT REQUESTED**

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

WHELAN CORRENTE & FLANDERS LLP         WILLIAMS & CONNOLLY LLP
100 Westminster Street, Suite 710      725 Twelfth Street, N.W.
Providence, RI  02903                  Washington, DC  20005
Tel:  (401) 270-4500                   Tel:  (202) 434-5000

*Attorneys for Defendants CVS Health Corp., Larry J. Merlo, David M. Denton,
Jonathan C. Roberts, Robert O. Kraft, and Eva C. Boratto*

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.   PLAINTIFFS FAIL TO PLEAD MATERIALLY FALSE OR MISLEADING
     STATEMENTS ...................................................................................................... 3

     A. CVS's Disclosures Were Not False or Misleading Merely Because They Did Not
        Include Plaintiffs' Desired Details or Chosen Phrasing. .................................... 4

     B. Defendants' Opinion Statements Are Not Actionable. .................................... 7

     C. Plaintiffs' Arguments on Puffery, Corporate Optimism, and Forward-Looking
        Statements Fail. ............................................................................................ 10

     D. SEC Certifications Are Not Actionable. ....................................................... 12

II.  PLAINTIFFS FAIL TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A
     STRONG INFERENCE OF SCIENTER. ............................................................. 12

     A. Plaintiffs' Theory Is Premised on Fraud by Hindsight and Pure Speculation ................ 13

     B. Plaintiffs' Confidential Witness Allegations Fail to Support a Strong Inference of
        Scienter. ...................................................................................................... 17

     C. Plaintiffs' Trading Allegations Fail to Support a Strong Inference of Scienter. ............. 20

     D. Plaintiffs' Core Operations Allegations Fail to Support a Strong Inference of
        Scienter. ...................................................................................................... 22

     E. Neither the Size nor the Timing of CVS's Goodwill Impairments Support a Strong
        Inference of Scienter. .................................................................................... 23

III. PLAINTIFFS HAVE NOT PLEADED VIOLATIONS OF SECTION 20(A). ................. 25

IV.  LEAVE TO AMEND SHOULD BE DENIED. ..................................................... 25

CONCLUSION ......................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) .......................................................................................13, 26

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ...........................................................................................5, 25

*Auto. Indus. Pension Tr. Fund v. Textron Inc.*,
   682 F.3d 34 (1st Cir. 2012) ................................................................................................18

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990) (en banc) ................................................................................4

*Brennan v. Zafgen, Inc.*,
   853 F.3d 606 (1st Cir. 2017) .............................................................................................14

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ..................................................................................12, 17, 18

*Campo v. Sears Holdings Corp.*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) .....................15

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ..........................................................................................9, 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
   632 F.3d 751 (1st Cir. 2011) .............................................................................................14

*City of Roseville Emps. Ret. Sys. v. Textron, Inc.*,
   810 F. Supp. 2d 434 (D.R.I. 2011) ......................................................................................6

*Corban v. Sarepta Therapeutics, Inc.*,
   2015 WL 1505693 (D. Mass. Mar. 31, 2015),
   *aff'd*, 868 F.3d 31 (1st Cir. 2017) .......................................................................................6

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) ...................................................................................23

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...............................................................................................16

*Emerson v. Genocea Biosciences, Inc.*,
    353 F. Supp. 3d 28 (D. Mass. 2018) ...................................................................20

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ....................................................................19, 26

*Fisher v. Kadant, Inc.*,
    589 F.3d 505 (1st Cir. 2009) ...............................................................................26

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ...............................................................................23

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................23

*Ganem v. InVivo Therapeutics Holdings Corp.*,
    845 F.3d 447 (1st Cir. 2017) ...............................................................................14

*Gray v. Evercore Restructuring LLC*,
    544 F.3d 320 (1st Cir. 2008) ...............................................................................26

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ...............................................................................22

*Gross v. Summa Four, Inc.*,
    93 F.3d 987 (1st Cir. 1996) ...............................................................................4

*In re Aceto Corp. Sec. Litig.*,
    2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ...................................................24

*In re Ariad Pharma., Inc. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016) ....................................................................14, 19

*In re Biogen Inc. Sec. Litig.*,
    193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) ...................................21

*In re Biogen Inc. Sec. Litig.*,
    857 F.3d 34 (1st Cir. 2017) ....................................................................14, 18, 19, 23

*In re Bos. Tech., Inc. Sec. Litig.*,
    8 F. Supp. 2d 43 (D. Mass. 1998) ...............................................................................4

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ...............................................................................6, 12

*In re Dynavax Sec. Litig.*,
    2018 WL 2554472 (N.D. Cal. June 4, 2018) ...............................................................9

*In re FirstEnergy Corp. Sec. Litig.*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004)...................................................................................23

*In re Genzyme Corp.*,
  2012 WL 1076124 (D. Mass. Mar. 30, 2012),
  *aff'd*, 754 F.3d 31 (1st Cir. 2014) .......................................................................................14

*In re Genzyme Corp. Sec. Litig.*,
  754 F.3d 31 (1st Cir. 2014)..................................................................................................25

*In re Medtronic Inc., Sec. Litig.*,
  618 F. Supp. 2d 1016 (D. Minn. 2009).................................................................................22

*In re Pharma., Inc. Sec. Litig.*,
  2007 WL 951695 (D. Mass. Mar. 28, 2007)...........................................................................5

*In re Synchronoss Sec. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010) .....................................................................................5, 9

*Kafenbaum v. GTECH Holdings Corp.*,
  217 F. Supp. 2d 238 (D.R.I. 2002)........................................................................................7

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994)..............................................................................................7

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).......................18

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharma., Inc.*,
  838 F.3d 76 (1st Cir. 2016)..................................................................................................23

*Mahoney v. Found. Medicine, Inc.*,
  342 F. Supp. 3d 206 (D. Mass. 2018) ..................................................................................21

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  305 F. Supp. 3d 181 (D. Mass. 2018), *aff'd*, 925 F.3d 151 (1st Cir. 2019).......................22, 23

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  928 F.3d 151 (1st Cir. 2019)..............................................................................................8, 23

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)...............................................................................................13, 14

*N.J. Carpenters Pension & Annuity Fund v. Biogen Idec Inc.*,
  537 F.3d 35 (1st Cir. 2008).................................................................................................19

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................................................................1

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .............................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 135 S. Ct. 1318 (2015) ...........................................................................7, 8, 9, 24

*Ong v. Chipotle Mex. Grill, Inc.*,
 294 F. Supp. 3d 199 (S.D.N.Y. 2018) ...........................................................10, 11

*Orton v. Parametric Tech. Corp.*,
 344 F. Supp. 2d 290 (D. Mass. 2004) ...........................................................10, 11

*Pension Tr. v. J.Jill, Inc.*,
 360 F. Supp. 3d 17 (D. Mass. 2018) ...............................................................14, 16

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001) .............................................................................19

*Rosen v. Textron, Inc.*,
 321 F. Supp. 2d 308 (D.R.I. 2004) ...................................................................14

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000).........................................................................16, 23

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
 573 F.3d 98 (2d Cir. 2009).............................................................................16

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
 75 F.3d 801 (2d Cir. 1996)......................................................................11, 16, 18

*Shaw v. Dig. Equip. Corp.*,
 82 F.3d 1194 (1st Cir. 1996) ...........................................................................11

*Silverman v. Motorola, Inc.*,
 772 F. Supp. 2d 923 (N.D. Ill. 2011) .................................................................25

*Sousa v. Sonus Networks, Inc.*,
 261 F. Supp. 3d 112 (D. Mass. 2017) ...............................................................14

*Stiegele ex rel. Viisage Tech., Inc. v. Bailey*,
 2007 WL 4197496 (D. Mass. Aug. 23, 2007) ......................................................20

*Suna v. Bailey Corp.*,
 107 F.3d 64 (1st Cir. 1997)..............................................................................13

*Swack v. Credit Suisse First Bos.*,
 383 F. Supp. 2d 223 (D. Mass. 2004) ...............................................................25

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ...................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................2, 12, 17

*Wu v. Stomber*,
883 F. Supp. 2d 233 (D.D.C. 2012), *aff'd*, 750 F.3d 944 (D.C. Cir. 2014)..............................6

## FEDERAL STATUTES, REGULATIONS, AND RULES

Private Securities Litigation Reform Act of 1995 ..........................................1, 2, 11, 12

15 U.S.C. § 78u-4 ............................................................................................12

17 C.F.R. § 210.5-02.3........................................................................................7

Federal Rule of Civil Procedure 9 ...........................................................................12

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 104–369 (1995) ...........................................................................1

**INTRODUCTION**

Plaintiffs' Opposition largely regurgitates allegations from the Amended Complaint ("AC"), accompanied by conclusory arguments that those allegations are sufficient under the controlling law.  They are not.

The Private Securities Litigation Reform Act ("PSLRA")—a special statute passed in 1995 that raised the pleading bar specifically for private securities actions—and the large body of case law under Section 10(b) foreclose Plaintiffs' claims.  Congress enacted the PSLRA to "curtail the filing of meritless [securities] lawsuits" in light of "significant evidence of abuse," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting H.R. Conf. Rep. No. 104–369, at 31, 41 (1995)).  The PSLRA "imposed stringent procedural requirements on plaintiffs pursuing private securities fraud actions," requiring *both* that Plaintiffs plead particular facts to explain why Defendants' statements are actionably misleading, and also that they allege particular facts that raise a "strong" inference of scienter.  *Id*.

This case presents an especially extreme example of the kind of case the PSLRA was enacted to eradicate.  In a typical securities class action, plaintiffs seize on a company's announcement of bad news paired with a stock drop to allege that the company must have known of the bad news earlier.  Courts routinely dismiss such hindsight-driven claims.  Here CVS in fact disclosed throughout the putative class period the challenges the LTC unit faced—forecasting to the market that further deterioration might trigger an impairment.  Indeed, two thirds of the goodwill write-down that serves as the basis for Plaintiffs' claims occurred *during the class period*—on a date when CVS's stock price went *up*.

Unable to claim that investors were unaware of the challenges and corresponding risk during the class period that the LTC unit might deteriorate, Plaintiffs resort to a claim that

Defendants must have known about the challenges earlier, or should have used more pejorative language in disclosing them. But Plaintiffs point to *nothing*—let alone the particularized allegations required under the PSLRA—to support these contentions. Rather, they retreat to a claim that the LTC unit was "in free fall" by the end of 2015, *see* AC ¶¶ 297–98, suggesting that either CVS somehow knowingly overpaid for the Omnicare LTC business, or that the LTC business deteriorated by a magnitude of billions within the six-month period between the August 2015 acquisition and the first alleged false or misleading disclosure in February 2016. Neither assumption is plausible, nor does either give rise to an inference of fraudulent intent that is "as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

For this and many other reasons, Plaintiffs cannot meet their elevated burden of pleading scienter. Plaintiffs' theory—that CVS committed fraud because it was "scrambling" to meet competition from Amazon in late 2017—is invented from whole cloth, unmoored from any particularized allegation relating to any Defendant, or anyone else at CVS. Faced with their own litany of conclusory allegations as to what Defendants purportedly knew, Plaintiffs toss up their hands and complain that Defendants unfairly "cherry-pick[ed] allegations" to identify the holes in their theory. Opp. 40 n.24. But *this is* their theory, as recited at the outset of the AC, *see* AC ¶¶ 7–23, and again in the introduction of their brief, Opp. 2–3. The AC contains not a *single* alleged fact that could show that any Defendant knew that CVS's disclosures concerning the LTC unit were misleading in any respect. The same is true as to CVS's goodwill accounting, the linchpin of Plaintiffs' claim. Tellingly, Plaintiffs now concede that they "do not dispute anything about Defendants' accounting" for goodwill. Opp. at 31. And with good reason; *no one* has challenged CVS's accounting judgments, including its auditors and its regulators. Without any facts to

support a claim, Plaintiffs simply invent a narrative based upon rank speculation. This is precisely what the PSLRA's heightened pleading standard is designed to prevent.

The AC does not come close to stating a viable claim under the stringent standards that apply to it; it should be dismissed.

## ARGUMENT

## I. PLAINTIFFS FAIL TO PLEAD MATERIALLY FALSE OR MISLEADING STATEMENTS.

Plaintiffs half-heartedly contend that Defendants' statements were literally false, but those assertions are undeveloped and clearly unavailing. Opp. 27–28.[1] Instead, Plaintiffs primarily focus on alleged omissions, asserting that CVS's disclosures concealed the true state of the LTC unit, including that it had purportedly suffered serious customer losses and that its goodwill was impaired. *Id.* at 1–2.[2] But CVS warned investors about problems with the LTC unit throughout the class period, including—in language that Plaintiffs' Opposition *nowhere* acknowledges—that if it did not achieve its forecasts, "it [was] reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed impaired by a material amount." MTD Ex. 1 at 39. No reasonable investor could have been misled in light of these disclosures.

---

[1] To the extent Plaintiffs argue literal falsity at all, they do so based on clear mischaracterizations of CVS's statements. For example, Plaintiffs question "whether CVS 'benefitted' from the Omnicare Acquisition," Opp. 27, but the statement they criticize was that "net revenues" and "gross profit" were positively affected by the acquisition, which they do not claim to be untrue.

[2] Plaintiffs repeatedly assert that CVS improperly combined the LTC unit with its Retail segment to "conceal the problems with the Omnicare LTC business." Opp. 11, 19, 21, 24, 42. But the AC alleges no facts relating to the decision to combine the business segments, let alone any showing that Defendants did so with an intent to "conceal" anything. In fact, in its first Form 10-Q after the Omnicare acquisition, CVS reported the Retail Pharmacy and LTC operating results together because "the operations and economic characteristics are similar." MTD Ex. 6 at 19; *see* MTD 3. Plaintiffs plead no facts to cast doubt on the veracity of that statement. Nor do Plaintiffs explain how, if this decision was made as of that pre-class period filing, it was allegedly motivated by a desire to hide problems with the brand new unit's performance.

3

A.    **CVS's Disclosures Were Not False or Misleading Merely Because They Did Not Include Plaintiffs' Desired Details or Chosen Phrasing.**

CVS made repeated disclosures that the LTC unit faced challenges throughout the entire class period.  MTD 4–11.  For example, in November 2016, CVS informed investors that the fair value of the LTC unit exceeded its carrying value by just 7%.  MTD Ex. 8 at 36.  The next month, then-CFO David Denton told investors that it was taking "longer than expected to realize all the benefits" from the Omnicare acquisition.  MTD Ex. 9 at 4.  In November 2017, CVS warned that the value of the LTC unit had fallen to within 1% of goodwill impairment due to several challenges, including problematic "client retention rates," and that it was "reasonably possible" that "the LTC reporting unit could be deemed to be impaired by a material amount" if it missed its forecasts.  MTD Ex. 1 at 39.  When that materialized and CVS disclosed a $3.9 billion write-down in 2018—during the class period—CVS further warned that the LTC unit "could be deemed to be impaired again by a material amount."  MTD Ex. 2 at 46.

Plaintiffs ignore these disclosures over the course of several years, and instead assert that *all* of CVS's statements were fraudulent because they were not "complete" and omitted various details that Plaintiffs now deem significant.  *See, e.g.*, Opp. 19, 21, 33, 35.  But the law does not require the "completeness" Plaintiffs propose.   Although Plaintiffs rely for their completeness argument on *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996), *see* Opp. 17, they omit the remainder of the discussion from that case, which makes clear that the law "does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be '*so incomplete as to mislead*.'"  *Gross*, 93 F.3d at 992 (emphasis added) (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc)); *In re Bos. Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998) ("[A] duty to disclose arises only where . . . the omitted fact is material to

the statement in that it alters the meaning of the statement.")  Thus, "it is not enough to allege that the statement is incomplete; rather, the plaintiff must state facts showing that, due to its incompleteness, the statement *affirmatively led the plaintiff in a wrong direction* (rather than merely omitted to discuss certain matters)."  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 419 (D.N.J. 2010).

Here, CVS's disclosures about the LTC unit's challenges did not lead investors in the "wrong direction."  To the contrary, they were consistent with the challenges the unit faced, and the challenges that Plaintiffs now base their claims upon.  Defendants warned of slower-than-expected integration beginning shortly after the acquisition.  MTD 4–5.  As things worsened over time, CVS disclosed additional challenges with the LTC unit, including "customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates," and warned that its goodwill could become "materially impaired."  *Id.* at 8; *see id.* at 5–10.  Against this backdrop, no investor could have believed, as Plaintiffs assert, "that there were no downsides or problems integrating the LTC business" absent the "qualifying facts" they claim were required.  Opp. 28.

Plaintiffs also fail to plead any basis to believe the omitted details could have rendered CVS's statements materially misleading.  Contrary to Plaintiffs' suggestions, Defendants do not demand that they "plead evidence" or allege precise "dollar values for each customer loss."  *Id.* at 22, 24.  But the law requires that Plaintiffs plead "*facts that show exactly why* the statements or omissions were misleading."  *In re Pharma., Inc. Sec. Litig.*, 2007 WL 951695, at *4 (D. Mass. Mar. 28, 2007) (emphasis added) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002)).  Plaintiffs have not met this bedrock standard.  Instead, they merely repeat the number of beds that CVS allegedly lost in certain instances, unable to contextualize those numbers by size or

timeframe.  Opp. 23, 25.  But context is key:  If a business loses 1,000 beds out of 2,000 total, that single loss might be material to that business; if it loses 1,000 beds out of 100,000, it is not.  (This is all the more important here, given that the LTC unit comprised only a tiny fraction of the overall revenues for the company.  MTD 3.)  Compounding this problem, Plaintiffs allege nothing to demonstrate that any material losses occurred significantly in advance of CVS's own disclosure in November 2017 that, among other challenges, the LTC unit was experiencing "client retention" issues.  Opp. 23 (arguing that losses "since 2015" or "from 2015–2019 are sufficiently particular); MTD Ex. 1 at 39.  The AC thus provides no basis to infer that CVS's disclosures were false or misleading *when made*.  *City of Roseville Emps. Ret. Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 445 (D.R.I. 2011).[3]

Finally, CVS's statements were not rendered fraudulent because they did not use Plaintiffs' chosen wording to describe the challenges.  A company does not "have a duty to cast the descriptions of its business in the most negative light," *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017), and "the fact that defendants [do] not use the specific terminology preferred by plaintiffs does not mean the[ir] disclosures [are] misleading," *Wu v. Stomber*, 883 F. Supp. 2d 233, 261 (D.D.C. 2012), *aff'd*, 750 F.3d 944 (D.C. Cir. 2014); *see also* MTD 14–16.  Although Plaintiffs insist they are not challenging CVS's phrasing, they continue to argue the statements were misleading precisely

---

[3] *In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002), is not to the contrary.  Opp. 25–26.  Here, Plaintiffs' attempt to characterize "former employees taking accounts" and "customers intentionally defaulting on accounts" as "unusual" is a far cry from the "unusual activity" in *Cabletron*, where a CW made a direct allegation that an individual defendant had asked that CW to store company inventory in his home to facilitate the fictitious sales at issue.  311 F.3d at 25.  The court concluded the heightened pleading standard was met without additional specific information such as "the names used for phony customers" or "the exact dollar amounts" of the fraudulent sales.  *Id.* at 32.  Here, Plaintiffs allege nothing specific to support any allegation of fraud, and instead simply invent it.

because CVS did not use the language or characterizations they prefer. *See, e.g.*, Opp. 2 (conceding CVS's disclosures "suggested that something might be amiss in the LTC Business" but describing the same disclosures as "anodyne"), *id.* at 19 (CVS failed to disclose that business "was hemorrhaging customers"). These are just the kind of "pejorative characterizations" that the law eschews. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994).[4]

## B. Defendants' Opinion Statements Are Not Actionable.

Plaintiffs concede that many of CVS's statements, including the subjective accounting judgment regarding goodwill associated with the LTC unit, were opinions that are actionable only to the extent permitted by *Omnicare*, but their attempt to meet that governing law falls flat.

First, Plaintiffs' claim as to the goodwill statements fails at the threshold because they admit that they "do not dispute anything about Defendants' accounting." Opp. 31. Goodwill is an accounting concept, *see* AC at ¶ 82 n.4, and, thus, CVS's opinion *is* its accounting—which Plaintiffs now admit they do not and cannot dispute. And a statement of a *correct* belief obviously cannot give rise to liability—even if the speaker had an "unclean heart." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 n.2 (2015). Thus, Plaintiffs' concession puts them out of court, plain and simple.

Moreover, even if it were theoretically possible for Plaintiffs to make out a claim despite the goodwill accounting being correct, their allegations miss the mark under *Omnicare*'s strictures.

---

[4] Plaintiffs' attempt to invoke SEC Rule 5.02-3 is unavailing. Rule 5.02-3 provides technical requirements for reporting receivables in a company's financial statements. 17 C.F.R. § 210.5-02.3. A theory that CVS's alleged violation allowed it to "hid[e]" the performance of the LTC segment makes no sense. Rule 5-02.3 requires only that the company break out receivables by type (e.g., trade versus manufacturer/vendor), not by business segment. *See* 17 C.F.R. § 210.5-02.3. In any event, SEC regulations "do not, themselves, provide an independent duty of disclosure" that can be enforced through private suits under Rule 10b-5. *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 249 (D.R.I. 2002). Defendants are aware of no court citing Rule 5-02.3 for the proposition that it can supply the duty element of a Rule 10b-5 suit, and Plaintiffs offer no authority in support of their theory.

Under *Omnicare*, a statement of opinion—such as statements about goodwill—can give rise to lability only if the speaker (1) does not "actually hold[] the stated belief," (2) if the opinion includes specific, embedded facts that "were untrue," or (3) if the opinion "omits material facts about the issuer's inquiry into or knowledge concerning [the] statement of opinion" and those facts "conflict with what a reasonable investor would take from the statement itself."  135 S. Ct. at 1326, 1327, 1329.  The AC fails to meet any of these standards.

As to the first (subjective disbelief), Plaintiffs have nothing to say other than to incorporate their allegations that Defendants acted with scienter.  Opp. 29.  But again, Plaintiffs' concession that the goodwill accounting was correct precludes liability for statements on that topic even if they had "unclean heart[s]"—i.e., acted with scienter.  In any event, for reasons discussed below, Plaintiffs also have failed to plead scienter, so their incorporation by reference gets them nowhere.[5] And as to the second type of *Omnicare* claim (false embedded facts), Plaintiffs make no attempt to argue that they have satisfied that standard.

Instead, Plaintiffs rest their case on the third *Omnicare* prong—alleged omissions going to Defendants' "inquiry into or knowledge concerning" the opinion, i.e., about "how the speaker has formed the opinion."  *Omnicare*, 135 S. Ct. at 1328–29.  But none of the alleged facts Plaintiffs point to fall in that category.  Rather, Plaintiffs simply repeat once again their hyperbolic mantra that the LTC unit was "collapsing" due to "customer exodus, abysmal customer service, ineffective synergies and intentional customer defaults."  Opp. 30.  Plaintiffs believe these "facts" cut against CVS's goodwill opinion, but none of them relates to Defendants' "inquiry into or knowledge

---

[5] Plaintiffs' bootstrapping from scienter fails for yet another reason:  Plaintiffs could plead scienter based on alleged recklessness, *see Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019), but that would not satisfy the first prong of *Omnicare*, which requires that the speaker "knew" that she did not hold the stated opinion, 135 S. Ct. at 1326.

about" the opinion.  Indeed, CVS's goodwill opinion acknowledged that problems with "client retention rates" were incorporated into its evaluation of the LTC unit's goodwill.  "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to an issuer supports its opinion statement."  *Omnicare*, 135 S. Ct. at 1329.  Plaintiffs' allegations are therefore no different from the allegations found insufficient in multiple decisions holding that a plaintiff cannot merely list "events and circumstances . . . that could have suggested the likelihood of goodwill impairment."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017); *see also* MTD 21–24.  Plaintiffs plead no facts showing that CVS misled investors about whether and how it considered these factors in reaching its goodwill opinion.[6]

As discussed above, a statement is not misleading unless it affirmatively points reasonable readers in the "wrong direction."  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d at 419.  And under the third prong of *Omnicare*, omissions do not render opinion statements like goodwill actionable unless they mislead a reasonable investor, "reading the statement in context," about how the opinion was formed—"facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have."  135 S. Ct. at 1332.  But "an investor reads each statement within . . . a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Id.* at 1330.  No reasonable investor reading CVS's disclosures—including that the LTC unit's goodwill was within one percent of being impaired because of problems with "client retention rates"—could have formed a view that the specific facts Plaintiffs allege (such as local or regional client losses) could not exist.  *See, e.g., In*

---

[6] The same conclusion applies to class period opinion statements on topics other than goodwill, only one of which Plaintiffs bother to mention in their Opposition.  Opp. 31–32.  Again, Plaintiffs merely repeat the purported reasons they disagree with the stated belief that CVS could "drive" synergies—not facts concerning how that belief was formed.  *Id.*

*re Dynavax Sec. Litig.*, 2018 WL 2554472, at *6 (N.D. Cal. June 4, 2018) (company's general statements about non-cardiac adverse events in drug trials "cannot reasonably be said to have misled investors into believing that no cardiac adverse events had occurred"). To the contrary, reasonable investors would have understood that the disclosed "client retention" problems meant that such specific instances *did* exist.

### C. Plaintiffs' Arguments on Puffery, Corporate Optimism, and Forward-Looking Statements Fail.

The Opposition fails to overcome that many of the statements at issue are inactionable puffery, expressions of corporate optimism, and forward-looking statements. Opp. 32–38.

Plaintiffs contend that statements that the LTC unit was "performing well" and a "leader in the market" are actionable statements of "current or historical performance." *Id.* at 32–33. But whether the statement concerns the "current state of affairs" is irrelevant to the puffery analysis. *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 300 (D. Mass. 2004) ("The corporate puffery rule 'covers loose optimism about both an issuer's current state of affairs and its future prospects.'"). What matters is whether a reasonable investor would look to these statements in context as "guarantees" about the current performance of the LTC unit in light of CVS's extensive disclosures. *Ong v. Chipotle Mex. Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements of puffery and corporate optimism inactionable unless they amount to specific promises or guarantees). And these statements are indistinguishable from the many similar statements held not to be actionable. *See* MTD 25.

Plaintiffs' assertions that Defendants' statements about "synergies" are actionable because "'synergies' destroyed the LTC Business" are nonsensical and totally conclusory. Opp. 34. Nor would that alleged fact, or Plaintiffs' equally unsupported declaration that "Defendants could not have believed those statements," alter the puffery analysis. *Id.* As Defendants have already

10

established, no reasonable investor could rely on such "rosy affirmation[s] commonly heard from corporate managers" and "loosely optimistic statements," so they are "immaterial as a matter of law." *Orton*, 344 F. Supp. 2d at 299–300 (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)); *see* MTD 24–28.

Plaintiffs assert more generally that statements of puffery or corporate optimism are actionable because "once Defendants spoke they had a duty to make a complete and accurate disclosure." Opp. 32–33.[7] But numerous courts have rejected the argument that puffery gives rise to a duty to disclose. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (rejecting an argument that general announcements of optimism and performance created a duty to disclose); *Ong*, 294 F. Supp. 3d at 232 (rejecting as "circular" plaintiffs' argument that statements of puffery were actionable and created a duty to disclose).

Finally, Plaintiffs attempt to invoke the exception to the PSLRA safe harbor based on "actual knowledge" of falsity, Opp. 37–38, but they have failed to allege such actual knowledge. Even assuming that Defendants were aware of "LTC client losses in key regions and the severe competitive pressure from Omnicare's former employees," *id.* at 37, that would not amount to actual knowledge of the falsity of any forward-looking statements, because no Defendant ever made a statement that denied the existence of these alleged facts. As discussed at length above, CVS disclosed the challenges the LTC unit faced.

---

[7] Plaintiffs attempt to distinguish Defendants' authorities by stating that each one concerns only a statement of future performance. Plaintiffs own parentheticals show their argument is wrong. *See* Opp. 33 n.16 (describing statement that "company 'was arguably' 'well positioned'").

### D. SEC Certifications Are Not Actionable.

Plaintiffs have failed to plead that the SEC filings contain false or misleading statements, and therefore have failed to plead that the certifications themselves are actionable.  MTD 30. Plaintiffs point to a handful of allegations by CWs about customer losses as allegations that Merlo, Denton, and Boratto "had actual knowledge of the false and/or misleading nature of the statements set forth in those securities filings at the time those documents were filed."  Opp. 38.  But those allegations say nothing whatsoever about Merlo, Denton, or Boratto, let alone any of their "actual knowledge."  *See* AC ¶¶ 166–78 (mentioning Defendant Kraft, "upper management," or "CVS Health executives"); *see also infra*, p. 17–18.

## II. PLAINTIFFS FAIL TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.

Plaintiffs do not dispute that the PSLRA sets a high bar for pleading scienter, but their speculative and unsupported theories fail to clear that bar.  *See* Opp. 39.  They point to *no* particularized facts suggesting that *anyone* at CVS ever knew or believed that the company's statements were false or misleading.[8]  Instead, they reiterate their entirely speculative and unsupported allegations, arguing that these satisfy their burden when considered "holistically."  *Id.* at 39, 43, 52–53.  But Plaintiffs' scienter allegations are insufficient to support a strong inference either individually *or* collectively.  *See* MTD 30–40.  "Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA."  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004).  Put

---

[8] Plaintiffs assert that the First Circuit recognizes the group-pleading doctrine, Opp. 39 n.23, but the Supreme Court has acknowledged its continuing validity is an open question after the PSLRA, *see Tellabs*, 551 U.S. at 326 n.6.  The First Circuit declined to resolve the issue, *see In re Cabletron*, 311 F.3d at 40, and the PSLRA requires Plaintiffs to plead scienter as to each defendant.  15 U.S.C. § 78u-4(b)(2)(A).

another way, "zero plus zero plus zero plus zero" still equals zero. *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).

### A. Plaintiffs' Theory Is Premised on Fraud by Hindsight and Pure Speculation.

None of Plaintiffs' allegations about Defendants' knowledge or motive—including those allegations vital to Plaintiffs' entire theory of liability—is supported by anything more than speculation. Plaintiffs do not respond to most of the gaps Defendants identified, *e.g.*, MTD 32–33, but argue instead that Defendants unfairly "cherry-pick[ed] allegations" from the AC. Opp. 40 n.24. But these allegations constitute their scienter theory, as recited at the outset of the AC and their brief. *See* AC ¶¶ 7–23; Opp. 1–3. These allegations constitute a mix of impermissible "fraud-by-hindsight" and speculation—and are spun together to create a fundamentally implausible theory. They are insufficient under the law.

Plaintiffs agree "that allegations of 'fraud by hindsight'. . . do not state a claim for securities fraud." Opp. 18. It is not enough to allege that "because something eventually went wrong, defendants must have known about the problem earlier." *See Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008). Nor may Plaintiffs rely on allegations that "defendants must have known about the severity of their problems earlier because conditions became so bad later on," *Suna v. Bailey Corp.*, 107 F.3d 64, 69 (1st Cir. 1997), or "simply contrast a defendant's past optimism with less favorable actual results," *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008).

But Plaintiffs' claim is premised on their assertion that throughout the entire three-year class period, "the LTC Business had cratered . . . and the goodwill associated with that business was impaired by ***over $6 billion***." Opp. 2 (emphasis in original). In Plaintiffs' view, Defendants concealed this fraud for years, and "[i]nvestors did not learn the truth until February 2019," when

13

CVS took a (second) goodwill impairment.  *Id.*  They infer—without support—that because CVS reassessed its goodwill later in 2018 and 2019, Defendants must have known earlier about the problems that would ultimately trigger the deterioration of the business.  And they harp on the difference between CVS's repeated statements that goodwill was not yet impaired, but could become impaired, to contrast Defendants' past optimism with less favorable results.  That is exactly what the fraud-by-hindsight rule forbids.

To avoid the obvious application of the fraud-by-hindsight rule, Plaintiffs first cite *Boston Scientific* to suggest that the First Circuit is wary of the rule.  Opp. 18.  Not so.  Rather, the First Circuit repeatedly has applied the fraud-by-hindsight principle since *Boston Scientific*.  *See In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017); *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 617 (1st Cir. 2017); *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 457 (1st Cir. 2017); *In re Ariad Pharma., Inc. Sec. Litig.*, 842 F.3d 744, 751 (1st Cir. 2016); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 759 (1st Cir. 2011).  And courts within the First Circuit repeatedly have invoked this prohibition to dismiss complaints.  *See Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 326, 328 (D.R.I. 2004) (dismissing claim premised on write-down of goodwill); *see also, e.g.*, *Pension Tr. v. J.Jill, Inc.*, 360 F. Supp. 3d 17, 27, 30–31 (D. Mass. 2018) (dismissing claim premised on allegedly misleading omissions); *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 121 (D. Mass. 2017) (dismissing claim premised on business's failure to meet forecasts); *In re Genzyme Corp.*, 2012 WL 1076124, at *11, *13 (D. Mass. Mar. 30, 2012) (dismissing claim premised on allegedly misleading omissions), *aff'd*, 754 F.3d 31 (1st Cir. 2014).

Plaintiffs next assert that this case is "*not* fraud by hindsight" because the AC contains other allegations that "could have provided a basis for advance knowledge" of the severity of the

LTC unit's alleged issues.  Opp. 18–19.  This argument rings hollow in light of their repeated attempts to bootstrap CVS's goodwill impairment as an answer to many of the AC's deficiencies. *See id.* at 20, 21 (actionability), 25 (materiality); 27–28 (falsity); 41 (scienter); 44–45 (reliability of CW allegations); 50–51 (arguing that the "large impairment of the LTC business supports a strong inference of scienter").  The addition of other, deficient allegations of scienter—like Plaintiffs' CW allegations, allegations of suspicious trading, or "core operations" allegations—does not change the fundamental nature of Plaintiffs' claim here.  And when those are stripped away, the AC must be dismissed.

In particular, although Plaintiffs repeatedly assert that Defendants were motived to conceal the LTC unit's performance due to potential competition from Amazon and the impending Aetna Acquisition, *id.* at 2–3, 11–13, 48–49, any connection between the LTC unit and the Aetna Acquisition remains wholly speculative, MTD 32–33.[9]  Plaintiffs cite a *Wall Street Journal* article suggesting that CVS was "scrambling" to meet competition from Amazon, and they add an additional layer of speculation that CVS was therefore motivated to commit fraud.  AC ¶ 189.  But courts uniformly recognize that "[i]t is not enough to quote press speculation about defendants' motives."  *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 333 n.77 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).  Here, the article comes nowhere near supporting a strong inference of intent to commit fraud.  It cites no identifiable sources, and contains no statements showing that particular Individual Defendants "recognized" that the Aetna Acquisition was "necessary to . . . protect the Company . . . from Amazon."  AC ¶ 190; *cf.* Ex. 34.  Nor does the article—or any other allegation in the AC—provide any facts supporting Plaintiffs' speculation that anyone, let alone any Defendant, believed that the LTC unit's performance could have affected

---

[9] Nor do Plaintiffs explain how a marketplace development in "fall 2017," AC ¶ 14, could have motivated a fraud dating back to the end of 2015.

the Aetna Acquisition.  Indeed, when the LTC unit took its first, $3.9 billion goodwill impairment charge in August 2018 (during the putative class period) and announced further challenges in the LTC unit, the Aetna Acquisition remained pending.[10]

Similarly, Plaintiffs' speculation that Defendants were motivated to "dribble out" disclosures by a desire to maintain CVS's credit rating cannot support a strong inference of scienter.  Goals "possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating" or "the appearance of corporate profitability," do not suffice.  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  In particular, "a company's desire to maintain a high bond or credit rating" is not enough.  *San Leandro*, 75 F.3d at 814.[11]

Although Plaintiffs now claim that Defendants "repeatedly stated . . . that the Aetna acquisition was necessary to protect the company from the existential threat presented by Amazon," Opp. 48 (citing AC ¶ 190), the cited paragraph simply asserts that conclusion, without any supporting facts (or statements from Defendants) whatsoever.  Equally unsupported is their reassertion that Defendants "knew" that "disclosing the precarious condition of the LTC Business could affect the Company's credit rating," *id.* at 12, which is supported by no allegations of Defendants' knowledge.  And, as usual, Plaintiffs' theory relies on unwarranted interpretations of Defendants' statements.  For example, Plaintiffs assert in support of scienter that Defendants

---

[10] Notably, on the day CVS announced the goodwill impairment in August 2018, its stock price went up by $2.72, or 4.16%.  Tellingly, Plaintiffs include information about CVS's stock price movements on each of the alleged "dribble out" disclosures except this one.  AC ¶¶ 19, 23.  The Court may take judicial notice of CVS's stock price.  *See Pension Tr.*, 360 F. Supp. 3d at 26 n.2.

[11] Plaintiffs rely on *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000), but the Second Circuit has sharply limited the application of that case, concluding it holds only that a specific desire to inflate stock prices and acquire another company "may, 'in some circumstances,' be sufficient for scienter," but "the inquiry is an 'extremely contextual one'" and requires "a unique connection between the fraud and the acquisition." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 n.6 (2d Cir. 2009).  And *Rothman* never decided "[w]hether sufficient motive could be shown *solely* by an allegation" that defendants were influenced by an impending acquisition, which was "not the issue before [it]."  220 F.3d at 94 (emphasis added).

16

"actively misled investors" when Merlo stated in 2018 that "integration work [was] going very well," despite the fact the Omnicare integration was purportedly "failing." *Id.* at 42 (quoting AC ¶ 196). But Merlo's statement referred to *CVS's preparations to integrate Aetna*, not its integration of Omnicare. *See* AC ¶ 196; Ex. 35 at 2–3, 9.

Moreover, as explained, *see* MTD 33–34, that Defendants *did* disclose problems with the LTC unit erodes any inference of scienter. That is particularly true here, because those disclosures occurred *at the same time* as CVS's alleged motivation to maintain its bond rating. *See* AC ¶¶ 17, 19–23; Opp. 49. CVS warned investors just before the Aetna Acquisition was announced that the LTC unit was within 1% of impairment, facing challenges with "client retention rates" and other areas, and that it was "reasonably possible" the LTC unit "could be deemed impaired by a material amount." AC ¶ 301. Plaintiffs' theory that Defendants schemed to maintain CVS's bond rating by disclosing only *some* negative information—instead of remaining silent—makes no sense. Plaintiffs have not met their burden to raise a strong inference of scienter "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

### B. Plaintiffs' Confidential Witness Allegations Fail to Support a Strong Inference of Scienter.

Plaintiffs' CW allegations do not support a strong inference of scienter. As an initial matter, "the sheer volume of confidential sources cited cannot compensate" for pleading inadequacies. *Chubb Corp.*, 394 F.3d at 155. It is the quality, not the quantity, of information that matters. Here, the requisite quality is absent. To that end, Plaintiffs do not dispute that more than half of the CWs never worked at CVS during the class period, and six more departed within the first year. MTD 35, 36 n.7. Nor do they dispute that most CWs were low-level employees who allege client losses only in specific markets, and who were not positioned to judge the effect those losses might have on the LTC unit overall. *Id.* at 36. Nor do they dispute that none of their CWs

alleges *any* contact with Defendants Merlo, Denton, Roberts, or Boratto, *id.* at 37, that only two allege any contact with Rocky Kraft, *id.*, or that "warnings by subordinates or expressions of concern by executives are notably absent" from any CW's account, *id.* at 38 (quoting *Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34, 39 (1st Cir. 2012)).[12]

Instead, Plaintiffs contend that their CW allegations are sufficient when "considered collectively." Opp. 42. This fails for the reason explained above: zero plus zero equals zero. And Plaintiffs' suggestion that they have alleged "a litany of facts demonstrating Defendants' knowledge of customer losses," *id.* at 43, is simply untrue. They cite only to allegations establishing that *one* defendant—Rocky Kraft—"had access to weekly operations reports" and "participated in calls" where relevant topics "were discussed," AC ¶¶ 168, 171, and that other executives "had access to" software that tracked LTC performance, *id.* ¶ 170. But the fact that senior management received reports, including in "deep drill downs," weekly meetings, and other "regular[] communicat[ions]" are "unremarkable," and "lacks the necessary particularity" to support a strong inference of scienter. *In re Biogen*, 857 F.3d at 43 n.7; *see also, e.g.*, *Chubb Corp.*, 394 F.3d at 154 (allegations of regular meetings insufficient); *San Leandro*, 75 F.3d at 812–13 (allegation that confidential sales reports revealed large declines insufficient); *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461–62 (S.D.N.Y. 2010) (allegations that company "compiled . . . performance data and reported its conclusions through the corporate hierarchy" insufficient), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). This is all Plaintiffs' "litany of facts" offers; it is nowhere near what is required to state a viable claim.

---

[12] Plaintiffs assert that *Textron* "is inapposite because that case analyzed materiality and did not refer to CW allegations." Opp. 44 n.29. They are wrong on both counts. The court noted that it "need not decide the materiality issue because the complaint fails adequately to allege scienter" and observed that plaintiffs' complaint "relied on 23 confidential witnesses." *Textron*, 682 F.3d at 36, 39.

Nor are Plaintiffs correct when they attempt to excuse the shortcomings that Defendants have identified in their CW allegations. Although they argue CWs need not have been employed during the class period, they rely on dicta from the district court decision in *Abiomed*. Opp. 42–43. But Defendants relied on the First Circuit opinion from that *same case*, which held that the relevant CWs "did not even work at [the company] during the Class Period so would not have had firsthand knowledge of the state of mind of [company] management during that period." *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015). Plaintiffs also assert "there is no requirement under First Circuit law" that CWs be "of a certain level or stature." Opp. 43. No one said there was—rather, CW allegations do not give rise to a "strong inference of scienter as to senior management if none of the witnesses were senior managers and they had little contact with such managers." *In re Biogen*, 857 F.3d at 43; MTD 36–37.

Plaintiffs' central response to their failure to plead facts showing the timing and significance of customer losses, *see* MTD 34–35, is a footnote reiterating (for a second time) that "scienter is a holistic assessment," Opp. 43 n.27. But that is a non sequitur. And it illustrates the problem with Plaintiffs' defense of their CW allegations, which provide no basis to infer *what specific Defendants knew* or *when they knew it*. *See, e.g.*, *In re Biogen*, 857 F.3d at 42–43; *In re Ariad*, 842 F.3d at 751. Indeed, "[a] statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and form an intent not to disclose it." *N.J. Carpenters Pension & Annuity Fund v. Biogen Idec Inc.*, 537 F.3d 35, 45 (1st Cir. 2008). Context is key in making this showing, because "[p]roblems and difficulties are the daily work of business people" and thus their existence "does not make a lie" out of everything a company says. *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Plaintiffs have not pleaded facts showing that the customer losses were

material such that Defendants' public statements were false or misleading when made, much less that the Individual Defendants actually knew about or believed they needed to disclose the losses.

### C. Plaintiffs' Trading Allegations Fail to Support a Strong Inference of Scienter.

Plaintiffs' trading allegations do not give rise to a strong inference of scienter.  First, as detailed in the opening brief, all of the sales in question were conducted pursuant to Rule 10b5-1 trading plans, which negates scienter.  Plaintiffs fault Defendants for not submitting the trading plans, but Defendants bear no burden here—it is Plaintiffs who must allege sufficient facts to raise a strong inference of scienter.  Courts have rejected scienter allegations based on the existence of 10b5-1 plans even though the plans were not submitted.  *See, e.g.*, *Stiegele ex rel. Viisage Tech., Inc. v. Bailey*, 2007 WL 4197496, at *13 (D. Mass. Aug. 23, 2007).

Plaintiffs also suggest that trading plans adopted during the purported class period are less probative.  While that may sometimes be true, with a class period as long as in this case (three years), it is hardly surprising or nefarious that plans may have been adopted during that time.  "[S]uch a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades" and "strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim."  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007).  Moreover, courts recognize that plans entered during a class period may still rebut an inference of scienter.  *See, e.g.*, *Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 42 (D. Mass. 2018).  The AC alleges no specific facts that could show that the Defendants' trading plans were adopted for improper purposes.

Even aside from the 10b5-1 plans, Plaintiffs' trading allegations fail to create any inference of scienter, much less the requisite strong inference.  By their silence, Plaintiffs concede that no

trading by Kraft or Boratto contributes anything to the scienter analysis. *See* MTD 38. Plaintiffs' own allegations as to Roberts show no increase in trading volume during the putative class period. *See id.* at 38–39; AC ¶ 214. And, as noted in the opening brief, both Merlo and Roberts *increased* their net holdings during the putative class period, a factor recognized as inconsistent with scienter by many cases (including one cited by Plaintiffs, *Mahoney v. Found. Medicine, Inc.*, 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (dismissing for lack of scienter), cited at Opp. 46).[13]

Plaintiffs make much of sales by both Merlo and Roberts in September 2017 and January and February 2019, which they allege were motivated by a desire to avoid the impact of price declines in November 2017 and late February 2019, respectively. Opp. 46. As an initial matter, they have no response to Defendants' argument that sales in September 2017 are too remote to support a strong inference of scienter. *See* MTD 39–40. Rather, they now allege that it is significant that Defendants' transactions and holdings were made up partially of options. Opp. at 47–48. But that actually *undercuts* Plaintiffs' inference of scienter, because it explains that many of Defendants' sales arose from the exercise of stock options that were due to expire. The shares sold in September 2017 were pursuant to options that had been held for years but were due to expire on April 1, 2018. MTD Exs. 22, 27. Similarly, all the shares sold by Merlo and Roberts in January and February 2019 were from options, again held for years, that were set to expire on April 1, 2019. MTD Exs. 23, 24, 28. Sales of option shares that are about to expire are no evidence

---

[13] Plaintiffs' attempt to distinguish these cases is unavailing. Their assertion that shares received through "options awarded" should not count is at odds with their own recognition, just two lines later, that some of the increases in the cited cases were from "option awards." Opp. 47. And in *Mahoney*, the case cited by Plaintiffs, the court considered the individuals' holdings in "stock and options." *See* Mem. of Law in Support of Defs.' Mot. to Dismiss the Am. Class Action Compl. at 21, No. 1:17-cv-11394, ECF No. 27. Similarly, the court in *In re Biogen Inc. Securities Litigation* expressly rejected a distinction between "active" stock purchases and "passive" vesting of previously awarded shares" for purposes of determining whether an individual's holdings increased. 193 F. Supp. 3d 5, 50 n.21 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017). No matter the source of the shares, the point is that Merlo and Roberts could have sold more but chose to remain heavily invested in CVS, facts inconsistent with any inference of fraud.

of scienter. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (insider trading is "not unusual" when the selling defendants "have a limited period of time to exercise their company stock options"); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *41 (C.D. Cal. Apr. 14, 2015); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009). The sales in September 2017, January 2019, and February 2019 also were consistent with these officers' trading patterns prior to the class period. The class period sales were larger in absolute terms only because the number of options set to expire was larger. Plaintiffs plead no inference of fraud that is as compelling as this innocent inference.

### D.   Plaintiffs' Core Operations Allegations Fail to Support a Strong Inference of Scienter.

Plaintiffs assert they have alleged scienter because the LTC unit was purportedly part of CVS's "core operations." AC ¶¶ 331–33; Opp. at 49–50. But a "core operation" is one that is "central to [the company's] continued survival as a business entity." *Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 219 & n.32 (D. Mass. 2018), *aff'd*, 925 F.3d 151 (1st Cir. 2019). Even if the LTC unit is "important," Plaintiffs cannot credibly contend it is "central" to CVS's survival. *See id.* Indeed, the LTC unit is many times smaller than the rest of CVS's Retail segment, which itself comprises only a part of CVS's operations. AC ¶ 100; MTD 3 (immediately before the acquisition, Omnicare reported 26 million prescriptions dispensed and $1.2 billion in net sales, while for that same period, CVS's Retail segment reported 244 million prescriptions dispensed and $17 billion in revenues).

Moreover, courts "have been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus

factor.'" *Metzler Asset Mgmt. GmbH*, 305 F. Supp. 3d at 219.[14]  And while the "importance of a particular item to a defendant can support an inference that the defendant is 'paying close attention' to that item," the inference is "only helpful in establishing scienter if that close attention would have revealed an incongruity so glaring as to make the need for further inquiry obvious." *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharma., Inc.*, 838 F.3d 76, 82 (1st Cir. 2016).  Here, Plaintiffs do not establish the customer losses they identify were material to CVS's business overall such that Defendants' statements were rendered knowingly or recklessly misleading.  *See supra*, p. 5–6; MTD 16–18; *see also In re Biogen*, 857 F.3d at 44 ("core operations" allegations "clearly f[e]ll short" because the allegations did not establish the existence of data that "materially contradicted [the defendants'] statements"); *Metzler Asset Mgmt. GmbH*, 928 F.3d at 165 (same).

### E.    Neither the Size nor the Timing of CVS's Goodwill Impairments Support a Strong Inference of Scienter.

Finally, Plaintiffs argue that the "size" and "timing" of CVS's goodwill impairments bolster their scienter allegations.  Opp. 50–52.  But this is exactly the fraud-by-hindsight theory Plaintiffs disavowed earlier.  *Supra*, p. 13–14.  And, critically, none of the cases that Plaintiffs cite involved a matter of *opinion*.[15]  But like all opinions, goodwill is an "inherently subjective and

---

[14] Indeed, the First Circuit in *Metzler* distinguished *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004), upon which Plaintiffs rely, as having "strong[] evidence of knowledge within the company of fraudulent practices," including an "an email . . . stating that a mid-level vice president ordered a company-wide practice of fraudulently inflating sales numbers."  928 F.3d at 165–66.  No similar allegations support Plaintiffs' claims here.

[15] *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 650 (8th Cir. 2001) (write-down in asset value and past years' earnings); *Rothman*, 220 F.3d at 85–87 (write-down in expected royalties where company had violated GAAP); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 176, 178 (S.D.N.Y. 2010) (write-down of mortgage-related assets where company had violated GAAP); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 594 (N.D. Ohio 2004) (restatement of prior years' financial statements where company had violated GAAP).  Many of these cases also involved write-downs or restatements that were required because the companies had violated GAAP.  Here, however, Plaintiffs "do not dispute anything about Defendants' accounting" for goodwill.  Opp. 31.

uncertain assessment" that Plaintiffs cannot "second-guess" to state a claim for fraud.  *Omnicare*, 135 S. Ct. at 1327.  Thus, neither "the timing [nor] magnitude of . . . goodwill write downs . . . alone . . . contributes strongly" to an inference of scienter.  *City of Dearborn Heights*, 856 F.3d at 622.  And where, as here, Plaintiffs' other scienter allegations are defective, courts have dismissed similar claims premised on allegations about goodwill.  *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019) (noting dismissal of a case where the write-down was $14 billion).  Indeed, in every goodwill case, there is a write-down worth millions or billions of dollars.  But those claims are nonetheless routinely dismissed.

Moreover, Plaintiffs' arguments rely on the false premise that CVS wrote down the LTC unit's goodwill swiftly, "suddenly," or without warning.  *E.g.*, Opp. 52 (implausible that CVS "suddenly realized" goodwill was impaired).[16]  This is wholly contradicted by their own admission that "for the last half of the class period . . . Defendants suggested that something might be amiss in the LTC Business as a result of various industry factors and 'client retention rates.'"  *Id.* at 2.  It is also inconsistent with the series of disclosures CVS made over the course of the class period. CVS warned investors of slower-than-expected integration, problems with "client retention rates" and other factors, cautioned them about repeated downward pressure on the LTC unit's performance forecasts, including the possibility that the unit's goodwill could become materially impaired.  *See* MTD 5–8.  Even after it took the first goodwill impairment in August 2018, it disclosed additional factors that were threatening the LTC unit's performance and it cautioned that it was "reasonably possible in the near term that [LTC] goodwill . . . could be deemed to be impaired again by a material amount."  MTD 9–10; MTD Ex. 2 at 46.  A quarter later, it

---

[16] Plaintiffs also continue to assert that CVS initially told investors that "the 'goodwill' of the Omnicare LTC business [was] $8.6 billion."  Opp. 50 (asserting the amount was later reduced "without explanation" to $6.3 billion).  That is incorrect, as Defendants explained.  MTD 4 n.2.

emphasized the same point, informing investors that the fair value of the unit exceeded carrying value by "approximately 2%." MTD Ex. 15 at 46. These repeated disclosures distinguish this case from all of Plaintiffs' authorities. *See* Opp. 50.

## III.   PLAINTIFFS HAVE NOT PLEADED VIOLATIONS OF SECTION 20(A).

Plaintiffs' Section 20(a) claim fails at the threshold because they fail to allege an underlying violation of Section 10(b). Nor have Plaintiffs pleaded facts that could meet the culpable-participation requirement as to any Individual Defendant, for the same reasons they have failed to plead scienter.[17] But even aside from these failings, there is no control-person liability claim stated as to Defendants Kraft or Roberts. Plaintiffs' Opposition points to no facts showing that either of these persons could exercise control over CVS. That Defendant Kraft was the head of the LTC unit, Opp. 53, does not show that he controlled CVS. *See, e.g.*, *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 246, 227 n.1 (D. Mass. 2004) (head of research department not liable as controlling person); *Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 927, 932 (N.D. Ill. 2011) (head of business unit not controlling person). Nor does the fact that Defendant Roberts spoke to investors mean that he controlled CVS to the extent that he can be held liable for statements made *by others*. *See* Opp. 53.

## IV.   LEAVE TO AMEND SHOULD BE DENIED.

Plaintiffs briefly request an opportunity to move for leave to amend their complaint again if the Court grants Defendants' motion. Opp. 54. The Court should deny their request. Plaintiffs' own authority affirmed a dismissal without leave to amend, *see In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 46 (1st Cir. 2014), and "plaintiffs were put on notice of the deficiencies in the

---

[17] Contrary to Plaintiffs' insinuation, Opp. 54, the First Circuit has not rejected the culpable-participation requirement. *See Aldridge*, 284 F.3d at 85 (declining to reach question).

complaint by the motion to dismiss," *Abiomed*, 778 F.3d at 247.  "If they ha[ve] something relevant to add," they must move to amend their complaint now.  *Abiomed*, 778 F.3d at 247. Indeed, the First Circuit particularly disfavors "allowing plaintiffs to hedge their bets by adding a cursory contingent request in an opposition to a motion to dismiss," as Plaintiffs have done here. *Fisher v. Kadant, Inc.*, 589 F.3d 505, 510 (1st Cir. 2009); *ACA Fin.*, 512 F.3d at 57 (same); *Gray v. Evercore Restructuring LLC*, 544 F.3d 320, 327 (1st Cir. 2008) (same).

## CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice.

Dated:  December 12, 2019                    Respectfully submitted,

Steven M. Farina (admitted *pro hac vice*)
Amanda M. MacDonald (admitted *pro hac vice*)
Michael J. Mestitz (admitted *pro hac vice*)
Elizabeth Wilson (admitted *pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC  20005
Tel:  (202) 434-5000
Fax: (202) 434-5029
sfarina@wc.com
amacdonald@wc.com
mmestitz@wc.com
ewilson@wc.com

- and -

*/s/ Robert C. Corrente*
Robert C. Corrente (R.I. Bar No. 2632)
100 Westminster Street, Suite 710
Providence, RI  02903
Tel:  (401) 270-4500
Fax:  (401) 270-3760
rcorrente@whelancorrente.com

*Attorneys for Defendants*