UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST and INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION FUND OF EASTERN PENNSYLVANIA AND DELAWARE,[1] Plaintiffs, v. CVS HEALTH CORPORATION; LARRY J. MERLO; DAVID M. DENTON; JONATHAN C. ROBERTS; ROBERT O. KRAFT; AND EVA C. BORATTO, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 19-437-MSM-PAS |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Before the Court is the Defendants' Motion to Dismiss (ECF No. 67) a shareholder securities fraud action, brought pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.A. § 78u-4. The Defendants, CVS Health Corporation ("CVS" or "CVS Health") and several executives of both CVS and its

---

[1] This action was originally entitled *Anarkat v. CVS Health Corporation,* but the parties agreed to substitute the then-named plaintiff by court-approved stipulation. (ECF No. 31). The case was filed in the Southern District of New York but transferred to Rhode Island on August 9, 2019. It was filed as a putative class action on behalf of all persons who acquired CVS Health stock between the dates of February 9, 2016 and February 20, 2019, inclusive (the "Class Period"), but at the time of this writing, there has not been class certification.

subsidiary, Omnicare, Inc. ("Omnicare"), contend that the Amended Complaint (ECF No. 38) fails to meet the enhanced pleading standard applicable to lawsuits claiming violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.[2]

For the reasons stated below, the Court GRANTS the Defendants' Motion to Dismiss. (ECF No. 67).

## I.    STANDARD FOR PLEADING

In brief, and explained below, the Plaintiffs allege that CVS Health made statements during the Class Period that were both false and misleading, that the Plaintiffs relied on those statements and, as a result, suffered an economic loss. (ECF No. 38 at 131, ¶¶ 346-61).[3]

"To state a cause of action under § 10(b) and Rule 10b-5, a plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.*, 93

---

[2] The defendants are CVS Health, Larry J. Merlo, David M. Denton, Jonathan C. Roberts, Robert O. Kraft, and Eva C. Boratto (collectively, the "Defendants").

[3] All statements of fact are taken from the Amended Complaint and as is appropriate at this stage of litigation are assumed to be true. Securities fraud litigation, however, demands that the Plaintiffs not only allege sufficient facts but that they plead them with particularity and support them with detailed information. *In re Cabletron Systems, Inc.*, 311 F.3d 11, 27 (1st Cir. 2002) (complaint must specify statements alleged to have been misleading, and the reason they are misleading; beliefs must be backed with sufficient facts to support them).

F.3d 987, 992 (1st Cir. 1996).  A fact is "material only if its disclosure would alter the total mix of facts available to the investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision." *Hill v. Gozani*, 638 F.3d 40, 57 (1st Cir. 2011) (quoting *Cooperman v. Individual, Inc.,* 171 F.3d 43, 49 (1st Cir.1999)).  Actions brought under this rubric must meet an enhanced threshold of pleading, far greater than the conventional "plain statement" subject to Federal Rule of Civil Procedure 12(b)(6).  *Hill,* 638 F.3d at 55.  The heightened pleading demands that the Amended Complaint specify each statement alleged to be misleading and the reason.  *Id.*  In other words, statements made on information and belief must state the particular facts from which that belief was formed.  *Id.* at 55-56.

To defend against a Motion to Dismiss, the Plaintiffs must allege sufficient and adequately detailed facts to show that the Defendants either "consciously intended to defraud" or "acted with a high degree of recklessness." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 82 (1st Cir. 2002).  While the Plaintiffs may rely on inference, that inference must be a "strong" one rather than a merely "reasonable" one, and the facts supporting that inference must be stated with particularity.  *In re Cabletron Systems, Inc.,* 311 F.3d 11, 28 (1st Cir. 2002).  Liability may be shown by either affirmative statements that were false when made or by the omission of information that is so important that what was disclosed is rendered "so incomplete as to mislead." *City of Roseville Employees' Retirement Syst. v. Textron, Inc.,* 810 F. Supp. 2d 434, 443 (D.R.I. Aug. 24, 2011) (quoting *Hill,* 638 F.3d at 57).  The inference of actionable

*scienter* must be "at least as compelling as any opposing inference of nonfraudulent intent." *In re Ariad Pharmaceuticals, Inc.,* 842 F.3d 744, 751 (1st Cir. 2016). If the Court finds no actional misstatements, however, it need not reach the issue of whether the complaint fails to adequately allege scienter. *Hill,* 638 F.3d at 70 n.9; *see infra* n.21.

## II.   BACKGROUND

CVS is a national company, founded in 1963 and headquartered in Rhode Island, traditionally selling retail from nearly 10,000 chain stores across the country. While it is a combination of convenience store and drug store, a large part of its retail business stems from its pharmacies. In recent years, CVS has focused on the pharmacy business, giving vaccinations and housing "minute clinics" that provide immediate medical care to walk-in customers. It has, according to the Amended Complaint, 156 specialty long-term care ("LTC") pharmacies in forty-six states and a LTC repackaging facility. (ECF No. 38 at 2, ¶¶ 2-3). CVS has made acquisitions that both enhanced its medical focus and spawned lawsuits. In 2015, it acquired Omnicare, a national distributor of pharmaceuticals with a leadership role in the skilled nursing facility arena. That acquisition gave rise to this litigation. Then, in 2018, CVS acquired Aetna Inc. ("Aetna"). That acquisition generated other litigation. *E.g., Waterford Township Police & Fire Ret. Syst. v. CVS Health Corporation, et al.,* No. 1:19-cv-00434-MSM (D.R.I.) (ECF No. 1, filed Aug. 15, 2019).

The two acquisitions are related. The Plaintiffs here are shareholders who held CVS stock during the period after the Omnicare acquisition but before the Aetna

purchase. They contend that CVS actively put out false and misleading information in its financial reports and announcements during the Class Period, motivated by the desire to hide its struggling LTC business to ensure that the Aetna purchase would succeed and on terms preferable to CVS. (ECF No. 38 at 6, ¶¶ 15-16). They allege that although CVS acquired Omnicare with the idea of taking over what was at the time a healthy distribution network of pharmaceuticals in the LTC market, mismanagement ultimately spurred substantial client losses. In addition to false and misleading reports designed to hide the problem from investors, the Plaintiffs point to CVS's decision to "fold[]" the LTC business into its front-store retail operations in its financial reports to make it impossible for investors to see the drain. (ECF No. 38 at 6, ¶ 8).

## III.   ANALYSIS

The allegations of fraudulent statements fall into three categories. First, the Plaintiffs allege straightforward false and misleading statements about CVS Health's performance and the success of its operations. Second, the Plaintiffs contend that the failure to disclose the customer losses, and the inadequacy of the disclosure that finally did occur, caused the statements made to be misleading. And third, the Plaintiffs complain that CVS misled investors by omitting unfavorable facts from the goodwill assessments attributed to its LTC business before taking a significant impairment.

A. <u>False Statements</u>

The Plaintiffs point to a series of statements that, except for some thin warnings in 2017 and early 2018 of possible client retention problems, painted a rosy and profitable picture of the alliance of CVS and Omnicare.  The acquisition was undertaken to expand CVS profits by bringing under its umbrella what was touted at the time as a leading presence—indeed, *the* leader—in the LTC skilled nursing facilities market.  Statements by CVS executives issued in 2016 and early 2017 gave no clue that the optimism of the endeavor would not come to fruition.[4]  At most, these statements began to warn that success might take a little longer than predicted.[5]  Plaintiffs contend that it was not until 2018 that CVS executives cast doubt on the ultimate achievement.

The statements can be placed in three categories:

1. That CVS had capitalized on Omnicare's leadership position in the LTC industry and was, therefore, itself a "leader."[6]
2. That the "synergies" it had implemented were working well, when, according to the Amended Complaint, they were driving away customers.  (ECF No. 38 at 40, ¶ 118).

---

[4] The Plaintiffs point to, and the Court recounts, several statements made *prior* to the Class Period, presumably as background and as relevant to the knowledge of CVS executives.  *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 202 (1st Cir. 1999) (events prior to class period may be probative of subsequent practice).  Statements that were made before the class period began, however, are not actionable under the PLSRA.  *In re Int'l Bus. Machines Corp. Sec. Litig.,* 163 F.3d 102, 107 (2nd Cir. 1998).

[5] For example, the warning that the Defendants point to in February 2016 that client loss "could" occur is a far cry from acknowledging that it *was* occurring.  (ECF No. 67 at 16).

[6] Most of these statements occurred *before* the Class Period.  For example, Defendant Kraft boasted at the December 2015 Analyst day that CVS had acquired the "leading pharmacy provider to elderly in chronic care settings."  That year's annual report asserted that CVS Health was a "leading presence in long-term pharmacy care [having] forged a competitive advantage."  (ECF No. 38 at 39, ¶ 116).

   3. Direct assertions that the acquisition was succeeding in expanding CVS's revenues and would continue to be profitable.[7]

With respect to statements during the Class Period, as for the first set—that the new endeavor was, by virtue of the acquisition, a "leader" in the LTC industry—that is more a statement of optimism, or perhaps wishful thinking, than anything an investor would rely on.  Statements of hope are not unusual and are generally considered mere "puffery." *Glassman v. Computervision Corp.,* 90 F.3d 617, 636 (1st Cir. 1996) (noting, however, that the statements were accompanied by "strongly cautionary language"); *Accord, San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 812 (2nd Cir. 1996) (statements that company "should deliver income growth in earnings per share" without disclosing defection of Marlboro smokers to discount brands were not actionable).  Such "puffery" is not actionable as it "encompasses statements that lack the sort of definite positive projections that might require later correction." *In re General Electric Securities Litigation,* No. 19-cv-1013 (DLC), 2020 WL 2306434 at *7 (S.D.N.Y. May 7, 2020) (examples are that a merger was "off to a promising start," that the defendant was "optimistic" about earnings and "expected" its product to perform well, and the like).[8]

---

[7] For example, Defendant Merlo asserted on the 2016 Analyst Day that CVS continued to hold a "leadership position in long-term care with Omnicare."  (ECF No. 38 at 33, ¶ 95).  Those rosy predictions continued into the first quarter of 2017, echoing the ones made on the May 2, 2017 first quarter call.  *Id.*

[8] In a supplemental filing (the "Supplemental Letter"), the Defendants brought to the Court's attention *In re General Electric Securities Litigation*, No. 1:19-cv-01013, 2020 WL 2306434 (S.D.N.Y. May 5, 2020) ("*General Electric*") as relevant to their Motion to Dismiss.  (ECF No. 72).  Claiming "improper gamesmanship" before

[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217 (1st Cir. 1996).[9]  The First Circuit is especially strict in this regard, and vague prospects of future success that prove ill-founded are not sufficiently material unless accompanied by statements implying certainty or by erroneous statements of fact.  *Colby v. Hologic, Inc.,* 817 F. Supp. 204, 209, 211 (D. Mass. 1993).

As a characterization, these first set of statements may have been overly optimistic.  But absent assertions supported by fact that CVS Health at that time had only a small fraction of the market, or was barely a "player," the labeling of CVS as a "leader" can hardly be termed objectively false.  And, indeed, one of the failings of the Amended Complaint is that it does not draw a clear timeline of customer losses; thus, while there is an ample demonstration of customer loss, there is no comparative basis

---

oral argument, the Plaintiffs asked the Court to strike the Defendants' Supplement Letter or disregard *General Electric.*  (ECF No. 74).  The Court denies the Plaintiffs' requests.  The Court did not review *General Electric* in detail until it received the Plaintiffs' response to the Supplemental Letter, alleviating any "gamesmanship" the Defendants may have attempted to gain.

[9] Citing as examples of such "loosely optimistic statements," that a company: was expecting "another year of strong growth," *San Leandro*, 75 F.3d at 811; was "on target toward achieving the most profitable year in its history," *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 213 (4th Cir. 1994); or was "'well positioned' for growth," *In re Caere Corp. Sec. Litig.,* 837 F. Supp 1054, 1057-58 (N.D. Cal. 1993). Additionally, "[p]rospects for long term growth are bright" was also deemed a "loosely optimistic statement." *Colby,* 817 F. Supp. at 211.

for concluding that the customer base had fallen so far behind what it was pre-acquisition as to make the "leadership" label cross from exaggeration into falsehood.

The second set of statements—to the effect that the "synergies" effectuated by CVS were helping to ensure that the Omnicare acquisition was "performing well"—are statements of opinion which are not actionable unless the circumstances raise a strong inference that the speaker knows the opinion is untrue. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015). An example of this is the statement made by Defendant Denton on the third quarter 2016 call that it was only a matter of time before the Omnicare operation lived up to expectations. (ECF No. 38 at 102, ¶ 285). Other statements were merely expressions of hope for future success, such as "I'm confident that we'll capitalize on the synergies once [the needs of residents are targeted]." (ECF No. 38 at 97, ¶ 272 (quoting the CVS Health third quarter 2016 call)). Even though the Amended Complaint is replete with instances of customer loss, the Amended Complaint does not demonstrate a clear connection between customer dissatisfaction and CVS's insistence on migrating its existing retail protocols to the LTC market. While that causal relationship may have existed in the minds of the Plaintiffs' confidential witnesses, there is no direct evidence of its truth. *See City of Roseville,* 810 F. Supp. 2d at 444 (confidential witnesses alleged pattern of increasing cancellations of loans, but the information was not specific enough about percentages). This contrasts with the direct connection between the statements and the actuality in *In re Ariad Pharmaceuticals, Inc.,* 842 F.3d 744 (1st Cir. 2016). There, officials expressed optimism about obtaining a

"favorable label" from the Food and Drug Administration ("FDA") weeks *after* learning that the FDA had rejected ARIAD's proposed label. *Id.* at 753. It was misleading, the Circuit Court held, to continue to put out expressions of hope about an event that clearly was not going to occur. *Id.* Disclosure of the rejection "would have altered the total mix of information available to investors." *Id.* Similarly, in *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72 (1st Cir. 2002), the undisclosed information directly contracted the explicit statements made. There, the company made specific predictions about profitability even with price reductions without disclosing that it had agreed to insulate distributors against price cuts *and* that it had committed to "take back" agreements whereby it would allow returns of unsold inventory. *Id.* at 82-83. In addition, there were allegations that the company knew that those arrangements rendered its reserve insufficient. *Id.* at 83. The district court's dismissal of the complaint was reversed. *Id.* at 85.

The most problematic statements are those in the third category—statements such as those contained in the second quarter 2016 call: "revenues in the retail/LTC Segment increased 16.0%, or $2.8 billion, to approximately $20.0 billion . . . *primarily driven by the addition of the long-term care ("LTC") pharmacy operations acquired as part of the acquisition of [Omnicare]."* (ECF No. 38 at 36, ¶ 106). The Plaintiffs do not contend, however, that the numbers were false; instead, they dispute the implication that the Omnicare-acquired business was continuing to succeed when customers were leaving. Again, the Plaintiffs provide no clear timeline that matches the time when the statements were made to specific customer losses. Nor do they

include sufficient information to determine *how much* of the customer base had left at any given period.  Indeed, they complain that CVS itself did not break out the Omnicare-based operations from the remainder of the retail business.  *Id.* at ¶¶ 109, 113.  That same lack of segregated numbers makes it impossible to discern whether the effect of the customer loss was so significantly inconsistent with the performance statements as to render the latter false.

Moreover, many of these statements are "forward-looking," looking to the future.  Such forward-looking statements are protected under the Exchange Act.  *In re Biogen Inc. Securities Litigation,* 193 F.Supp.3d 5, 40-41 (D. Mass. 2016).  For example, the pronouncements do not speak of CVS Health's "having attracted" large numbers of customers; instead, they speak of its "ability to attract and retain managed care customers and favorable industry trends."  (ECF No 38 at 80, ¶ 239).  In that respect, the statements are different from those held actionable in *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27 (2011).  *Matrixx* involved a cold remedy that, it turned out, had the unfortunate side effect of loss of smell.  There was no disclosure of the reports of consumers who had lost their sense of smell even though the company had received much information from doctors, including some studies of the relationship between the adverse effect and the product.  *Id.* at 31.  What the company did tout was that it was "poised for growth," and predicted that revenues would be up.  *Id.* at 33.  Moreover, Matrixx had issued a press release suggesting that studies confirmed the cold remedy did not cause a loss of smell when in fact it had conducted no such studies.  *Id.* at 34.  Taken collectivity, the statements were such

11

that "reasonable investors" would have viewed the omitted facts as "having significantly altered the 'total mix' of information made available." *Id.* at 47 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

Finally, many statements the Plaintiffs point to are simply too vague to have been material. The second quarter 2016 10-Q, for example, stated that "Net revenues were positively affected by the addition of LTC." (ECF No. 38 at 81, ¶ 241). The statement on the Fiscal Year 2016 call that "the addition of both Omnicare and the Target pharmacies and clinics has *contributed nicely to our* performance . . ." was similarly vague. (ECF No. 38 at 102, ¶ 286) (emphasis supplied). Plaintiffs point to what were basically the same few statements using the phrases "positively affected" and "ability to attract and retain" customers but repeated many times. (ECF No. 38 at 79-84, ¶¶ 239-245). The repetition over the course of 2016 and into 2017 does not make them any less vague nor any more demonstrably false.

### B. Misleading Statements Regarding Client Retention

The Plaintiffs contend that the statements recounted above were, if not false, misleading because CVS failed to contemporaneously reveal the extent of the customer losses it was sustaining. (ECF No. 69 at 19.) The Amended Complaint does not allege affirmative false statements about client retention. Instead, it relies on a theory that the omission of client loss information throughout 2016 and much of 2017 was so fundamental, and the references to "difficulties with client retention" so oblique and late when they began to emerge, that CVS Health's financial statements

12

and pronouncements were misleading. *Id.* (citing *Matrixx Initiatives,* 563 U.S. at 44-45).

There is no question that CVS Health was suffering significant customer loss. Omnicare was at the time of its acquisition a leading distributor of pharmaceuticals to LTC facilities. By bringing Omnicare's pharmaceutical distribution network, and its customer base, into what was later termed CVS/Retail, the CVS corporation intended to harvest the increased revenues previously captured by Omnicare. CVS to that point had served primarily a retail pharmacy clientele.

The Plaintiffs contend that soon after the acquisition, the CVS/Omnicare operation began to lose customers "in droves" for several reasons, all due to CVS's lack of understanding of the LTC customer needs, its attempt to force LTC sales into its templates for retail sales, its inability to maintain good relationships with customers because it substituted knowledgeable Omnicare employees with inexperienced CVS account managers, and its overall mismanagement of the LTC distribution. (*See, e.g.,* ECF No. 38 at 50, 79-81, 104-07, ¶¶ 147, 239, 240, 241, 288, 291, 293, 295). The inability to retain customers was the result, allegedly, of specifically described phenomena:

1. CVS Retail's losing, by both voluntary and involuntary termination, several experienced customer service representatives who then "poached" their former Omnicare clients and brought them to their new employers.
2. Customers reacting to poor customer service by either leaving CVS Health at the conclusion of their outstanding contracts or deliberately failing to make payments, resulting in cancellations of their contracts.
3. CVS imposing new "synergies" on previous Omnicare customers that they did not like, such as centralized billing resulting in reimbursement delays, substituting account managers for customer service representatives, and forbidding district managers from meeting directly with LTC facilities.

4. Attempting to run the LTC distribution network as it did its retail pharmacies, from several different distribution locations.

5. Creating a bottleneck by untimely notifying account managers of new customers.

The Plaintiffs proffer much support of their claim of actual customer losses. They also demonstrate the many opportunities CVS passed up to include mention of increasing customer retention problems. The critical question, however, is whether the rosy prospects painted by CVS and its executives were explicit enough to move past mere "puffery" and to create a positive outlook with sufficient clarity to render those statements misleading without inclusion of the omitted information.

### 1. Substantiation of Loss of Customers

As a backdrop, the Amended Complaint relies on nineteen confidential witnesses ("CWs"), most of them former CVS or Omnicare employees. (ECF No. 38 at 15-22, ¶¶ 46-69). Information from confidential witnesses may be relied upon if the persons are sufficiently described and the information sufficiently detailed to create an inference of personal knowledge of the circumstances described. *In re Cabletron Systems,* 311 F.3d at 29 (adopting criteria of *Novak v. Kasaks,* 216 F.3d 300, 314 (2nd. Cir. 2000)). If they are not named, they must be sufficiently described to support the probability that such a person would have the knowledge alleged. *In re Cabletron Systems,* 311 F.3d at 29-30. Here, the CWs are described by their

14

roles,[10] whether they were employed by CVS or Omnicare,[11] their responsibilities regarding customers,[12] the geographic area or customer base they were affiliated with,[13] and, where otherwise not apparent, the basis of their knowledge.[14]   The

---

[10] CWs 1, 2, 4, 6, and 7 were all consultant pharmacists.  (ECF No. 38 at 15-17, ¶¶ 47, 48, 50, 53-54).  CW3 was a staff pharmacist.  *Id.* at ¶ 50.  CW5 was director of public relations for Omnicare.  *Id.* at ¶ 52.  CW8 was regional director of human resources.  *Id.* at ¶ 55.  CW9 was a district manager.  *Id.* at ¶56.  CW10 was a regional manager.  *Id.* at ¶58.

[11] CWs 1, 3, 14, and 15 worked for Omnicare before the acquisition and Omnicare LTC or CVS Health afterwards.  *Id.* at ¶¶ 47, 50, 62, 65.  CWs 2, 4, 5, 6, 10-13 worked for Omnicare prior to the acquisition.  *Id.* at ¶¶ 48, 51-53, 59-62.

[12] For example, CW2 "served for a time as the primary point of contact for LTC facilities," "assist[ing] LTC facility leaders and staff in identifying, evaluating and addressing pharmacy-related concerns, ….", as did CW 1.  *Id.* at ¶¶ 47,48.  CW3 filled prescriptions for approximately 180 skilled nursing and assisted living facilities."  *Id.* at ¶ 50.

[13] CW1 covered facilities in South Florida, *Id.* at ¶ 47; CW 2 "served over 100 LTC facilities for Omnicare in Ohio," *Id.* at ¶ 49.  CW3 served the Saratoga Springs, N.Y. area.  *Id.* at ¶ 50.  CW7 handled eight accounts in New York and other areas in the eastern region.  *Id.* at ¶ 54.  CW 8 worked in the west region.  *Id.* at ¶ 55.  CW9 worked in Southern California in 2015 and the region around St. Louis, Missouri, from 2016 to 2018.  *Id.* at ¶ 56.  Prior to the acquisition, CW10 managed all the Omnicare pharmacies in Missouri, Kansas, and Southern Illinois.  *Id.* at ¶ 58.

[14] The former employees of Omnicare or CVS Health are described as working in the industry directly for competitors, or still involved in relationships with current Omnicare LTC employees.  CW2, for example, "has kept in contact with individuals who remained with CVS Health after the acquisition[,]" and "has a close relationship with a former high-ranking executive of Omnicare who is now the CEO of Remedi SeniorCare ("Remedi"), an LTC pharmacy provider that competes with the Omnicare LTC business."  *Id.* at ¶ 48.  He also "attended meetings of all Omnicare pharmacy managers in the area where loss of accounts and contract status were discussed."  *Id.* at ¶ 49.  CW6 works for competitor Polaris Pharmacy Services in Fort Lauderdale, Fla.  *Id.* at ¶ 53.  CW11 works for competitor Skilled Care Pharmacy in Mason, Ohio. *Id.* at ¶ 59.  CW12 left Omnicare to work for Wayne's Drugs in Oswego, N.Y., an enterprise affiliated with Harbor Pharmacy, an LTC service provider in Syracuse.  *Id.* at ¶ 60.  He then worked for both Specialty RX and ProCare LTC, both LTC providers in the N.Y./Connecticut area.  *Id.*  CW13, who left an Omnicare affiliate in New York in 2014, "has maintained relationships with his former colleagues at Omnicare, CVS Health and the LTC industry in general."  *Id.* at ¶ 61.  CW14 worked for an Omnicare affiliate until 2017 as a pharmacy technician, then supervising pharmacist and

Amended Complaint describes the network within which information was shared about business development and the customer base, particularly involving dissatisfied customers and those about to leave Omnicare LTC.  All Omnicare LTC employees, specifically including upper management, had access to a tool called SalesForce which "track[ed] customers, including customer performance and losses of accounts."  *Id.* at ¶¶ 57, 64.  In addition, some CWs described regular telephone calls with management to discuss customer gains and losses.[15]  The Amended Complaint ties various factual allegations to specific CWs[16] and therefore, together with the description of who the CWs are, demonstrates a sufficient basis for personal knowledge.  The Court finds that the confidential witnesses are sufficiently described, both as to their roles and their knowledge base, as to warrant reliance on their allegations for purposes of this Motion to Dismiss.

Having sufficiently established the basis of the allegations, the Plaintiffs also establish the significant client retention loss that they attribute to CVS operations after the acquisition.  The customer base the Amended Complaint focuses on is that of skilled nursing facilities.  At the time of acquisition in May 2015, Omnicare was a

---

general manager; he currently works for Prescription Center, a LTC pharmacy.  *Id.* at ¶ 62.

[15] CW14 had weekly calls with account managers and monthly calls with other general managers.  *Id.* at ¶¶ 63, 64.  CW14 maintains that there were regular calls upper management at Omnicare and CVS Health, specifically including Defendant Kraft, to discuss pharmacy performance and customer losses.  *Id.* at ¶ 64.

[16] For example, the information about loss of customers to Remedi is attributed to CW2, who is alleged to have a close personal relationship with the CEO of Remedi.  *Id.* at ¶ 48.  Similarly, CW3, who provided information about the loss of customers in upstate New York (*Id.* at ¶ 122), covered the Saratoga Springs, N.Y. area.  *Id.* at ¶ 50.

leading provider of pharmaceuticals to skilled nursing facilities. The Amended Complaint alleges that seventy-six percent of prescriptions Omnicare filled were for skilled nursing facilities, and only twenty-four percent were for other LTC facilities. Thus, the Plaintiffs argue, the loss of skilled nursing facilities as customers would have a substantially adverse impact on sales. (ECF No. 38 at 24-25, ¶ 76).

The Amended Complaint alleges the loss of thousands of skilled nursing facilities from the customer base of the post-acquisition combined CVS/Omnicare network by former employees who "poached them."[17]  *Id.* at ¶¶ 123, 159. Many of these employees were laid off around the time of the acquisition to reduce payroll. *Id.* at ¶ 149. Many more allegedly left because of poor customer service by the account managers from CVS who replaced the Omnicare customer service representatives.[18] A fundamental problem causing customers to flee, the Amended Complaint alleges,

---

[17] For example, Remedi took a large contingent of Catholic nursing homes, many Ohio customers, and expanded its operations from five to thirty states by taking Omnicare customers. *Id.* at ¶ 159. Cutie Pharmacy and PharmScript took upstate New York customers, and HIS took all the Omnicare nursing homes in Missouri. *Id.* at ¶¶ 122, 123. Polaris gained Omnicare customers making up 20,000 out of its 25,000 beds, all its 2,500 beds in Michigan, half of its 4,000 beds in Minnesota, almost all its 3,500 North Carolina beds, and 10,000 of 14,000 of its beds in Florida. *Id.* at ¶¶ 124, 136.

[18] The Amended Complaint describes specific examples of poor customer service, including the elimination of face-to-face visits between district managers and LTC clients; the substitution of account managers for customer service representatives; the discouragement of direct interaction in favor of an online customer management tool; instituting cumbersome new customer processes that caused long delays and with which pharmacies were too understaffed to cope. *Id.* at ¶¶ 147-151. It alleges that the replacement of the entire management team at Omnicare LTC caused adverse changes in the relationships with LTC facilities. *Id.* at ¶ 158.

was the lack of understanding of the LTC business by CVS which attempted to operate the newly acquired Omnicare LTC facilities network as it operated its retail business.  *Id.* at ¶¶ 155-56.  CVS attempted to impose its "big box" methods, where business was built by advertising, in contrast to the LTC personal relationships Omnicare fostered.  *Id.* at ¶ 150.

### 2.  *Need to Disclose*

The Plaintiffs have pled sufficient facts to demonstrate that during the Class Period, the new CVS Health endeavor was in fact losing customers in large numbers. What remains is to scrutinize their claims that the statements made by the Defendants to their investors were misleading because they failed to disclose that significant development.  This is a two-step process: (a) to what extent did the Plaintiffs fail to disclose the customer retention problem; and (b) did the statements they made obligate them to do so because they were misleading in the absence of the customer information?

### a.  *What CVS Health said about Client Retention*

There are few references to customer retention in the relevant filings. Although the Defendants maintain that they sufficiently warned investors of the challenges involved in integrating Omnicare, including maintaining the customer base, even they can point to few such warnings.  In a statement made in February 2016 and repeated in the Forms 10-K and 10-Q during the Class Period, CVS told investors that client loss "could" occur from any one of several causes.  (ECF No. 38 at 117-18, ¶¶ 312-314).  But this pronouncement simply warned of the lack of

18

guarantees; it did not, again, even hint that *at that time* customer retention had become a problem.  Another statement in December 2016, warned that "the ramp-up in the level of accretion is slightly slower than anticipated."  (ECF No. 38 at 58, ¶ 174).  This statement was directed at the prognosis for future success, and in no way was a warning of past or current client retention difficulties.

It was not until 2017 that CVS Health began to hint that it had been, and was continuing to experience, customer losses in any significant respect.  Defendant Denton made a statement that "bed census [was] lower," but he attributed that to a reduction in the number of beds at skilled-nursing facilities generally.  (ECF No. 38 at 59, ¶ 176).  The later 2017 reports alluded to declines because of actual "customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, *and client retention rates." Id.* at ¶ 301 (emphasis supplied). "Client retention rates" were again referred to as one of the "challenges" CVS faced, and finally in the second quarter of 2018, CVS's financials mentioned an impairment of goodwill that it attributed to "client retention issues" and a softening of the industry.  *Id.* at ¶ 21.

> b.  *Was the Omission of More Explicit Revelations Misleading?*

CVS was under no obligation to spell out the extent of customer retention difficulties simply because it mentioned them.  In *Hill v. Gozani*, the First Circuit held that NeuroMetrix was not obligated to spell out the extent of non-reimbursements simply because it mentioned that there was such a risk.  638 F.3d at 59.  That obligation would arise only if the omission "highly skew[ed]" the total

mix of information available to investors. *Id.* The risk of disaster because of the undisclosed information in *Hill* seems much more likely than the jeopardy faced by CVS Health if a portion of its business devoted to LTC did poorly. In *Hill,* the company knew that it was being reimbursed for procedures that were miscoded as highly specialist-driven when in fact the deserved level of reimbursement was much lower. *Id.* The company knew that its use of neurology-based coding was not sustainable, yet it hid the use of improper codes in its reports. *Id.* That the company did not disclose the *degree* of risk of non-reimbursement was held not sufficient to make the statements misleading. *Id.* at 60.

For the very reasons that render the statements made not per se "false," the failure to disclose customer loss was not misleading. The statements made were not quantified, they were not specific, they did not state or even imply that the customer base was *growing*. If they had, disclosure of the fact that it was shrinking would have been necessary to forestall a deceptive picture. There is nothing directly inconsistent, at least not in a substantial way, between the statements made and the loss of customers sustained. The statements of opinion, and of an optimistic future, could have been sincerely maintained despite a rocky road with respect to the customer base. They did not create an obligation to disclose more than what was stated.

## C. Goodwill

From August 2018 to February 2019, CVS wrote off $6.1 billion in goodwill, eliminating nearly the entire value of the goodwill assigned to its LTC business. (ECF No. 38 at 9-10, ¶¶ 21-24). The Plaintiffs argue that, before taking this goodwill

impairment, the Defendants misled investors by failing to disclose the "substantial, systemic obstacles" plaguing the LTC business, leaving investors to conclude that those obstacles did not exist. (ECF No. 69 at 30).

Goodwill is "an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (quoting J.A. 940 (Business Combinations, SFAS No. 141 ¶ 3j (Fin. Accounting Standards Bd. 2007)). Consistent with this definition, the Defendants defined "goodwill" in U.S. Securities and Exchange Commission ("SEC") filings as representing the "future economic benefits expected to arise from [CVS Health's] expanded presence in the pharmaceutical care market, the assembled workforce acquired, expected purchasing and revenue synergies, as well as operating efficiencies and cost savings." (ECF No. 67-7 at 10).[19]

Under Generally Accepted Accounting Principles ("GAAP"), a company must conduct an annual test of goodwill for impairment. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 611 (9th Cir. 2017) (citing Financial Accounting Standards Board Accounting Standards Codification (ASC) Topic 350: Intangibles—Goodwill and Other, ASC 350-20-35-28). "Impairment is the condition that exists when the carrying amount of goodwill exceeds its implied fair value." *Id.* (quoting ASC 350-20-35-2) (internal quotation marks omitted). Along

---

[19] In ruling on this Motion to Dismiss, the Court takes judicial notice of certain SEC filings made by the Defendants. *See Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 86 (1st Cir. 2008).

with its annual test, a company must conduct an interim goodwill test "if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below [the reporting unit's] carrying amount." *Id.*

"Estimates of goodwill depend on management's determination of the fair value of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait*, 655 F.3d at 110.  Goodwill assessments are thus opinion statements.  *Id.* at 111.  Allegations of the falsity of goodwill assessments must therefore be tested under the standard explained by the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).

In *Omnicare*, the Supreme Court stated that a speaker may be liable for making a false statement of opinion if "the speaker did not hold the belief she professed" or if "the supporting fact she supplied were untrue."  575 U.S. at 185-86. The Supreme Court also noted that sincerely held opinions that are factually true may nonetheless be actionable if the speaker omits information making the statement misleading to a reasonable investor.  *Id.* at 188-89.  Because "a reasonable investor may . . . understand an opinion statement to convey facts about . . . the speaker's basis for holding that view," the Supreme Court noted that "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."  *Id.* at 188.  But "reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."  *Id.* at 189-

90.   "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189.

The Plaintiffs' primary argument is that CVS's goodwill assessments are actionable under *Omnicar*e because the Defendants omitted facts necessary to prevent the assessments from being misleading. (*See* ECF No. 69 at 29–31).[20]

When a plaintiff relies on a theory of omission, the plaintiff must allege "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare,* 575 U.S. at 194. The Supreme Court noted that "was no small task for an investor," stressing "a few crucial points pertinent to the inquiry." *Id.* at 194, 196. First, plaintiffs cannot proceed under this theory without identifying one or more omitted facts. *Id.* at 196. If plaintiffs successfully identify an omitted fact "then the court must determine whether the omitted fact would have been material to a reasonable investor." *Id.* In other words, this inquiry tests whether "there is a substantial likelihood that a reasonable [investor] would consider it important." *Id.* (internal quotation marks omitted). If a plaintiff clears these hurdles, a court must then ask whether the alleged omission rendered the disclosure

---

[20]   The Plaintiffs also seem to suggest that CVS's goodwill assessments are actionable under *Omnicare* as false statements of opinion because "the Defendants did not subjectively believe [the] goodwill assessment[s]." (ECF No. 69 at 29).  In making this argument, they reiterate their arguments for scienter. *See id.*  This argument fails because the Plaintiffs admit that they "do not dispute anything about Defendants' accounting." *Id.* at 31. Goodwill is an accounting concept; and a correct statement does not give rise to liability under this theory. *See Omnicare*, 575 U.S. 175, 185 n.2.

misleading. *Id.* This inquiry must address the statement's context, including facts that were provided as well as hedges, disclaimers, or qualifications included. *Id.* at 196-97.

The Plaintiffs allege that the Defendants' goodwill assessments were misleading because they failed to "disclose the true nature and extent of the problems in the Omnicare LTC business" before taking a goodwill impairment. (ECF No. 38 at 109, ¶ 299). Citing confidential witness testimony, the Plaintiffs argue that at the time of the Defendants' goodwill assessments the Omnicare LTC business was already substantially impaired and the Defendants, as managers of CVS, had actual knowledge of this impairment. (*See* ECF No. 38 at 109-12, ¶¶ 298–304, 306; *see also* ECF No. 69 at 29-30). Without disclosing countervailing facts, Plaintiffs contend that they "infer[ed] from these statements that there were no substantial, systemic obstacles" in the LTC business. (ECF No. 69 at 30). While the Plaintiffs acknowledge that the Defendants made disclosures of customer retention rates and lower occupancy rates starting in 2017, the Plaintiffs assert that the disclosure was inadequate. *Id.*

Defendants counter that the Plaintiffs' allegations at most suggest that there were client losses during the Class Period but lack any quantification of the losses. (ECF No. 67 at 17). More importantly, the Defendants assert that nothing alleged conflicts with what the Defendants disclosed during the Class Period. (ECF No. 78 at 18-19). According to the Defendants, their disclosure starting in the third quarter of 2017 adequately noted that the multi-year cash flow projections for the LTC

24

business declined from the prior year for multiple reasons, including client retention rates. *Id.* at 63. This disclosure was a comparison of the state of the LTC business during the third quarter of 2017 with what was expected as of the third quarter of 2016.

The crux of the Plaintiffs' argument is that the goodwill assessment, which was based on CVS's judgments about client retention and lower occupancy rates, was misleading. While the Plaintiffs claim that CVS knew, before taking its goodwill write-off, about the factors it later pointed to in making its impairment, the Amended Complaint lacks enough to challenge the Defendants' "inquiry into or knowledge concerning" the goodwill assessments. *Omnicare,* 575 U.S. at 189. The Plaintiffs, in hindsight, point to troubling trends with integrating the LTC business and proffer that the Defendants must have known not only of the existence of these trends but also their eventual negative implications. "But a company's knowledge of unfavorable trends does not show that its goodwill balances were misleading as of the time they were stated; previously known trends may later reveal themselves to be of a different magnitude or importance than initially expected." *In re Gen. Elec.*, 2020 WL 2306434, at *14. As discussed, the Amended Complaint provides no clear timeline on when these unfavorable trends became salient, nor when the negative outcomes became unavoidable. The allegations in the Amended Complaint amount to a retrospective disagreement with CVS's judgement, without sufficient facts to undermine the assumptions CVS used when it made its goodwill assessments.

Nevertheless, even if the Court did accept the Plaintiffs' assertion that the Defendants omitted material facts, it would still need to determine whether the omissions rendered the disclosure misleading, considering the disclosure in context, the facts provided, and other disclaimers. *Omnicare,* 575 U.S. at 196. The Plaintiffs cannot overcome this hurdle. CVS did publicly disclose to investors the challenges plaguing the LTC business during the Class Period that could lead to a goodwill impairment. Starting in the third quarter of 2016, after conducting its annual goodwill impairment test, CVS noted that while the fair values of its "Pharmacy Services and Retail Pharmacy" reporting units exceeded their carrying values by "significant margins," the fair value of its LTC business exceeded its carrying values by only 7%. (ECF No. 67-9 at 36). It further noted that as September 30, 2016, the balance of goodwill for the LTC Business was approximately $6.3 billion. *Id.* In October 2015, goodwill of $8.6 billion was allocated to CVS's Retail Pharmacy and LTC Business. (ECF No. 67-7 at 10).

CVS disclosed the results of its next annual goodwill impairment test in its 2017 third quarter filing, noting that while "the fair values of [its] Pharmacy Services and Retail Pharmacy reporting units exceed[ed] their carrying values by significant margins . . . the fair values of [its] LTC . . . reporting unit[] exceeded [its] carrying value[] by approximately 1% . . . . (ECF No. 67-2 at 39). CVS went on to state:

> [T]he results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%. Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates. Our

26

projected discounted cash flow model assumes future script growth from our senior living initiative and the impact of acquisitions. Such projections also include expected cost savings from labor productivity and other initiatives. Our market multiple method is heavily dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers. If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount.

*Id.* This disclosure was repeated in CVS's 2017 annual report. (ECF No. 67-14 at 22). And later, in May 2018, the Company disclosed in its quarterly report that the:

LTC reporting unit continues to face challenges that may affect our ability to grow the business at the rate that we had originally estimated when we made the acquisition of Omnicare and when we performed our prior year annual goodwill impairment test. These challenges include customer reimbursement pressures, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and client retention rates.

(ECF No. 67-15 at 42; ECF No. 38 at 110, ¶ 302).

Months later, in August 2018, CVS announced that an interim goodwill impairment test was required. (ECF No. 67-3 at 45-46). This interim impairment test "showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in [the] $3.9 billion pre-tax goodwill impairment charge" for the second quarter of 2018. *Id.* at 46. With these results, CVS again noted the disclosed challenges facing the LTC Business and stressed the possibility of another impairment to goodwill. *See id.* at 46. Challenges continued, causing CVS to conduct an interim goodwill impairment test in December 2018 that led to the $2.2 billion goodwill impairment charge in the fourth quarter of 2018. (ECF No. 67-4 at 29).

Considering this disclosure in context, no reasonable investor could have believed that the issues the Plaintiffs claim were omitted did not exist.  The Plaintiffs have therefore failed to adequately allege that the Defendants made misleading statements of opinion in their goodwill assessments during the Class Period.

### D. <u>Motion to Amend</u>

In their opposition, the Plaintiffs requested leave to amend their Amended Complaint if the Court grants any portion of the Defendants' Motion to Dismiss. (ECF No. 69 at 54).  This request is denied.  *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) ("The plaintiffs do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA.")

### IV.   CONCLUSION

In summary, the Plaintiffs have not met the pleading burden applicable to lawsuits claiming violations of Sections 10(b) of the Exchange Act and Rule 10b-5 to withstand a motion to dismiss.[21]  The Court therefore GRANTS the Defendants' Motion to Dismiss (ECF No. 67).[22]

---

[21] As noted above, without finding any actionable misstatements, the Court need not address the Defendants' alternate theory that the Amended Complaint fails to adequately allege scienter.  *See Hill*, 638 F.3d at 70 n.9.

[22] Because the Section 10(b) claims fail, the Plaintiffs' Section 20(a) claim necessarily fails as well, as derivative of the Section 10(b) claims.  *See In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44-45 (1st Cir. 2017); *Hill*, 638 F.3d at 70.

IT IS SO ORDERED:

_____
Mary S. McElroy
United States District Judge

Date:  February 11, 2021